# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SCLAFANI, and individual; and PATRICIA SCALFANI, an individual,<br><br>        Plaintiffs,<br><br>vs.<br><br>AIR & LIQUID SYSTEMS COPRPORATION, et al.,<br><br>        Defendants. | Case No.<br>2:2012-cv-03013-SVW-PJW |

## EXPERT OPINION OF RADM DAVID P. SARGENT, Jr. USN (Ret.)

I am a retired Rear Admiral of the United States Navy, in which I served between 1967 and 1999. I began my active Navy career in 1967 after receiving a Bachelor of Science degree in Mechanical Engineering from Cornell University and receiving a commission in the Navy through the Naval ROTC program. Upon commissioning in the Navy, I attended the Pacific Fleet Engineering Officer's School in a course focused on the operation and maintenance of engineering plants of World War II era steam propulsion warships. In 1974, I received a Master of Mechanical Engineering degree from the Naval Postgraduate School, Monterey, California. In addition, I am a licensed Professional Engineer (Mechanical) with extensive operational experience in ship engineering, ship maintenance and at-sea operations, and I am a Navy Certified Acquisition Professional.

My assignments from 1967 until 1988 were primarily involved with the operation and maintenance of Navy warships. Thereafter, I held a variety of program and technical management positions in the Naval Sea Systems Command program offices where I was responsible for the design, construction, fleet introduction, in-service support, and modernization of various classes of warships. Upon selection to Rear Admiral in 1994, I was assigned as Commander, Naval Surface Warfare Center, a diverse organization of research laboratories and engineering stations responsible for research and development of all technical aspects of Navy surface ships and submarines. My final assignment before retirement in October 1999 was as Program Executive Officer (PEO) for Aircraft Carrier, Expeditionary Warfare and Auxiliary ships. In that position, I had overall responsibility for all matters relating to both the technical and programmatic details of design, construction, delivery and support of both new and in-service aircraft carriers, expeditionary warfare and auxiliary ships of the Navy.

I am now the President of Sargent Enterprises, Inc. which includes several business units: SEI Associates, a consulting business that provides technical and management advice to marine industries; SEI Marine Technologies LLC; a company that operates and maintains various test and demonstration craft for R&D companies involved in developing new equipment and hull

forms for future high performance ships, SEI Vistas LLC that is focused on the introduction of innovative durable construction technologies for maritime related uses, and SEI Properties LLC, a business unit involved in the management and renovation of rental properties, I have served for many years in active leadership of the American Society of Naval Engineers (ASNE) and in 2001 was elected to serve as President ASNE, and served two consecutive two-year terms. I continue as an active member of ASNE leadership. I am also a member of the Sigma Xi Engineering Honorary Society, the American Society of Mechanical Engineers, The Cornell Engineering Alumni Association, the U.S. Navy League and several other professional societies. I serve on the Board of Directors of the Maritime Technology Alliance.

I have been asked in this case to summarize the military environment on Navy warships, Navy organization, responsibilities, ship design and acquisition processes and related documentation, and the use of asbestos on Navy ships as these subjects relate to David Sclafani, and to offer opinions specific to the potential for David Sclafani to have been in proximity to asbestos containing materials while serving on active duty in the United States Navy from approximately January 1960 until June 1963.

### The Military Environment on Navy Warships is Unique

The military setting on Navy ships is unique and distinct from the civilian environment, and also differs somewhat from that of land based military organizations. All have management structures, but the military command hierarchy of rank is well defined and the accountability and authority of the Navy ship's Commanding Officer approaches absolute. This authority is based in Federal statute and Navy Regulations and Instructions. Over time, there have been evolutionary changes in these to incorporate changing societal values, but the authority of the individual in command remains constant. When routine "orders" are given, prompt and appropriate response is expected. The failure to obey a lawful order is a punishable offense and, depending upon the situation (wartime, national emergency, misconduct), the punishment can be severe. Individual freedoms that are common to civilians are not as universally applied to military members. Civil liberties indeed exist, but they are tempered to the strict Uniform Code of Military Justice and the requirements of individuals serving in the Country's national defense. Military personnel are required to wear uniforms with rank insignia, and to maintain strict physical and grooming standards. Military members ask for permission to leave the presence of a senior in a normal setting, and juniors initiate salutes when in uniform. Although the actual work tasks and duties performed by Navy sailors may be similar to some civilian trades, Navy uniformed personnel are not civilians "doing their job."

The normal day in the military also differs dramatically from the civilian environment. Whereas civilians have a "normal work day" of 8 or so hours and then return to their "private life", in the military the "work day" is 24 hours long. Here again that 24 hour day is unique for Navy personnel on ships for several reasons. First, a warship is the only weapons system in which the operators live within the machine they operate. Armies live in barracks or tents, store their weapons in ammo magazines, and conduct their daily military tasks in locations separate from both of those. On Navy ships, the vessel is the "barracks", the "magazine, the "weapon", and the military "work site", and is continuously in motion on the oceans of the world. Thus, sailors on a Navy ship must continuously operate the ship's propulsion system and "hotel services"

equipment that make the ship safe and livable, but must also spend a "military work day" focused on training and maintenance of the "weapon systems" to be battle ready. These two requirements are done concurrently on ships through a "watch bill" in which personnel operate the ship on a twenty-four hour basis, and a "work day" of approximately eight hours. The "watch bill" is typically comprised of four hour "watches" during which the "engineers" operate the propulsion, electrical generating, and other systems that make the ship mobile, safe and livable, the ship's officers and "deck force" stand navigation and ship control watches on the bridge, and the "operations crew" continuously operate the ships radars, communications, and other electronics equipment. There are typically three "watch sections", thus allowing the personnel to be "on watch" for four hours, and "off watch" for eight hours. Those watch sections in an "off watch" status during the daylight hours use that time to accomplish the "military work day" focused on training and readiness of the war fighting equipment. Thus, a typical day for a sailor on a Navy ship includes two four hour "watches" and up to eight hours of "military work". In addition to the concurrent "watches" and "military work", a Navy ship typically conducts "underway replenishment" every three or four days. During these "underway replenishments", warships rendezvous in close formation with Navy oilers, ammunition ships, and food cargo ships and transfer large quantities of fuel, ammunition, and food to that are needed to keep the ship operating and battle ready. These "underway replenishments" typically take three to four hours to complete, and require "all hands" to be involved to operate the special equipment and to handle the food, ammunition, and cargo coming aboard. These "underway replenishments" can occur at anytime of the day, and are often done in the middle of the night. Therefore, a Navy sailor's "typical work day" is very busy with "watches", "work", and "special evolutions" such as replenishment.

## Navy Warships are Unique and Complex

Warships must be designed to meet very demanding performance requirements such as high speed and firing of weapons, the ability to safely carry and employ a vast array of explosives and ammunition, the ability to operate for long periods at sea without support or replenishment, and do all these missions both in peacetime and in combat.

Navy warships are some of the most complex machines ever designed and constructed. They are high-speed, floating, heavily armed communities that must support hundreds of crew members and a vast array of complex systems for months at sea. Ships are the only machines sufficiently large, complex and mobile that the operators must live inside the machines they operate. Thus, warships of all sizes and types contain all the facilities of a community plus multiple the armaments and ammunition. Major characteristics and capabilities include a sturdy and survivable hull form, high performance propulsion systems, electrical power generation to support all needs, fresh water distilling systems, food storage, preparation, and eating spaces as well as clean up, living spaces, laundry services, medical spaces, library, firefighting and damage control capabilities, and many other services.

Navy warships must be designed to operate effectively in very harsh and hostile environments, to survive battle damage and fight again, and to meet demanding speed and maneuvering requirements. Over time, the specific types of enemies, weapons and combat which Navy ships must face have changed, from a focus on surface-to-surface combat involving heavy guns to

greater use of aircraft and missiles. These changes have created fundamental changes in the design and construction of Navy vessels.

Beginning in and following World War II, the aircraft carrier became the most significant type of surface ship. An aircraft carrier must use high speed to create wind over the deck to launch and recover aircraft. The result was an overall increase in the speed demanded of Navy vessels of all types, whether carriers or the support and escort vessels that accompany them. To meet these demands, Navy designers had to develop significantly higher horsepower propulsion plants. It was also imperative that this increased power be achieved without significant increase in either the size or the weight of the propulsion plant, since increased size and weight would require even more horsepower.

The unique aspects of Navy warship design and development placed other requirements on the Navy establishment. Since there was no U.S. industry that either designed or assembled these high performance propulsion plants, the Navy itself had to undertake the design of these complex and state-of-the-art warships, and had to develop ways to verify the performance and reliability of these new designs. To accomplish this, the Navy maintained an engineering establishment with many different engineering specialties. The Navy had the most diverse and advanced engineering workforce in the nation. Additionally, verifying the performance of these new propulsion designs required that the Navy engineering organization build large shore-based laboratories in which they assembled and operated prototypes of these propulsion plants. These prototypes served many uses including verifying performance, validating reliability, and developing optimum operating procedures.

## Navy Vessels – Concept to Operational – The Process

### *Cost and Feasibility Studies*

Prior to the 1940s through the 1970s, the design of a Navy warship started with the establishment of Navy war fighting requirements at the national level. Examples included requirements such as the need to ensure that sea lanes in international waters cannot be denied by an enemy, the need to detect and neutralize hostile ships, submarines, and aircraft that might threaten U.S. or allied coasts, the need to transport and operate aircraft near enemy territory, and the need to transport and debark Marines anywhere in the world. From requirements such as these, various ship concepts were formulated.

Rigorous feasibility studies were done on these concepts by both seasoned Navy operators and by experienced ship engineers and designers to validate and mature the concepts, and to develop initial cost estimates for budgeting and congressional funding requests. A final ship concept design emerged, describing such parameters as approximate physical size and displacement of the ship, what weapons and sensors would be used aboard, what speed it was required to achieve, what range it must be able to achieve without refueling, and how long it must operate at sea without replenishment. Typically, it took a year or more to progress from a defined new warship requirement set to an agreed-upon concept design to meet those requirements.

*Preliminary Design*

The next step in the creation of a new warship during the time periods in question was the conversion of the concept design into a preliminary design package that contained sufficient details of the structure and all ships systems to allow engineers to verify that the ship would meet established requirements. During preliminary design Navy engineers determined all equipment arrangements, the weight and stability of the ship, a detailed understanding of the ship's displacement and powering requirements, and a much better cost estimate. Work included investigation of details such as identification of what materials and technologies existed or could be developed in time to achieve the performance of each system, and ensuring that these technologies and design details could in fact be manufactured and integrated into a completed warship were considered and addressed.

The preliminary design phase was accomplished by dividing the very complex ship into many groupings and sub-groupings such as hull design, propulsion, electrical, deck equipment, messing and berthing, medical, navigation, weapons, sensors, and auxiliary systems to name just a few. During this preliminary design phase, engineers had to develop and document the performance, configuration, and location of each system and piece of equipment that is required to meet the overall ship performance requirements.

The preliminary design also had to comply fully with extensive Navy warship design General Specifications and other design guidance developed over many decades of experience. Examples include aspects such as how much damage the ship must be able to experience and still remain operable, what levels of shock from battle damage equipment must withstand and remain operational, and what fire fighting and damage control capabilities must be included in the design. At the completion of the preliminary design and related documentation, the Navy was confident that the ship and all included systems and equipments will function as designed and would meet the war fighting requirements.

Although the time to develop a preliminary design varied greatly depending on the size and complexity of the warship, typically for a destroyer-type warship, the preliminary design required six months to a year and thousands of man-years of engineering work.

*Development of the Contract Design package:*

The next phase in progressing from a ship design to an operational warship was the contract design process, in which the preliminary designs were converted into documentation of proper format and sufficient details for use in the government acquisition contracting process. In essence, this effort was to "design" the procurement contract.

The complex ship systems and subsystems described in the preliminary design were typically comprised of a myriad of individual mechanical and electrical components connected together in intricate ways. During the contract design phase, Navy engineers had to confirm that sources exist from which the specified materials, equipment, and consumables could be obtained. However, usually there was no one source from which the Navy could obtain these complex warship systems and subsystems. Rather, sources had to be identified for individual components

RADM Sargent in Sclafani, David for Crane Co.

that can later be assembled into the Navy's complete systems.  Thus, the Navy typically had to procure, for each vessel, countless individual components from dozens of individual suppliers and sources.  Examples of components associated with just the propulsion systems on Navy warships include specific types of steel and fasteners, pipe and fittings; pumps, valves, turbines, condensers; electrical motors, generators, switchboards and controllers; gauges, meters, alarms; boilers, condensers and reduction gears.  During World War II and well into the 1960s, virtually all equipment that was to be installed in warships was procured by the Navy and provided to the building shipyard as government-furnished equipment.

This detailed designs of all equipment, subsystems, systems, and the entire ship also had to fully comply with the plethora of Navy design guidance developed from previous experience.  For example, the Navy set and followed internal standards and requirements regarding such matters as levels of redundancy necessary to preclude single point of failure, standardization of consumables and spare parts amongst different equipment, systems and with other warship classes, crew operating environmental requirements such as temperature, noise, lighting, equipment labeling, standard Navy identification and labeling of decks, doorways, compartments, and equipment, and housekeeping matters such as heating and ventilation, food storage preparation and serving, and laundry requirements.

The contract design package when complete included the entire set of Ship Specifications with detailed design information, the contract plan for procuring all equipment as well as contracting for ship construction, and the multitude of individual requests for proposals that were required to describe every piece of material, equipment and subsystem that had to be procured to allow construction of the warship.  The development of the contract design package involved multiple government decisions.  Examples include decisions which were subject to various Navy and other federal guidance and regulations, such as Federal Specifications, Federal Acquisition Regulations and Defense Federal Acquisition Regulations.

The Navy developed specifications called, since the 1950s, Military Specifications (MILSPECs) for use in the contract design package.  Thousands of MILSPECs were developed for various specific materials, equipment, components, books, manuals, label plates, etc.  These MILSPECs presented very detailed descriptions of what the government required when procuring the items covered by the MILSPECs, including requirements such as chemical composition, dimensions, required testing and performance demonstrations, required labeling, packaging and shipping requirements, and similar content.  These specifications typically cross-referenced and invoked other specifications.

The Navy maintained the responsibility to develop the MILSPECs and other standards for the manufacture and supply of equipment used in the construction, maintenance and repair of Navy ships.  Specifications for any equipment intended for use aboard Navy ships were drafted, approved and maintained by the Navy.  Once promulgated, only the Navy could make changes or modifications to those specifications.  MILSPECs were prepared by hundreds of Navy engineers highly qualified in specialty areas such as, among many other things, valves, pumps, steam turbines, gas turbines, reduction gears, ship propulsion, electrical systems and auxiliary equipment.

RADM Sargent in Sclafani, David for Crane Co.

This specification system was initiated in the 1930s and was expanded in both scope and detail for use in the procurement of the large number of complex warships procured in the World War II timeframe and since. The technical specifications system always included a disciplined revision and change process to ensure technical specifications were kept current and reflected changing requirements, technology, materials, and other related updates.  Manufacturers of components such as pumps, valves, and electrical equipment procured by the Navy for use in warships were required to comply with technical specifications in all details in order for the Navy to accept the equipment being manufactured, tested, and shipped.

Navy specifications were communicated to vendors such as Crane Co. when the Navy (or private entities, such as shipyards or design professional firms retained by the Navy) issued Requests for Proposal (formerly called Invitations for Bid) for the manufacture or supply of certain equipment.  Compliance with the standards and specifications issued for equipment supplied for ultimate use aboard Navy ships was directly monitored by Naval Machinery Inspectors under both of the following divisions: (a) Machinery Inspectors under the Bureau of Supplies and Accounts worked on-site at vendor facilities, such as Crane Co.'s manufacturing facilities; and (b) Machinery Inspectors under BUSHIPS/NAVSEA carried out their responsibilities at the shipbuilding yards. The Machinery Inspectors ultimately worked for the Secretary of the Navy or the Secretary of War. These Inspectors exercised primary, front line control and direction over the work performed for the Navy by original equipment manufacturers, regardless of whether the equipment was being constructed or supplied pursuant to a Navy or private contract.  Crane Co. equipment could not have been installed aboard Navy vessels unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications.

The incredible level of detail contained in these specifications is necessary to ensure complete and common understanding between the government and vendors of what it is the government is requires and is committing to pay for, to ensure commonality across systems with similar components, and ensure that replacement parts, equipment and consumable materials, some provided by different manufacturers, will all perform as desired.  An acquisition contract typically invokes many different MILSPECs, various technical documents such as drawings prepared by the Navy's Bureau of Ships.  Taken together, the contract and the incorporated materials present all details of what the Navy requires.  It is through this detailed acquisition process that misunderstanding, or rejection at the time of government acceptance inspection, is avoided.  This process also minimizes contract disputes between the government and industry vendors.

Developing the contract design package is comparable to the effort required if a team was to simultaneously develop the detailed designs and contracts to construct a small city including all the required services such as utilities, hospitals, restaurants, and the like.  Because of the complexity and thoroughness required, development of the contract design package for a warship such as a destroyer typically took two years or more to complete, with thousands of man-years or effort from engineers, logisticians, contract and legal specialists.

For many vessels, the Navy retained experienced naval architecture and marine engineering firms to act as "Design Agents" under contract to the Navy.  These Design Agents assisted in both the creation of the Navy contract design package and the interface with construction

shipyards and equipment suppliers after aware of construction and procurement contracts. Use of Design Agents provided the Navy with a common means of expanding its own in-house technical staff. Design Agents both acted under and imposed on equipment suppliers strict Navy specifications. In short, the task of the Design Agent was to ensure completion of work in accordance with all applicable specifications to the same extent that would have occurred had the Navy supervised the work directly.

### Detailed Design

From the 1940s through the 1970s, the next step in the creation of a new warship was the conversion of the contract design into detailed design package that contains sufficient details of the structure and all ships systems to allow the building shipyard to build the ship and integrate all specified equipment in accordance with Navy requirements and specifications. The detailed design was typically accomplished by the construction shipyard – whether a Navy yard or a private yard – after the construction contract was awarded. During this detailed design phase, engineers had to develop and document in detail the exact location, mounting details, and interface details of each system and piece of equipment in the total ship. Even where not performed by Navy personnel, the detailed design was also overseen by Navy representatives.

### Warship Construction

The final phases in getting the warship operational included the construction, testing and trials, and acceptance by the Navy. During World War II and up until the mid-1960s, some Navy warships were constructed at Naval Shipyards and others were constructed at private shipyards under Navy contract and supervision. Once the Navy selected a construction shipyard, that shipyard was required to comply with all details of the contract in the procurement of material and equipment, the construction of the ship, the testing of equipment, subsystems, and systems and the demonstration to the government that all systems functioned properly. All construction and testing was overseen on a daily basis by the on-site Navy Supervisor of Shipbuilding team. Formal acceptance of the completed warship was recommended by the Navy Board of Inspection and Survey only after the members of the Board had witnessed successful sea trials of all systems.

Construction of even a relatively small warship such as a destroyer typically took three to five years, with larger ships requiring somewhat longer. During World War II, the construction time for warships was dramatically reduced through the concerted efforts of both the Navy and the industries involved. The Navy working with the War Production Board instituted standardization of warship designs, central procurement of ships' major equipment, propulsion machinery, and ordnance, and allocation of key materials. Industry went to twenty-four hour workdays with multiple shifts, prefabrication and automation of many processes, and multiple other time saving methodologies. The Navy and the U.S. Navy worked closely with the shipbuilding industries and increased the number of shipyards capable of constructing destroyers and larger ships from approximately a dozen in 1940 to around 70 in about two years.

### Asbestos and Insulation in the Navy

As described above, the Navy requirements for aircraft carriers and other warships of World War II and later included the need for significantly higher speeds than previously. This high speed required was achieved by the design and development of sophisticated high-pressure steam propulsion systems. Steam pressures of 600 pounds per square inch and the ability to superheat the steam to 850° F became the norm.

The key to meeting this high horsepower demand was the development by the Navy of much high pressure, superheated steam propulsion plants. With the increased pressures came greatly increased temperatures and thus the need for much improved insulation technologies, both for plant efficiency and for operator comfort and safety. These "high power density" propulsion plants increased the operating temperatures of machinery and piping, and they created a need for greatly improved thermal insulating and lagging materials. The Navy maintained significant expertise in the important areas of heat transfer and insulation. As a consequence, the thermal insulation needs associated with various equipment and systems was a significant issue in the design of Navy vessels from a number of perspectives. Thermal insulation served a number of important functions, as set forth, for example, by the 1947 version of the Navy's BUSHIPS Manual, a technical reference for Navy engineers, where Chapter 39 was devoted entirely to "Thermal Insulation":

REASONS FOR INSULATING

(1) In every power plant there is a heat loss from all heated surfaces and a heat flow to all cooled surfaces. Heat flow may occur in three ways; by conduction, by convection, and by radiation.

(2) Conduction is the heat flow from one part of a body to another part of the same body, or from one body to another with which it is in physical contact, without displacement of the particles of the body. This manner of heat flow is most important in insulation as it is the low conduction which results in the greatest temperature differential between a hot insulated surface and the atmosphere (as in steam piping insulation), or the relatively warm atmosphere and a cold surface (as in refrigerating plant insulation). Heat transfer from insulated pipes or large blanketed or cemented surfaces (turbines, evaporators, etc.) to the outer surface of their lagging is included in this mode. Conduction is associated with solids and comparison of materials in this respect is measured by a factor called the "thermal conductivity" which expresses rate of conductivity in British thermal units (B.t.u.) per inch of thickness per hour per square foot of area per degree Fahrenheit temperature differential.

(3) Convection is the transfer of heat from one point to another within a fluid, gas or liquid, by circulating or mixing of one portion of the fluid with another. These currents are produced by warm fluid being displaced by heavier cold fluid. It is of interest to note that convection reduces the effectiveness of air space insulation unless such space is very small.

(4) Radiation is the method of heat transfer by which a hot body gives off energy in the form of radiant heat which is emitted in all directions. Radiant heat, like light, travels in straight lines and with the speed of light. The surface condition greatly affects the ability of a body to radiate heat. Dull, dark, rough finished surfaces are the best radiators. Conversely, bright, shiny, smooth surfaces are good heat reflectors.

(5) In order to minimize the transfer of heat from or to a body or surface which is hotter or colder, respectively, than the surrounding atmosphere, thermal insulation is applied. This thermal insulation is a material or materials of low thermal conductivity. (See par. 39-2 (2).) While increasing the economy of the plant, thermal insulation also reduces the quantity of air necessary for ventilating and cooling requirements and prevents injury of personnel due to burns from contact with hot parts of apparatus. It also insures more uniform heat distribution within equipment. Another function of thermal insulation is to prevent "sweating" of cold surfaces on which atmospheric moisture condenses thus causing undesirable dripping as well as accelerated corrosion of the metal. Insulation must be sufficiently effective to reduce heat losses and lower surface temperatures to a degree which will permit habitable conditions in a specific space or compartment.

Due to the importance of heat transfer and insulation in Navy propulsion plants and aboard Navy vessels more generally, the Navy maintained significant expertise in these areas. The BUSHIPS manual and other documents issued and continuously updated by the Navy contained detailed instructions for the insulation by Navy shipyards or private contractors of various systems and equipment, including, primarily, the miles of piping associated with thermal systems aboard vessels. The Navy's specifications provided detailed instructions as to the specific insulating materials to be used, and also as to the amounts of those materials and the manner in which they were to be applied.

A 1946 article entitled "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels" summarized the extent of and reasons for the Navy's use of asbestos-containing insulation during World War II:

The chief reasons for the wide use of amosite felt and pipe covering in naval work are its low thermal conductivity, light weight, strength, and refractoriness. When the felt and pipe cover were first developed, we were still building vessels under the Washington Treat of Limitations in Tonnage, and every pound saved meant that much more armor, guns or ammunition for a given displacement, to say nothing of more economic operation for the weight involved in insulation.

Amosite pipe covering weighs about 14 pounds per cubic foot, with a temperature limit of 750 degrees F. as compared to magnesia with a weight of 16 pounds per cubic foot [. . . .]

The development of amosite felt started in 1934 when a need existed to secure a thermal insulation lighter in weight and thermally more efficient than the materials (blocks and cement or asbestos blankets) which were then being used in destroyer turbines. . . .

RADM Sargent in Sclafani, David for Crane Co.

10 of 24

Originally amosite was used only for turbine insulation, but it proved so satisfactory that its field of application enlarged to include insulation of valves, fittings, flanges, etc. From the initial destroyer, it has been used on almost all the destroyers built since that time and on all other combat vessels built since before the War.

Pipe covering was a later development in late 1935 and early 1936. Due to the manufacturing problems involved, it took a longer time to evolve into a satisfactory shape, and its first use on naval vessels was in 1937. Since that time its use has spread markedly and it was used on the great majority of naval combat vessels built during World War II.

The Navy's dictation of the methods and materials for insulation of thermal systems took various forms. As noted above, these included serial iterations of the BUSHIPS Manual's Chapter 39 on "Thermal Insulation." The Navy also prepared and imposed upon Navy design engineers General Specifications for Machinery for Vessels of the United States Navy. Those specifications included an entire section – Section S39 – governing "Thermal Insulation for Machinery and Piping." Beginning in 1962, the Navy began issuing a Military Standard intended "to amplify the general requirements for insulation of piping, machinery, uptakes, and mechanical equipment covered in the General Specifications for Ships of the U.S. Navy or in ships specifications.

The Navy and/or its Design Agents prepared for the builders of Navy vessels detailed drawings and plans showing the precise methods and materials for insulation of various systems and equipment. Those documents – referred to as "Insulation and Lagging Schedules" – implemented the overall requirements of the General Specifications, and they provided the actual instructions to the personnel applying insulation as part of an integrated system of temperature control and energy conservation consistent with the Navy's needs in the operation of its vessels. These plans are referred to as "Insulation and Lagging Schedules." They were typically developed for each class of warship. The Insulation and Lagging Schedules included details on the materials to be used, the thickness, installation procedures, and finishing details for tens or even hundreds of tons of thermal insulation materials to be applied by Navy and private shipyards. Once the Navy selected a construction shipyard, that shipyard was required to comply strictly with all Navy specifications, plans and drawings in the application of insulation and lagging to systems and equipment aboard Navy vessels.

Throughout the World War II and post- World War II era, the vast majority of thermal insulating materials used aboard Navy vessels contained asbestos. Asbestos-containing materials offered many advantages over previous or alternative materials in meeting these needs. They were relatively light compared with previous materials, had better insulating properties, did not require excessive thicknesses in application, were more durable and were resistant dissolving in or absorbing salt water. The materials also served as fire protection in an environment in which fires were an ever-present danger.

Thus, the use of asbestos in thermal insulation allowed the Navy to design and field propulsion systems that met the demanding war fighting requirements of World War II and later. The importance of asbestos to Navy warships is attested to by the fact that it was assigned a high

RADM Sargent in Sclafani, David for Crane Co.

priority in the U.S. government's critical materials allocation process. Asbestos was in short supply during World War II, and its use was controlled through the War Production Board process. A very large percentage of asbestos was allocated to the needs of the Navy and U.S. Navy for use in insulation for ship construction.

The Navy's demands for asbestos-containing insulation were extraordinary. For example, the Insulation and Lagging schedules for destroyers of the Navy's *Sumner* and *Gearing* classes – relatively small vessels of which the Navy constructed approximately 200 during World War II – specified nearly 24 tons of asbestos containing thermal insulation be installed. A 1979 Department of the Navy letter recites the following estimates of the quantities of asbestos containing thermal insulation aboard different types of Navy vessels of the 1950s and 1960s:

| | |
|---|---|
| Destroyer - DD | 87,634 lbs |
| Guided Missile Cruiser - CGN | 123,770 lbs |
| Submarine – SSN | 62,465 lbs |
| Replenishment Oiler – AOR | 78,515 lbs |
| Large Harbor Tug – YTB | 6,858 lbs |

Larger vessels, such as aircraft carriers and battleships, required multiples of those amounts. Taken as a whole, in both new construction and overhaul, the Navy applied thousands of tons of asbestos containing thermal insulation materials aboard its vessels from the 1930s through the 1970s.

Due to the complexities of the ship design and construction process, and the global nature of the Navy's approach to selection and procurement of insulation and lagging materials, manufacturers of components such as Crane Co. were not consulted by the Navy with respect to insulation of their equipment. Moreover, they had no control over the types and quantities of insulation products to be used in conjunction with their equipment, nor could they even be certain whether or not any insulation would, in fact, be applied to their equipment due to the variety of circumstances and potential uses of the original equipment once aboard a Navy vessel.

Above and beyond the tens or hundreds of tons of thermal insulation used, other asbestos materials were ubiquitous aboard Navy vessels. These materials included electrical insulating materials, flooring, refractories and sealing materials. Among other things, military specifications for gasket and packing for centrifugal pumps required the use of asbestos-containing materials.

## Written Materials Regarding Equipment Supplied to the Navy

Technical specifications referenced in the procurement documents for shipboard components in propulsion, auxiliary, electrical, weapon and all other systems have, since at least the 1940s, included detailed requirements regarding all written materials supplied with the components. Manufacturers were required to supply drawings and plans, and at times draft technical manuals for equipment. The applicable specifications included strict instructions regarding the labeling of and packaging of the components themselves, and for all technical documentation that was procured with them.

To achieve its objective of ensuring that, in form and content, the marking on equipment filled the specific informational role, for the specific Navy audience and environment, the Navy developed precise specifications as to the nature of any markings, communication or directions affixed to or made a part of any equipment supplied by OEMs for ultimate use aboard Navy ships. OEMs would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to vary or to deviate in any respect from the Navy specifications in supplying equipment, including affixing any type of warning or caution statement to equipment intended for installation in a Navy ship, beyond those specifically required by the Navy without prior discussion and express approval by the Navy.

The Navy likewise had precise specifications as to the nature of written materials to be delivered with equipment supplied by OEMs to the Navy. This written material included a variety of formats such as design drawings, system schematics as well as operator reference materials to assist the equipment operators in operating, servicing and maintaining such equipment and to assist the Navy training establishment to develop instructional materials and courses. Through specifications, the Navy required that certain equipment be supplied with a defined number of copies of one or more instruction books or technical manuals. The Navy typically developed these technical manuals by including development of a draft manual as part of equipment procurement contracts. The draft manuals were required to be submitted to the Navy for detailed review and feedback. Once the draft manuals were found to be acceptable to the Navy, a BUSHIPS number was assigned and the manual became an official BUSHIPS document the contents of which were controlled by the Navy. The term "manufacturer's instruction books" that is found in many Navy rate training manuals refers to these Navy developed and approved technical manuals.

Navy personnel or those of the Navy's Design Agents participated intimately in the preparation and review of these instruction books and technical manuals in a standardized format used by the Navy. These manuals included safety information to the extent – and only to the extent – directed by the Navy. Manufacturers of components and equipment were not permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to include any type of warning or caution statement in instruction books or technical manuals, beyond those required and approved by the Navy without prior discussion and approval by the Navy. The Navy dictated and, itself or through its Design Agents, reviewed and approved the contents of all technical manuals, including any cautionary language or emphasis. The Navy approached this process for review and approval of technical manuals in an exacting manner. It often created lengthy memoranda detailing word-by-word line edits to the content of technical manuals submitted for approval, including the wording of instructional material and warnings. Review of and comment upon instructional materials by the Navy's Design Agents was similarly detailed.

The reasons for the Navy's detailed control over and review and approval of all written communication regarding equipment it procured was to ensure consistency of that information with the overall goals and priorities of the Navy in its operations. The Navy employed millions of uniformed and civilian personnel aboard thousands of vessels and at hundreds of land-based facilities around the world. The information provided with regard to equipment had to be

consistent with the Navy's overall evaluation of the appropriate types and level of information its personnel required to efficiently perform their job responsibilities under a variety of circumstances. In addition, written communications regarding work practices, including safety precautions and equipment, had to be coordinated with the training of Navy personnel, the physical circumstances in which they performed their work, and the tools, protective devices and equipment and other materials available aboard Navy vessels and at Navy installations.

Uniformity and standardization of any communication, particularly safety information, are critical to the operation of the Navy and Navy ships. The Navy could simply not operate safely and effectively if personnel were trained differently, using inconsistent information received from different manufacturers. If every equipment, structural steel and pipe manufacturer were allowed to decide on the need for, and provide its own safety and health warnings (including those concerning asbestos insulation that might be used on or around its product), inconsistent warnings would certainly have resulted. If each were to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances. Therefore, the Navy's detailed specification of what warnings were required, both on equipment and in technical documentation, was logical and necessary.

Asbestos-associated health issues, and the insulation materials with which the Navy associated those issues, were ubiquitous in Navy environments. Tens of tons of asbestos-containing insulation were present in mechanical and other spaces aboard Navy vessels. Consistent with its objective to ensure that all documentation to which its personnel were exposed be thoroughly consistent with its overall training and procedures, the Navy would not have permitted equipment suppliers to place asbestos-related warnings on packaging or containers for components such as pumps, valves, electrical equipment or related parts or items supplied during the 1940s, 1950s, or 1960s. Similarly, the Navy would not have permitted equipment suppliers to place asbestos-related warnings in any literature or documentations supplied with equipment for Navy ships during the 1940s, 1950s and 1960s.

In this regard, it is useful to consider the Bureau of Ships Technical Manual. This manual, prepared by the Navy and updated periodically, was intended to provide guidance and information to Navy personnel on various matters. The Manual contained specific chapters covering numerous topics.

A review of examples of Chapter 47 relating to pumps and Chapter 95 relating to gaskets and packing reveals that even when drafting its own manuals governing activities widely known to involve asbestos, the Navy nowhere included any cautionary language regarding – or even any mention of – any potential hazards relating to asbestos. In addition, neither Chapter 39 of the BUSHIPS Manual relating to insulation nor Chapter 48 covering piping (and valves) likewise contained reference to such hazards during the 1940s, 1950 and 1960s. Similarly, the Navy's system-level manuals of the type described above likely did not, even where they pertained to propulsion or other systems on which the Navy required shipbuilders and Navy personnel to install large amounts of asbestos insulation, contain asbestos-related cautions to Navy personnel.

The absence of asbestos-related cautionary language in the Navy's own manuals for equipment or for asbestos-containing materials is consistent with the notion that the Navy did not accept, and did not permit, asbestos-related warnings in technical manuals relating to individual pieces of machinery or equipment, and is fully consistent with my experience that such warnings were not neither sought nor welcome from manufacturers of such items.

Consistent with these objectives, practices and procedures for the design, inspection and procurement of equipment for use on Navy vessels, the Navy would not have permitted Crane Co. or other equipment suppliers to place asbestos-related warnings on packaging or containers for components such as pumps, valves, electrical equipment or related parts or items supplied during the 1940s, 1950s, or 1960s. Similarly, the Navy would not have permitted Crane Co. or other equipment suppliers to place asbestos-related warnings in any literature or documentations supplied with equipment for Navy ships in the 1940s, 1950s and 1960s.

### Navy Organization

Consistent with the sweeping scope of its mission and responsibilities, the Navy is comprised of many different organizations, each of which is specialized in focus, talent and experience. These organizations work together in accomplishing the very complex and unique sequential efforts from the defining of Navy war fighting requirements, designing ships and weapon systems that will meet these requirements, and contracting with industry and other government agencies to procure the vast array of required equipment and materials and to construct and test warships. This diverse Navy organization can be described in four major groupings:

-- Secretary of the Navy (SECNAV) and the Chief of Naval Operations (CNO) Headquarters staffs (CNO staff is referred to as OPNAV)

-- Operational Fleets

-- Technical Bureaus (now called Systems Commands)

-- Staff Corps (Medical, Dental, Legal, etc.)

*SECNAV and CNO Staffs*

The staffs of Secretary of the Navy (SECNAV) and the Chief of Naval Operations (CNO) are involved in the analysis of national Navy war fighting needs, and the development of specific war fighting requirements that must be met. At a top level for warships, these requirements include such things as the types and numbers of ships needed; the capabilities for these ships such as speed, weapons to be installed; types and numbers of aircraft to be embarked; the range and duration at which these ships must be able to operate independently at sea without replenishment; and the reliability of systems that must be guaranteed in order for the Navy to meets its war fighting mission. These staffs are manned by a combination of experienced uniformed Navy personnel with extensive Fleet experience and career civil servants.

### *Operational Fleets*

The Operational Fleets are the Navy's war fighters who control and operate the various ships, aircraft, and other equipment in the Navy and Marine Corps. There are several numbered Fleets (*e.g.*, Sixth Fleet, Seventh Fleet) with regional geographic responsibilities around the world. These Operational Fleets have always worked closely with the headquarters staffs in the development of Navy warship required capabilities.

### *Technical Bureaus*

The Bureau System was established in 1842 to provide the Navy with necessary technical and management control. By the early 1940s, there were six bureaus:

- -- Bureau of Naval Yards and Docks
- -- Bureau of Ships (BUSHIPS)
- -- Bureau of Supplies and Accounts (BUSANDA)
- -- Bureau of Ordnance and Hydrography
- -- Bureau of Medicine and Surgery
- -- Bureau of Aeronautics

In the 1950s, a Bureau of Weapons (BUWEPS) was formed by merging the Bureau of Ordnance and the Bureau of Aeronautics. In the 1960s the bureau system evolved several times into what are now called the Systems Commands where BUWEPS was divided into the Naval Air Systems Command and Naval Ordnance Command (NAVORD), and BUSHIPS was divided into the Naval Ship Systems Command (NAVSHIPS) and the Naval Electronics Systems Command. In 1975, another reorganization took place in which NAVSHIPS and NAVORD became the Naval Sea Systems Command (NAVSEA). During this organizational evolution the Bureau of Supplies and Accounts (BUSANDA) became the Naval Supply Systems Command.

### *Navy Staff Corps*

The various staff corps of the Navy are comprised of professionals such as doctors, dentists, and lawyers who support all aspects of the Navy in their respective specialties.

The Bureau of Medicine and Surgery (BUMED) has always had a very significant role in both the design and operation of Navy warships, in addition to its fundamental role in the overall health and well-being of Navy personnel. All ships have medical facilities integrated into the design, both for normal medical support of the large crews, and for treatment of battle injuries. Small ships such as destroyers have a modest infirmary space and other spaces that can be converted for medical use while at battle stations. Larger ships have much greater medical capability, with aircraft carriers being fully equipped with several operating rooms for surgery and large hospital wards for sick and wounded personnel.

BUMED also plays a very significant role in the operation of Navy ships. BUMED establishes the medical policies and procedures, both preventive and curative, which are utilized on all Navy warships. Additionally, the crew of each warship includes medical personnel who are involved

in preventive medicine, crew training, health inspections, and treatment of ailments and injuries. Small ships such as destroyers typically have one highly trained enlisted hospital corpsman assigned, and large ships have both physicians and hospital corpsmen. Aircraft carriers have numerous medical doctors and surgeons with various specialties.

## Responsibilities in Warship Design and Construction

Responsibilities for the various functions associated with warship design and construction in from the World War II period to the 1970s were as follows:

### *SECNAV and OPNAV Staffs*

Working closely with the Operational Fleets and Bureaus, these staffs had the responsibility for defining Navy war fighting requirements, developing concepts of operations and ship concepts, and requesting congressional authority and funding to build war ships.

### *BUSHIPS*

The Bureau of Ships was comprised of a broad assortment of engineers and technical personnel, and was responsible for all technical aspects of Navy warships. Included were the preliminary designs of ships, the detailed design of ships, subsystems and equipment, and development of the contract design package. BUSHIPS, aided by BUSANDA, had the responsibility to develop the contract design package and the myriad invitation for bids required to actually procure and construct the ships. All U.S. Naval Shipyards were under the direct command of BUSHIPS, as were the resident Supervisors of Shipbuilding who performed the same government supervisory functions at civilian shipyards. Thus, BUSHIPS was responsible for both the new construction and future repair and overhaul of ships at both Navy and private shipyards. BUSHIPS and BUSANDA each had on-site Navy inspectors at various vendors' plants that were responsible for verifying that the vendor complied exactly with all provisions of that vendor's procurement contracts. BUSHIPS was also responsible for the design development of equipment repair and maintenance standards and procedures, and for the development of Navy Specs/MILSPECs that related to ships and ship equipment.

### *Other Technical Organizations*

Warships are equipped with many different weapon systems, aviation capabilities, and the accompanying electronic equipment.  Therefore, many other Navy and national technical organizations provided support to BUSHIPS in all phases of design and construction.  Principal supporting organizations included the Bureau of Ordnance, the Bureau of Aeronautics, and the Naval Electronics Command.  Also key in the development and testing of warship propulsion equipment and systems were the National Boiler Test Lab and the Naval Ship System Engineering Station.

*BUSANDA*

The Bureau of Supplies and Accounts was comprised of a variety of professionals with specialties in areas such as government contracting, logistics planning, financial and business management, warehousing and parts distribution management, etc. BUSANDA, in addition to on-site and continuous support of BUSHIPS and other technical bureaus, also provided all Supply Corps officers to the Operational Fleet. The Supply Corps officers were assigned to both ships and Fleet staffs and were responsible for planning and managing all shipboard messing, berthing and spare parts management. BUSANDA was responsible for maintaining and managing the vast inventory of spare parts, consumables, documentation, and replacement equipment for the Navy.

### Qualified Product Lists

As described in prior sections of this report the Navy procurement process for all component parts, materials and equipment for the construction, maintenance and repair of warships has since at least the early part of the twentieth century, been a very detailed contractual process that specifies through the use of Navy Specifications and later Military Specifications detailed requirements of composition, performance criteria, acceptance testing, labeling, documentation, packaging and shipping of components, systems and consumable materials that are being procured. Construction, maintenance and repair of Navy ships has always involved the participation of many different industries, facilities and teams both military and civilian that are located throughout the world. Virtually all of these organizations were required in some way to procure and utilize products and materials that must meet many different Navy or Military Specifications. Requiring each activity that is responding to Navy contracts to individually find vendors of products and materials that meet Navy and Military Specifications would be prohibitively time consuming and costly, particularly in times of high volume construction and repair such as the World War II period.

The Navy developed the Qualified Product List (QPL) process to identify and catalog specific vendors, products and materials that met all of the demanding requirements of many different Navy Specifications and later Military Specifications. The QPL process required manufacturers and/or vendors of materials and products who felt that they had a product of products that fully met all requirements of a particular Navy of Military Specification to submit samples of those products/materials to Navy testing laboratories for examination and testing to determine if they were in full compliance with that Specification. The Navy compiled and published QPLs for many Navy and Military Specifications that gave the details of which manufacturers, vendors and specific products were in compliance with those specifications. The Navy thus essentially "pre-certified" to government activities, manufacturers, shipyards, or other business that if they utilized a specific product listed in a QPL that the product complied with the specification. The Navy had a process to periodically re-verify QPL listed products and to update QPLs to reflect new or modified information, products and materials.

Each QPL corresponded to one specific Navy or Military Specification and was numbered and labeled to clearly describe that correspondence.

### David Sclafani's Navy Service and Proximity to Asbestos-Containing Products

I have reviewed the documents listed in the table below, and offer the following summary and opinions specific to the potential for David Sclafani to have been in proximity to asbestos containing materials while serving on active duty in the United States Navy from approximately January 1960 until June 1963. My opinions in this case are based on my knowledge and experience as a career Navy officer, degreed and licensed professional engineer, experienced ship engineer and commanding officer, and certified Navy acquisition professional. Each of these opinions is given to a reasonable degree of professional certainty.  In reaching my opinions, I have reviewed the documents listed in the table below.

| Documents reviewed |
| --- |
| Summons & Complaint |
| Plaintiff's Responses to Crane Co. Special Interrogatories |
| Plaintiff's Work History Sheet |
| National Personnel Records Center (NPRC) Navy personnel records for David Sclafani |
| David Sclafani's Statement in Support of VA Claim |
| Transcript of a deposition of David Sclafani Volumes 1-6 taken between 26 June and 17 July 2012 |

I also referred to the public websites www.navsource.org, and www.hazegray.org  that provide some historical information on Navy ships.

From reading David Sclafani's Statement in Support of his VA Claim, the NPRC Navy personnel records of David Sclafani and the deposition testimony of David Sclafani I learned that David Anthony Sclafani was born on 31 May 1942 in Springfield VT. I learned that David Sclafani enlisted in the Navy in January 1960 and served on active duty in the Navy until June 1963.  I learned that David Sclafani advanced to the rate of Fireman (FN) while serving on active duty in the Navy.

The NPRC records show that David Sclafani enlisted in the Navy on 12 January 1960 and completed Recruit Training at Naval Training Center Great Lakes IL from January 1960 until April 1960 and was then enrolled as a student in Navy Boiler Tender Class "A" School (BT "A"). The NPRC records show that David Sclafani was dropped from BT "A" School in June 1960 due to lack of interest and was transferred to *USS MORTON (DD-948)*. The NPRC records show that David Sclafani was in an unauthorized absentee status from *USS MORTON* between 26 January 1961 until 12 February 1961 and was returned to Navy custody by civil authorities.

The NPRC records show that David Sclafani was transferred from *USS MORTON* to *USS ROGERS (DD-876)* at some point but does not indicate on what dates he was transferred and reported.  The NPRC records show that David Sclafani was released from active duty at Naval Station San Diego CA on 6 June 1963 in the rate of Fireman (FN).

The NRPC records show that David Sclafani was advanced from Fireman Apprentice (FA) to Fireman (FN) in November 1960.

RADM Sargent in Sclafani, David for Crane Co.

David Sclafani testified that after completing recruit training he attended the Navy BT "A" School for about six weeks but did not pass the "A" School test. He testified that he was then assigned in *USS MORTON* in approximately May or June of 1960. He testified that he was assigned to the after fire room in *USS MORTON*. Sclafani testified that while serving in *USS MORTON* he believed the ship made two deployments to the western Pacific. David Sclafani testified that while serving in *USS MORTON* the ship was in dry dock and a shipyard overhaul for approximately four months in Long Beach.

David Sclafani testified that while he was serving in *USS MORTON* the ship had an oil fire in the after fire room while operating off the coast of California. He testified that he was not in the fire room at the time of the fire but was in the damage control party that responded to the fire. He testified that *USS MORTON* went to the shipyard and dry dock for repairs.

David Sclafani testified that he was transferred from *USS MORTON* to *USS ROGERS (DD-876)* in approximately January 1963 and served in *USS ROGERS* for approximately six months. He testified that he was assigned to the after fire room in *USS ROGERS*. Sclafani testified that while serving in *USS ROGERS* the ship operated locally at sea off the California coast.

In reviewing the websites listed above, I confirmed the following.

- *USS MORTON (DD-948)* was a steam turbine propelled Forrest Sherman Class Destroyer commissioned in May 1959.

- *USS ROGERS (DD-876)* was a steam turbine propelled Gearing Class Destroyer commissioned in March 1945.

Opinions: Having reviewed the documents cited above and based upon my familiarity with Navy ships and operations generally and with *USS MORTON (DD-948)* and *USS ROGERS (DD-876)* in which David Sclafani served in particular, I offer the following opinions to a reasonable degree of professional certainty regarding David Sclafani's work environment and proximity to asbestos containing materials while serving on active duty in the U.S. Navy.

1. David Sclafani's duties as a Fireman Apprentice (FA) and Fireman (FN) serving in *USS MORTONG (DD-948)* and *USS ROGERS (DD-876)* placed him in a working environment in close proximity to many piping systems and other propulsion equipment that the Navy specified be insulated with asbestos containing thermal insulation.

2. David Sclafani's duties as a Fireman (FN) serving in the fire room in *USS MORTON* during shipyard overhaul periods placed him in a working environment in which shipyard workers would have been removing and reinstalling asbestos containing thermal insulation on many piping systems and equipment incident to overhaul of those systems.

3. The U. S. Navy required the application of large amounts of asbestos containing insulation and lagging to piping, valves and other equipment located in the engineering spaces in *USS MORTON (DD-948)* and *USS ROGERS (DD-876)* in which David Sclafani served.

RADM Sargent in Sclafani, David for Crane Co.

4. The application of insulation to piping, valves and other equipment in U.S. Navy ships such as *USS MORTON (DD-948)* and *USS ROGERS (DD-876),* if insulated at all, was done after the piping, valves and equipment had been installed and hydrostatically tested. The installation of insulating material was done by the building shipyard during construction or the repair shipyard during shipyard overhauls and repair periods.

5. The manufacturers of equipment such as pumps, valves, and piping had no influence on whether the U.S. Navy would insulate the equipment after installation, or on what insulating materials the U.S. Navy specified.

6. The very large majority of asbestos containing material onboard warships such as *USS MORTON (DD-948)* and *USS ROGERS (DD-876)* in which David Sclafani served was the asbestos containing thermal insulation used by the U.S. Navy on propulsion and auxiliary steam piping and equipment.

7. The vast majority of that insulating material was in the engineering spaces, but some was also utilized throughout the ships on systems such as hot water and steam for cooking and heating and other hotel systems.

8. The total amount of asbestos material contained in gaskets and packing aboard USN ships such as *USS MORTON (DD-948)* and *USS ROGERS (DD-876)* in which David Sclafani served was very small compared to the extensive amount of asbestos contained in the Navy specified thermal insulation.

9. Manufacturers of equipment such as Crane Co. typically had no control over, knowledge of nor visibility into what the Navy did with the equipment after receipt, when or how it was maintained and overhauled, or what replacement consumable materials such as gaskets and packing the Navy used.

10. The U. S. Navy, not original equipment manufacturers, specified in detail the content and technical details of all gaskets, packing materials, and insulation to be used in all U. S. Navy shipboard equipment for both original and replacement applications.

In addition to the above, I understand that I may be asked to testify regarding my opinions and experience regarding various aspects of the design, construction, maintenance, repair, operation, objectives and mission of Navy ships, generally and as they may pertain to *USS MORTON (DD-948)* and *USS ROGERS (DD-876)* in which David Sclafani served.

I have personal knowledge of the types of plans, specifications and requirements that governed suppliers of equipment, products and materials for use on Navy and Navy designed ships, such as Crane Co. Based upon this knowledge, my experience, and the extensive materials I have reviewed in connection with various Navy ships, I can attest that any work performed on any material or products manufactured and supplied for ships of the U.S. Navy was performed to detailed requirements specified by the Navy. All work such as that was reviewed and inspected by Navy or other government personnel prior to acceptance by the Navy to ensure strict compliance of the equipment, products and materials with the government specifications.

RADM Sargent in Sclafani, David for Crane Co.

As a Navy engineering officer and program manager, I was often called upon to assist in determining conformance of shipbuilders, equipment vendors, and material and product manufacturers to drawings and specifications prior to acceptance by the Navy. The chain of command within the Navy concerning ship design and construction involves several layers of authority, particularly in the lines of command for technical and contractual control over Navy ship design, construction, maintenance and repair. Ultimately, the Secretary of the Navy has authority over the Navy including Navy shipbuilding design, construction, maintenance and operation. At the time of construction of *USS MORTON (DD-948)* and *USS ROGERS (DD-876)* in which David Sclafani served, the Navy Bureau of Ships (BUSHIPS) controlled all Navy ship design and construction and reported to the Chief of Naval Operations as well as to a civilian Assistant Secretary of the Navy. Under the command of BUSHIPS, the Navy's design and shipbuilding organization included several divisions and levels of authority concerning ship design, construction, maintenance, repair and inspection. The Chief of BUSHIPS and the Chief of the Bureau of Supply and Accounts (BUSANDA) maintained and directed technical and contractual control over shipboard equipment. Each of these two organizations had oversight responsibility concerning equipment, products or materials manufactured for installation or use aboard Navy ships.

In the 1920s and 1930s, complexity and sophistication of the propulsion and weapons systems on warships increased significantly. In order to assure quality and to promote efficiency and effectiveness, the Navy determined that a strict, explicit set of written standards were necessary to control the specifications of all equipment, products and materials manufactured and supplied to the Navy. As a result, the Navy developed an engineering process for the creation and subsequent modification, as needed, of written specifications outlining all requirements for equipment products and materials manufactured and supplied for the Navy's use. Such specifications covered, for example, not only the physical requirements of the equipment, products and materials but also, as will be seen below, the nature and the content of written instructions, directions and warnings that would accompany such equipment, products or materials.

BUSHIPS and BUSANDA had the responsibility to develop the written specifications and standards for the manufacture and supply of equipment, products and materials used in the construction, maintenance and repair of Navy ships. Specifications for any equipment, products or materials intended for use aboard Navy ships were drafted, approved and maintained by the Navy. The specifications were intended to address shipboard equipment, products and material requirements. Once promulgated, only the Navy could make any changes or modifications to those specifications. BUSHIPS maintained and controlled the specifications largely because it had superior knowledge of the demands and requirements of combat-ready ships.

In the context of ship construction, maintenance and repair BUSHIPS and/or BUSANDA prepared contract specifications, which incorporated and referenced the technical specifications. From time to time, privately owned shipyards or marine design professional firms also prepared contract specifications incorporating the Navy's specifications. Whether issued by the Navy or by private entities under contract to and as approved by the Navy, these specifications reflected

the contemporaneous state of the art and the special needs of Navy ships, including considerations for the safety and protection of the crew aboard fighting ships.

Navy specifications were communicated to vendors such as Crane Co. when the Navy (or private entities, such as shipyards or design professional firms) issued Invitation for Bids/Request for Proposals for the manufacture or supply of certain equipment, products and materials. Compliance with the standards and specifications issued for equipment supplied for ultimate use aboard Navy ships was directly monitored by Naval Machinery Inspectors under both of the following divisions:  (a) Machinery Inspectors under BUSANDA worked on-site at vendor facilities, such as Crane Co.'s manufacturing facilities; and (b) Machinery Inspectors under BUSHIPS carried out their responsibilities at the shipbuilding yards.  The Machinery Inspectors ultimately worked for the Secretary of the Navy or the Secretary of War.  These Inspectors exercised primary, front line control and direction over the work performed for the Navy by original equipment, products and materials manufacturers (OEMs/OPMs), regardless of whether the equipment was being constructed or supplied pursuant to a Navy or private contract.

BUSHIPS maintained engineers highly qualified in specialty areas such as pumps, valves, steam turbines, boilers and accessories, reduction gears, ship propulsion, electrical systems, and auxiliary equipment. In addition, because a majority of the Navy's surface ships used steam turbine engines as a principal form not only of propulsion, but also as a source of power in general, BUSHIPS further maintained significant expertise in the important area of heat transfer, insulation, and mechanical sealing materials (gaskets and packing) particularly the use of certain asbestos fibers in insulation and sealing materials.  These Navy engineers had control over the technical aspects of military specifications that concerned their area of expertise.  In addition, BUSHIPS had an Engineering Standards Group to help manage the large number of specifications and contract plans, as well as amendments and updates that existed at any given time.  Changes to specifications were continually under review as new technology, construction techniques or other considerations evolved.

Crane Co. equipment could not have been installed in *USS MORTON (DD-948)* or *USS ROGERS (DD-876)* in which David Sclafani served unless that equipment was first determined by the Navy to be in conformity with all applicable Navy specifications.   The Navy specifications governing any products supplied by Crane Co. for the Navy ships required that all gaskets supplied with the products be of a type approved by the Navy for the applications in question. The Navy specifications similarly governed the type of packing materials that could be supplied with products.

In my experience, OEMs, such as Crane Co. would not have been permitted, under the specifications, associated regulations and procedures, nor under the actual practice as it evolved in the field, to vary or to deviate in any respect from the Navy specifications in supplying equipment, including affixing any type of warning or caution statement to equipment intended for installation in a Navy ship, beyond those specifically required by the Navy without prior discussion and express approval by the Navy.

Based upon my knowledge of and experience in the design, inspection and procurement of equipment, products and materials for use on Navy vessels, the Navy would not have permitted

Crane Co. or other equipment suppliers to place asbestos-related health warnings in technical manuals supplied with products for *USS MORTON (DD-948)* and *USS ROGERS (DD-876)* in which David Sclafani served.

Replacement of the original gaskets and packing within any products supplied by Crane Co. for Navy ships would have typically been accomplished with gaskets and packing from other suppliers, not from Crane Co. The Navy did not consult with OEMs regarding the supply of replacement consumable materials, such as gaskets and packing that might be used in connection with that equipment. Rather, the Navy procured gasket and packing materials in bulk quantities directly from the manufacturers of such products in accordance with the Navy's then-current standards and specifications.

OEMs were generally not the suppliers of thermal insulation products specified by the Navy for application to the OEM's equipment after installation. Thus, other suppliers – not the OEM – provided thermal insulation products that may have been applied to the original equipment, including valves, pumps, piping, steam strainers, traps, and other equipment after it had been installed and tested. The Navy did not consult OEMs regarding the use or installation of thermal insulation materials that might be installed on that equipment after acceptance by the Navy. Moreover, not only did the OEM not have any control over the type and quantity of insulation product that the Navy specified to be used on its equipment, the OEM would have no knowledge whether or not any insulation would, in fact, be applied to the original equipment due to the variety of circumstances and potential uses of the original equipment by the Navy.

Signed this 6th day of December 2012 at Great Falls, Virginia.

David P. Sargent, Jr.

# CURRICULUM VITAE
## January 2010

## RADM David. P. Sargent, Jr. P.E., US Navy (Ret.)

David P. Sargent, Jr., a retired Rear Admiral of the United States Navy, is a licensed Professional Engineer with extensive operational experience in ship engineering, ship maintenance, and at-sea operations. Admiral Sargent is also an experienced program manager in the design and procurement of complex warships and associated weapons systems. He has a BSME degree from Cornell University (1967) and an MS (ME) degree from the Naval Postgraduate School (1974).

He began his Navy career in 1967 after receiving a Bachelor of Science in Mechanical Engineering from Cornell University. Upon commissioning in the Navy he was selected to attend the Cruiser-Destroyer Forces Pacific Fleet Engineering Officer's school in a course focused on the maintenance of engineering plants of World War II vintage steam propulsion ships. He finished at the top of his class and then served from October 1967- July 1970 aboard USS Wallace L. Lind (DD-703), a Sumner Class destroyer. He served first as the Main Propulsion Assistant responsible for the operation of boilers, engines and auxiliary machinery, and in 1969 was promoted to Chief Engineer. During this tour, Admiral Sargent participated in several extended deployments, and also directly supervised a major shipyard repair period including extensive overhaul and replacement of propulsion, electrical, and auxiliary machinery.

Admiral Sargent's Navy career included service in a variety of different ship classes including two diesel propelled Ocean Minesweepers (MSO) where he served as second in command of the ships, a position in which he had direct oversight of both engineering and operational departments. From 1975- 1977, Admiral Sargent served as the Commanding Officer in USS Shakori (ATF-162) a diesel-electric ocean salvage ship, and completed numerous ocean towing and salvage operations. He supervised a 90-day shipyard repair period while in command of USS Shakori in which the engines, motors, and generators were refurbished, and the towing and salvage gear was recertified.

From 1980-1982, Admiral Sargent served as Executive Officer of USS Spruance (DD-963), the first Gas Turbine propelled US Navy warship. During this period he was involved with both overseas deployment and with the first shipyard repair and re-certification of the ship's machinery, fueling equipment and Gas Turbine automatic control systems. After completing the Navy's Senior Officer Ship Maintenance Review Course in which he finished at the top of his class, Admiral Sargent commanded USS Farragut (DDG-37) from 1985-1988, a complex guided missile ship with 1200 psi steam propulsion plant. This tour also included extended deployments and a major shipyard machinery refurbishment period in which he had an active management role.

In addition to his extensive operational experience in warships, Admiral Sargent held a variety of management positions in the Naval Sea Systems Command program offices that are responsible for design, construction, introduction and support of new warships. Additionally, Admiral Sargent attended the Command and Staff Course at the U.S. Naval War College from 1977 to 1978, and the Program for Executives at Carnegie-Mellon Institute in 1991.

Upon selection to Rear Admiral in 1994, he was assigned as Commander, Naval Surface Warfare Center, a diverse organization of research laboratories and engineering stations involved in research and development of complex systems and support of US Navy surface ships, submarines, and other defense related systems. His final two tours before retirement were as Program Executive Officer (PEO) for Carriers, Littoral Warfare and Auxiliary Ships, and then as PEO Expeditionary Warfare. In these positions he had the overall responsibility of both the technical and programmatic details of design, construction, delivery and in-service support of all Aircraft Carriers, Amphibious, and special purpose ships of the Navy.

Admiral Sargent is now the president of Sargent Enterprises, Inc. which includes two companies serving the marine industry: SEI Associates, an engineering services business that provides technical and management support to marine industries; and SEI Marine Technologies; a company that operates and maintains various test and demonstration craft for R&D companies involved in developing new equipments and hull forms for future high performance ships,  and introduces durable construction technologies to maritime related industries. Managing these companies allows Admiral Sargent to continue his life-long "hands-on" approach to understanding and improving technical and mechanical systems utilized in the naval and commercial marine sector. Admiral Sargent has served for many years in active leadership of the American Society of Naval Engineers (ASNE) and in 2001 was elected to serve as President ASNE, and served two consecutive two-year terms. He continues as an active member of ASNE leadership. He is also a member of the Sigma Xi Engineering Honorary Society, the American Society of Mechanical Engineers, and the Cornell Engineering Alumni Association, the U.S. Navy League and several other professional societies. Admiral Sargent serves on the Board of Directors of the Maritime Technology Alliance.

**Record of Cases in which Rear Admiral Sargent has been Deposed or appeared at Trial**

| Deposition/Trial Date | Case |
|---|---|
| 25 May 2004 | K&L Braaten |
| 21 Jan 2005 | ML&B Tucker |
| 8 Feb 2005 | ML&B – Gudmundson |
| 17 Mar 2005 | K&L – Speicher |
| 7 Jun 2005 | CB&M – Main |
| 6 Jul 2005 | K&L– Galassi |
| 22 Nov 2005 | K&L - Henry |
| 28 Dec 2005 | K&L – Greathouse |
| 24 Jan 2006 | K&L – Riggle |
| 9 Feb 2006 | K&L – Barlow<br>ML&B – Barlow |
| 22 Mar 2006 | K&L - Whitteker |
| 23 Mar 2006 | K&L – Baer<br>WM&B – Baer |
| 24 Mar 2006 | K&L – Moultan |
| 8 May 2006 | K&L - Robertson<br>ML&B Buffalo - Robertson<br>ML&B Yarway - Robertson |
| 5 June 2006 | K&L Crane – Murch<br>ML&B Yarway – Murch |
| 6 June 2006 | K&L Crane – Goodyard<br>ML&B Buffalo – Goodyard |
| 7 June 2006 | ML&B Buffalo – Eaton<br>ML&B Yarway – Eaton |
| 13 June 2006 | K&L Crane – Baxter<br>ML&B Yarway – Baxter |
| 14 June 2006 | K&L Crane – McNamara<br>ML&B Yarway - McNamara |
| 12 July 2006 | K&L Crane – Norris<br>ML&B Buffalo - Norris |
| 13 July 2006 | K&L Crane – Learn<br>ML&B Buffalo - Learn<br>ML&B Yarway- Learn |
| 20 July 2006 | K&L Crane – Flores<br>ML&B Yarway – Flores |
| 7 August 2006 | K&L Crane – Burns |
| **5 September 2006<br>LA Trial** | K&L Crane Co. – Norris |
| 9 October 2006 | K&L Crane Co. – Strock<br>PD&P Warren - Strock |
| 26 October 2006 | K&L Crane Co. – Evans |
| 28 November 2006 | K&L Crane – Provencher<br>ML&B Yarway – Provencher<br>PD&P Warren – Provencher |
| 30 Nov 2006 | K&L Crane – Freeman<br>ML&B Yarway – Freeman<br>PD&P Dover – Freeman |

1 of 8

| Deposition/Trial Date | Case |
|---|---|
| 20 December 2006 | K&L Crane – Merrill<br>ML&B Buffalo – Merrill<br>ML&B Yarway – Merrill<br>PD&P Warren - Merrill |
| 30 January 2007 | K&L Crane – Walmach<br>ML&B Buffalo – Walmach<br>ML&B Yarway – Walmach<br>PD&P Warren - Walmach |
| 12 February 2007 | K&L Crane – Stein/Chambers |
| 6 March 2007 | ML&B Buffalo – White |
| 7 March 2007 | K&L Crane Co. – Lathrop |
| 5 April 2007 | K&L Crane Co – Mendenhall |
| 10 April 2007 | K&L Balthazar<br>ML&B Yarway Balthazar<br>HB Balthazar |
| 13 April 2007 | ML&B Buffalo – White, Trial preservation deposition |
| 17 April 2007 | PD&P Warren – Yager<br>TE&W Carrier – Yager |
| 17 May 2007 | K&L Crane Co – Bock<br>ML&B – Yarway - Bock |
| 22 June 2007 | K&L Crane Co – Graves<br>ML&B Yarway – Graves |
| 29 June 2007 | K&L Crane Co – Neidermeyer<br>ML&B Yarway - Neidermeyer |
| 19 July 2007 | K&L Crane Co – Eubanks<br>ML&B Buffalo – Eubanks<br>ML&B Yarway - Eubanks |
| 27 August 2007 | PD&P Warren – Kimball |
| 31 August 2007 | K&L Crane Co - John Davis |
| 4 September 2007 | K&L Crane Co. – Racik<br>ML&B Yarway – Racik |
| 5 September 2007 | K&L Crane Co. – Dudash |
| 5 October 2007 | K&L Crane Co. – Hebert |
| 9 October 2007 | ML&B Yarway – Hughes |
| 17 October 2007 | PD&P Warren – Luman<br>ML&B Buffalo |
| 16 November 2007 | K&L Crane Co. – Haupt<br>ML&B Buffalo – Haupt<br>ML&B Yarway – Haupt |
| 6 December 2007 | PD&P Warren – Taylor |
| 7 December 2007 | K&L Crane Co. – Durbin<br>ML&B Yarway - Durbin |
| 20 December 2007 | K&L Crane Co. – Hall<br>ML&B Yarway – Hall<br>PD&P Warren – Hall<br>S/G Byron Jackson – Hall |
| 21 December 2007 | ML&B Buffalo – Brendel<br>ML&B Yarway – Brendel<br>PD&P Warren – Brendel |

| Deposition/Trial Date | Case |
|---|---|
| 4 January 2008 | K&L Crane Co. – O'Neil<br>ML&B Buffalo – O'Neil<br>ML&B Yarway – O'Neil<br>PD&P Warren – O'Neil |
| 8 January 2008 | K&L Crane Co. – Roberts<br>ML&B Buffalo – Roberts<br>PD&P Warren – Roberts<br>WM&M Leslie – Roberts |
| 14 January 2008 | ML&B Buffalo – Price<br>K&L Crane Co. - Price |
| 31 January 2008 | K&L Crane Co. – Brewer<br>ML&B Yarway – Brewer<br>HP Legal Warren - Brewer |
| 1 February 2008 | ML&B Buffalo – Walton<br>ML&B Yarway - Walton |
| 1 February 2008 | ML&B Yarway - Dyer |
| **11 February 2008**<br>**LA Trial** | PD&P Warren – O'Neil<br>K&L Crane Co. – O'Neil<br>ML&B Yarway – O'Neil |
| **29 February 2008**<br>**Philly Trial** | K&L Crane Co – Baccus<br>ML&B Yarway – Baccus |
| 3 March 2008 | K&L Crane Co. – Haynes<br>ML&B Yarway – Haynes |
| 3 March 2008 | ML&B Yarway – Kleen |
| 10 March 2008 | K&L Crane – Baker<br>PD&P Warren – Baker<br>ML&B Yarway – Baker<br>WM&M Leslie - Baker |
| 27 March 2008 | PD&P Warren - Lohr<br>ML&B Buffalo - Lohr |
| **28 March 2008**<br>**SF Trial** | K&L Crane - Roberts |
| 22 April 2008 | K&L Crane Co. – Galassi<br>ML&B Yarway – Galassi<br>PD&P Warren – Galassi |
| 23 April 2008 | K&L Crane Co. – Janes<br>PD&P Warren – Janes<br>ML&B Yarway - Janes |
| **8 May 2008**<br>**LA Trial** | PD&P Warren – Brewer<br>K&L Crane – Brewer<br>WM&M Leslie –Brewer |
| 29 May 2008 | K&L Crane – Duncan<br>PD&P Warren – Duncan<br>WM&M Leslie – Duncan<br>MGGM Armstrong - Duncan |
| **1 June 2008**<br>**Evidentiary Hearing**<br>**Boston** | ML&B Buffalo – Holdren |
| 19 June 2008 | K&L Crane – Lenz<br>PD&P Warren – Lenz<br>ML&B Buffalo – Lenz<br>MGGM Armstrong - Lenz |
| 20 June 2008 | K&L Crane – Hudiburgh |

| Deposition/Trial Date | Case |
|---|---|
| 8 July 2008 | K&L Crane - Arredondo<br>ML&B Yarway - Arredondo<br>PD&P – Warren - Arredondo<br>WM&M Leslie  - Arredondo |
| 17 July 2008 | K&L Crane Co. – Abbay<br>ML&B Buffalo – Abbay<br>ML&B Yarway – Abbay<br>PD&P Warren – Abbay |
| 20 August 2008 | K&L Square D – Cohen<br>ML&B – TYCOM - Cohen<br>TE- Allan-Bradley- Cohen |
| 21 August 2008 | K&L Crane Co. – Fortier<br>ML&B – Buffalo – Fortier<br>ML&B Yarway - Fortier |
| 26 August 2008 | PD&P Warren – Munn<br>WM&M Leslie – Munn |
| 12 September 2008 | K&L Crane Co. – W. Taylor<br>PD&P Warren – W. Taylor<br>SM Gardner-Denver – Taylor |
| 16 October 2008 | K&L Crane Co. – Blackmon |
| 30 October 2008 | K&L Crane Co. – Walraven |
| 5 November 2008 | ML&B Yarway –Hilt<br>ML&B Buffalo – Hilt<br>K&L Crane Co. – Hilt |
| 11 November 2008 | K&L Crane Co. – Woodard<br>K&L Square D – Woodard<br>PD&P Warren – Woodard<br> LB IMO - Woodard |
| 25 November 2008 | K&L Crane Co. – MacDonald<br>ML&B Buffalo – MacDonald |
| 6 January 2009 | K&L Crane Co. – Handley<br>PD&P Warren – Handley<br>WM Leslie  - Handley<br>ML&B Buffalo – Handley |
| 7 January 2009 | K&L Crane Co. – Kiper |
| **22 January 2009<br>LA Trial** | K&L Crane Co. – Woodard |
| 5 February 2009 | VS Goodyear – Fitzpatrick |
| 11 February 2009 | K&L Crane – Cundiff<br>ML&B Buffalo – Cundiff<br>ML&B Yarway – Cundiff<br>PD&P Warren – Cundiff<br>LB IMO – Cundiff<br>WM&M Leslie - Cundiff |
| 24 February 2009 | ML&B Buffalo – Morgan<br>PD&P Warren – Morgan<br>LB IMO – Morgan |
| 26 February 2009 | K&L Crane Co. – Crull<br>ML&B Buffalo – Crull<br>PD&P Warren – Crull<br>K&L Square D – Crull<br>ML&B Yarway – Crull |
| 27 February 2009 | K&L Crane Co. – Kincaid<br>PD&P Warren – Kincaid<br>PD&P IMO - Kincaid |

| Deposition/Trial Date | Case |
|---|---|
| 27 February 2009 | K&L Crane Co. – Watts |
| | PD&P Warren – Watts |
| | ML&B Buffalo – Watts |
| | ML&B Yarway - Watts |
| 6 March 2009 | K&L Crane Co. -Slattery |
| 10 March 2009 | PD&P Warren - Hickman |
| | WM&M - Leslie  - Hickman |
| 12 March 2009 | AJ - McClure |
| 26 March 2009 | ML&B Buffalo –Flynt |
| | ML&B Yarway – Flynt |
| | K&L Crane Co. – Flynt |
| | PD&P Warren - Flynt |
| 31 March 2009 | K&L Crane – Johnson |
| **14 April 2009**<br>**LA Trial** | K&L Crane Co – Haupt |
| 29 April 2009 | K&L Crane Co – Gray |
| | ML&B Buffalo – Gray |
| | ML&B Yarway – Gray |
| | PD&P Warren – Gray |
| 5 May 2009 | K&L Crane Co. – Lebus |
| | PD&P Warren – Lebus |
| 13 May 2009 | K&L Crane Co. – Pelletier |
| | ML&B Buffalo – Pelletier |
| | PD&P Warren – Pelletier |
| | LB IMO – Pelletier |
| 20 May 2009 | PD&P Warren – Cheek |
| | K&L Crane Co. – Cheek |
| **21 May 2009**<br>**Greenville SC Trial**<br>**Videotaped** | WM&M Leslie – Lenz |
| 12 June 2009 | K&L Crane Co. – Van Hoy |
| 23 June 2009 | K&L Crane Co. – Goebel |
| | ML&B Yarway – Goebel |
| 30 June 2009 | S/M Byron Jackson – Creek |
| 8 July 2009 | K&L Crane Co.- Kelemen |
| 12 August 2009 | K&L Crane Co. – Brunson |
| 16 September 2009 | K&L Crane Co. – Eckerle |
| 1 October 2009 | K&L Crane Co. - Miller |
| | PD&P Warren - Miller |
| 2 October 2009 | PD&P – Lange |
| | WM&M – Leslie |
| 7 October 2009 | PD&P Warren - Contrino |
| | K&L Crane Co. - Contrino |
| | ML&B Buffalo- Contrino |
| | LB IMO - Contrino |
| | ML&B Yarway - Contrino |
| 12 October 2009 | K&L Crane Co. – Robertson |
| 4 November 2009 | K&L Crane Co. – Luper |
| 9 November 2009 | PD&P Warren – Holdren |
| **30 November 2009**<br>**Syracuse trial** | K&L Crane Co – Avery |
| 21 January 2010 | K&L Crane Co – Pantalone |
| | ML&B Buffalo – Pantalone |
| 17 February 2010 | K&L Crane Co. – Dix |
| | ML&B Buffalo – Dix |

| Deposition/Trial Date | Case |
|---|---|
| 4 March 2010 | K&L Crane Co. – Duncan<br>PD&P Warren – Duncan<br>ML&B Yarway - Duncan |
| **19 March 2010**<br>**Philadelphia Trial** | K&L Crane Co. – Bell |
| 22 March 2010 | PD&P Warren – Wangen |
| 15 April 2010 | K&L Crane Co. – Jacoby |
| 20 April 2010 | ML&B Buffalo – Keener |
| 29 April 2010 | ML&B Buffalo – Harbron<br>K&L Crane Co. – Harbron<br>PD&P Warren – Harbron |
| 11 May 2010 | K&L Crane Co. – Sunday<br>ML&B Buffalo – Sunday<br>PD&P Warren – Sunday<br>ML&B Yarway – Sunday |
| 12 May 2010 | K&L Crane Co. – Hutchins<br>FMC NP – Hutchins |
| 13 May 2010 | K&L Crane Co. – Conner<br>ML&B Buffalo – Conner<br>PD&P Warren – Conner<br>WM&M Leslie – Conner |
| 18 May 2010 | K&L Crane – Warden<br>PD&P Warren – Warden<br>ML&B Yarway – Warden |
| 19 May 2010 | K&L Crane – Dombrowski<br>PD&P Warren – Dombrowski<br>ML&B Yarway – Dombrowski<br>SM&B  NP – Dombrowski<br>WH – EV - Dombrowski |
| 20 May 2010 | K&L Crane – Thiebault<br>PD&P Warren – Thiebault<br>ML&B Yarway – Thiebault |
| 24 May 2010 | K&L Crane – Bludworth |
| 9 June 2010 | ML&B – Brunson |
| 10 June 2010 | ML&B Buffalo – Bussey |
| 28 June 2010 | K&L Crane Co. – Conner<br>ML&B Buffalo Pumps – Conner<br>PD&P Warren Pumps – Conner<br>WM&M Leslie Controls - Conner |
| 4 August 2010 | K&L Crane Co. – Gilpin<br>ML&B Yarway – Gilpin |
| 26 August 2010 | PD&P Warren – Estep |
| 8 September 2010 | K&L Crane Co. – Geist<br>PD&P Warren Pumps – Geist |
| 14 September 2010 | K&L Crane Co. – Austin |
| 15 September 2010 | K&L Crane Co. – Carkhuff |
| 16 September 2010 | K&L Crane Co. – Rio<br>PD&P Warren – Rio<br>LB IMO – Rio |
| 23 September 2010 | K&L Crane Co. – Baragar |
| 29 September 2010 | K&L Crane Co. – McDowell |
| 2 November 2010 | K&L Crane Co. – Kelley<br>PD&P Warren Pump – Kelley |
| 3 November 2010 | K&L Crane Co. - Prange |

| Deposition/Trial Date | Case |
|---|---|
| 8 November 2010 | K&L Crane Co. – MacLean<br>PD&P Warren – MacLean<br>LB IMO - MacLean<br>F&M Powell – MacLean<br>WH Edwards - MacLean<br>HL Sarco – MacLean<br>ML&B Yarway – MacLean |
| 9 November 2010 | K&L Crane Co. – Stone<br>PD&P Warren – Stone<br>ML&B Yarway – Stone |
| 16 November | K&L Crane Co. – O'Connell<br>PD&P Warren – O'Connell<br>LB IMO – O'Connell |
| 8 December 2010 | K&L Crane Co. – Eisler |
| 14 January 2011 | K&L Crane Co. – Russano |
| 20 January 2011 | K&L Crane Co. – Vawter |
| 22 February 2011 | K&L Crane Co. – Hays<br>PD&P Warren Pumps – Hays |
| 2 March 2011 | K&L  Crane Co. – Grammer<br>PD&P Warren  - Grammer<br>ML&B Yarway - Grammer |
| 7 March 2011 | K&L Crane Co. – Lewis<br>ML&B – Lewis |
| 9 March 2011 | K&L Crane Co. – Sumner<br>PD&P Warren Pumps – Sumner |
| 18 March 2011 | K&L Crane Co. – Morrison<br>     PD&P Warren Pumps - Morrison |
| 21 March 2011 | K&L Schneider Electric – Alvarado |
| **6-7 April 2011**<br>**Syracuse Trial** | K&L Crane Co. – McMillan |
| 8 April 2011 | ML&B Buffalo Pumps – Curry |
| 2 May 2011 | K&L Crane Co. – Truxillo |
| **10 May 2011**<br>**LA Trial** | K&L Crane Co. – Morrison |
| 17 May 2011 | K&L Crane Co. – Mansir<br>PD&P Warren Pumps– Mansir<br>ML&B Yarway - Mansir |
| 19 May 2011 | K&L Crane Co. – Box |
| 28 July 2011 | K&L Crane Co. – Smith, D. L.<br>K&L – Schneider Electric – Smith D.L.<br>PD&P – Warren Pump – Smith D.L.<br>WH – Flowserve Edwards – Smith D.L. |
| **3 August 2011**<br>**NYC Trial** | K&L Crane Co. – Dummitt |
| 13 September 2011 | K&L Crane Co. – Dow<br>ML&B Buffalo Pumps – Dow |
| 14 September 2011 | K&L Crane Co. – Tavaglione<br>PD&P Warren Pumps - Tavaglione |
| 20 September 2010 | K&L Crane Co. – Sicade<br>ML&B Buffalo Pumps – Sicade |
| 22 September 2011 | K&L Crane Co. – Overby |
| 23 September 2011 | K&L Crane Co. – Manley |
| 6 October 2011 | K&L Crane Co. – Gottschall |
| 22 November 2011 | K&L Crane Co. – Kern |

| 30 November 2011 | K&L Crane Co. –Abbay<br>PD&P Warren Pumps -Abbay |
|---|---|
| **Date** | **Client/Case** |
| 1 December 2011 | K&L Crane Co. – Whiting<br>ML&B Buffalo – Whiting<br>ML&B Yarway – Whiting<br>FM Wm. Powell – Whiting |
| **4 December 2011**<br>**Philadelphia Trial** | K&L Crane Co. – Reebel |
| 14 December 2011 | K&L Crane Co. –  Lang, James |
| **21 February 2012**<br>**Philadelphia Trial** | K&L Crane Co. – Paasch |
| 29 February 2012 | K&L Crane Co. – Vonwiller |
| 4 April 2012 | K&L Crane Co. – Browne |
| 8 May 2012 | K&L Crane Co. – Schulte |
| **20 June 2012**<br>**Wilmington Trial** | K&L Crane Co. – Carlton |
| 12 July 2012 | K&L Crane Co. – Paulus |
| 17 July 2012 | K&L Crane Co. – Kent, Donald |
| **7 August 2012**<br>**Rochester Trial** | K&L Crane Co. - Bohrer |
| **13 August 2012**<br>**LA Trial** | K&L Crane Co. – Kent |
| 18 Sep 2012 | K&L Crane Co. – Adler & Mirabile<br>ML&B Buffalo Pumps - Adler & Mirabile |
| 4 October 2012 | K&L Crane Co. – Driver |