SENSITIZER (Physiological)—A material which as ordinarily handled does not necessarily cause any discoverable reaction in living tissue, but which after initial or repeated contact with the tissue of some individuals may, at a later date, produce a prompt inflammatory reaction on contact, even in minute amounts, with the tissue of the same individuals.

POISON: Note:  The true determination of the "poisonous" properties of a chemical or mixture of chemicals must be based on its effect on humans. The collection of adequate data from human experience is usually impossible. In the absence of such data it is desirable to establish (or labeling purposes some arbitrary standards based on past experiences and some methods of testing which will permit the presumption of the possible hazards in hereafter a given product. The use of laboratory animals for this purpose is now considered the most reliable method generally available when conducted under controlled conditions.

A poison is commonly understood to be a product, contact with which will lead to fatal results, usually in a short period of time. Generally only oral intake has been considered. It is becoming more generally recognized, however, that other modes of contact or routes of entry, in particular inhalation and absorption through the skin, may have similar fatal effect. Any use of the term should, therefore, consider these three common routes of entry.

—A chemical or mixture of chemicals which falls within any of the following categories:

(a) Produces death within 48 hours in half or more than half of a group of 10 or more laboratory white rats weighing 200–300 grams at a single dose of 50 milligrams or less per kilogram of body weight, when administered orally; or

(b) Produces death within 48 hours in half or more than half of a group of 10 or more laboratory white rats weighing 200–300 grams, when inhaled continuously for a period of one hour or less at an atmospheric concentration of 2 milligrams or less per liter of gas, vapor, mist, or dust, provided such concentration is likely to be encountered by man when the chemical product is used in any reasonably foreseeable manner; or

(c) Produces death within 48 hours in half or more than half of a group of 10 or more rabbits tested in a dosage of 200 milligrams or less per kilogram body weight, when administered by continuous contact with the bare skin for 24 hours or less.

If available data on human experience with any chemical in the above-named concentrations indicate results different from those obtained on animals, the human data shall take precedence.

8

TOXICITY—The inherent capacity of a substance to produce bodily injury by other than physical means.

HAZARD—The risk of injury, illness, or damage that is encountered during reasonably anticipated handling and use of a substance. Hazard is determined by such factors as toxicity, physical characteristics and conditions of use and may not be in direct proportion to toxicity alone.

MIXTURE—A physical commingling of two or more substances which may or may not bear a fixed proportion to one another and which have not reacted chemically with one another.

ECONOMIC POISON—Any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any insects, rodents, fungi, weeds, and other forms of plant or animal life or viruses, except viruses on or in living man or other animals, which the Secretary (of Agriculture) shall declare to be a pest.

PESTICIDE—Same as Economic Poison.

1. Corresponds to ICO definition.
2. As defined in Chapter II "Engineering Control of the Air Contamination of the Working Environment" (Allen D. Brandt, D.Sc.) page 108, "Manual of Industrial Hygiene." USPHS.
3. Substantially identical with ICO Poison Class B definition and similar in most respects to regulations under the Federal Insecticide, Fungicide and Rodenticide Act.
4. From Federal Insecticide, Fungicide, and Rodenticide Act. It should be understood that there are laws, ordinances, and regulations in certain states which declare to be pests things which may not be so considered at present under the Federal Act.

9

# PART I

## Preparation of Warning Labels

### General Principles

In preparing warning labels, the following general principles should serve as a guide:

(1) Each chemical product presents a distinct problem and must be treated individually in the light of its own characteristics. Conclusions regarding the hazards of a product cannot safely be drawn either from the properties of the materials from which it is formed or by analogies based upon chemical structure.

Mixtures of two or more chemicals may have properties that vary in kind or degree from those of the individual components. Any warning label for mixtures should be based on the properties of the finished product.

Impurities may contribute hazardous properties and should not be overlooked.

(2) All statements on warning labels should be brief, accurate, and expressed in simple, easily understood terms.

(3) Precautionary labeling should be used only when and to the extent necessary. The language should be practical, not based alone upon the inherent properties of a product, but directed toward the avoidance of hazards resulting from such use, handling and storage as may reasonably be anticipated. The use of warning labels for relatively harmless products or the use of unnecessary words will develop a disregard for labels and defeat their purpose as surely as will failure to give adequate notice of hazards.

(4) On labels for different products, uniformity in language to indicate the same hazards and same degree of hazard is most desirable in order to gain greater understanding through standardization.

(5) The following subject matter should be considered for inclusion on a warning label:

A. Name of Product

B. Signal word designating degree of hazard—DANGER!, WARNING!, or CAUTION!

C. Affirmative statement of hazards.

D. Precautionary measures covering actions to be followed or avoided.

E. Instructions in case of contact or exposure, where advisable. (Note: Under some laws antidotes are required when the word "POISON" is used.)

Instructions for the handling and storage of containers should also be considered for inclusion on the label. This is information relating to characteristics of the container as well as those of its contents, and is discussed separately under *Container Handling and Storage* instructions, page 20.

(6) The inclusion of the word "POISON" and the skull and crossbones on a label should be limited to those cases where the product is a poison according to a definite toxicity standard* or where such use is prescribed by law. When used, this legend should be in addition to the other label warnings and should not take the place of the signal words DANGER!, WARNING!, and CAUTION! which are designed to show the relative degree of hazard.

(7) A non-descriptive code designation or trade name should not be used as the only identification of a hazardous chemical. If the complete chemical name is not shown, the label should clearly state the type of chemical, e.g., "corrosive acid," "lead compound."

(8) Warning statements should be grouped together in a prominent location on the label and should be printed in easily legible type which is in contrast by typography, layout, or color with other printed matter on the label. The label should be affixed firmly to and in a conspicuous place on the container.

### Preparation of Label

In the preparation of a warning label, the compilation of all available relevant information on the product is a necessary first step. An adequate knowledge of the toxicity of the material (obtained from the literature or through laboratory tests) and data on physical and chemical properties, packaging, and methods of handling and use of the product are needed to make possible a description of the hazards. In the case of an established product advantage should be taken of the experience of people involved in manufacturing, shipping and using.

*See terms page 8.

10

11

the material. All the *General Principles* should be kept in mind and the following information considered for inclusion on the label:

A. NAME OF PRODUCT  This is important information for the safety of handlers and users. It is preferable that the chemical name of the product be used. The recommendations of the American Chemical Society for nomenclature should be followed. Trade names may be used in addition to chemical names. A non-descriptive code designation or trade name should not be used as the only identification of a hazardous chemical. If the complete chemical name is not shown, the label should at least clearly state the type of chemical, e.g., "corrosive acid," "lead compound."

B. SIGNAL WORD  This word is intended to draw attention to the presence of hazard, and to indicate the degree of severity. The signal words recommended are, in the order of diminishing severity of hazard:

(1)  DANGER!
(2)  WARNING!
(3)  CAUTION!

Degree of severity can be expressed only in relative terms. "Danger" is the strongest of the three words and should be used for those products presenting the most serious hazards. "Caution" is recommended for those compounds presenting the least serious hazards. "Warning" is intermediate between "Danger" and "Caution." Reference to the illustrative labels in Part II of this Manual will help in the selection of the proper signal word.

C. STATEMENT OF HAZARDS  This statement should give notice of the hazards that are present in connection with the customary or reasonably anticipated handling or use of the product. Examples are:

CAUSES BURNS
VAPOR EXTREMELY HAZARDOUS

Many chemical products will present more than one type of hazard, in which case appropriate statements for each significant type should be included on the label. In general, the most serious hazard should be stated first.

While any compound may be hazardous if improperly used, it is impractical to cover every possible contingency on a label. Efforts should be directed toward giving notice of the significant hazards. A minor hazard may frequently be covered clearly and briefly by an appropriate precautionary statement alone. In some cases the total

hazard of a product, while justifying one or more precautionary measures, may be of such order as to require no statement of hazard on the label.

D. PRECAUTIONARY MEASURES  These instructions are intended to supplement the statement of hazards by setting forth briefly measures to be taken to avoid injury or damage from stated hazards. Examples are:

Keep away from heat and open flame.
Avoid breathing dust.

Precautionary measures may be included for hazards not considered of sufficient importance to require mention in the statement of hazards.

Statements similar to "Do not take internally," deserve special attention. They are seldom necessary where the precautionary measure to be followed is obvious as, for example, when the product is labeled "Poison" or the statement of hazards contains the words, "may be fatal if swallowed." On the other hand, the instruction may be desirable if the name, appearance, use or other attributes of the chemical are likely to result in its being taken orally through accident or mistaken identity.

E. INSTRUCTIONS IN CASE OF CONTACT OR EXPOSURE  The primary purpose of a warning label is to *prevent* injury or damage. However, instructions in case of contact or exposure may be included in those instances where the results of contact or exposure are severe and immediate treatment is highly desirable, and where simple remedial measures may be taken safely by non-professional persons before medical assistance is available.

Instructions should be limited to recognized first aid procedures based on simple methods and commonly available materials. Instructions for strictly medical treatment should be omitted except when specifically required by law or indicated by special circumstances.

Because of the serious and lasting effects that may result from eye injuries, a recommendation to get medical attention should accompany any specific instructions directed to treatment of the eyes.

In certain instances simple remedial measures such as washing or removal of clothing, may be included where they will serve to avoid serious injury following contact or exposure.

All precautionary information should appear on the label as a unit and should be printed in the order given above. The labels in Parts II

and III illustrate suitable arrangements and indicate relative prominence that should be given to the individual statements. Such relative prominence may be achieved in a number of ways such as by variation in type size, color, or layout of the printed material.

Note.—Some state laws and regulations require, on labels, the use of special or strictly defined antidotes or prescribe special ways in which these must be shown for certain chemicals. The requirements for any given poison may, therefore, vary greatly and the impossibility of showing, in the illustrative labels, antidotes which might be nationally acceptable has led to the practice of indicating only the need for an appropriate "First Aid—Antidote" statement where the "POISON, skull and crossbones" legend is used.

Table 1, on Page 16, is intended as a guide in the selection of precautionary statements for warning labels. Listed are classifications of materials according to the hazardous properties most frequently encountered in chemical products. Opposite each classification are given statements of hazard, precautionary measures and, in most cases, instructions in case of contact or exposure. It is important to recognize that chemicals can have inherent in them more than one of such hazardous properties, and that the label wording for such products should include an appropriate combination of the pertinent statements.

As each chemical product must be treated individually in the light of its own characteristics and customary or reasonably anticipated handling or use, there will be many instances in which the illustrative statements in Table 1 will not be applicable, either because they do not accurately express the degree of hazard or because they fail to cover the particular characteristics. In such cases, suitable statements should be chosen to fit the situation. The illustrative labels in Part II of this Manual may be helpful in the choice of appropriate wording.

*Use of Table 1 by Specific Example*

To illustrate the preparation of a specific warning label and the use of Table 1 in accordance with the principles outlined in the preceding text, Acetyl Chloride may be selected as an example.

Analysis of the physical, chemical and toxicological data shows the major hazards to consist of flammability (flash point between 20° F. and 80° F.), and a severe burning action on living tissue. A chemical property which is of secondary importance, is the relatively violent action in contact with water, particularly when small amounts of water are added to large quantities of the chemical. Thus two major and one minor hazard must be considered.

The selection of the signal word depends on the seriousness of the hazards, the acute rather than chronic action, and to a lesser extent on the number of hazards. In the case of Acetyl Chloride, both major hazards are serious and acute. Therefore, the signal word "DANGER" is indicated. (See page 12 f.)

Flammability is covered by Column 1, Class 4. Since the flash point is between 20° F. and 80° F., Acetyl Chloride falls in Type B for which the statement of hazard (Column 2) is:

FLAMMABLE

The second major hazard is the corrosive action on living tissue which is covered in Column 1, Class VII. Since the burns that result from contact are serious, the statement of hazard chosen from Column 2 is:

CAUSES SEVERE BURNS

The precautionary measures applying to the flammability hazard are chosen from Column 3. (The parenthetical word "sparks" is usually used only when the flash point is below 20° F.) The statements selected for this product are:

Keep away from heat and open flame.
Keep container closed.

The precautionary measures corresponding to the corrosive action of the liquid and vapor on living tissue, selected from Column 4, are:

Do not get in eyes, on skin, on clothing.
Avoid exposure to concentrated vapor.

The applicable instructions in case of contact or exposure are chosen from Column 5:

In case of contact, immediately flush skin or eyes with plenty of water for at least 15 minutes; for eyes, get medical attention.

The minor hazard arising from the relatively violent action of Acetyl Chloride in contact with water is covered by the special precautionary statement:

Do not allow water to get into container.

Assembling the various statements in order, *Signal Word, Statement of Hazard, Precautionary Measures,* and *Instructions in Case of Contact,* we have the completed label as follows:

## ACETYL CHLORIDE
DANGER! FLAMMABLE
CAUSES SEVERE BURNS
Keep away from heat and open flame.
Keep container closed.
Do not get in eyes, on skin, on clothing.
Avoid exposure to concentrated vapor.
In case of contact, immediately flush skin or eyes with plenty of water for at least 15 minutes; for eyes, get medical attention.
Do not allow water to get into container.

14

15



# TABLE 1
## Selection of Precautionary Statements

Products will be encountered that present hazards varying in kind or degree from those listed. Appropriate statements as to hazards, precautionary measures and instructions in case of contact or exposure should be prepared on the basis of the properties of the product, following the pattern and general phraseology of the following table. Parenthetical words in the table express variations in kind or degree and are to be used where applicable. SEE EXAMPLE PAGE 14.

NOTE: POISON, with skull and cross-bones, should be included if the product meets any of the criteria for "poison" set forth on page 8 or is required by law. If POISON is used, add first-aid statement as required.

| Class of Hazard | Statements of Hazard | Precautionary Measures | Instructions in case of Contact or Exposure |
|---|---|---|---|
| | IMPORTANT: Select applicable statement(s) only. Selection(s) to be based on actual hazard(s) or the degree of hazard. In some instances where a caution is indicated, the statement of hazard may be omitted and adequate information provided by the statement of precautionary measures. | IMPORTANT: Select applicable statement(s) only. Selection(s) to be based on actual hazard(s) or the degree of hazard. In some instances, the omission of a precautionary statement may be justified where the exposure to be followed is obvious from the statement of hazard. | IMPORTANT: Select applicable statement(s) only. Selection(s) to be based on necessity for prompt action in order to avoid serious effects. |
| I. Liquids flashing at 150°F. or below. (Flash points are determined by the Tagliabue Open-Cup Method.) A. Flash point 20°F. or below B. Flash point above 20°F. to 80°F. inclusive C. Flash point above 80°F. to 150°F. inclusive | Extremely Flammable Flammable (Combustible) | Keep away from heat (sparks) and open flame. Keep container closed (and away from heat). Use with adequate ventilation. | |
| II. Oxidizing Agents | Strong Oxidant Contact with Combustibles (Other) Material May Cause Fire | Store separately (away) from and avoid contact with combustible (other) material. Avoid contamination of clothing as it becomes dangerously flammable when dry. Keep container closed (and away from heat). Avoid contact with skin and eyes. | In case of contact, immediately flush skin or eyes with plenty of water for (at least) 15 minutes; for eyes, get medical attention (Wash clothing thoroughly before re-use). Sweep up spilling at once. Flush or absorb spillage with ... |
| III. Materials Giving Vapors Rapidly Toxic or Extremely Irritating on Exposure for a Short Time or in Low Concentrations | Vapor (Extremely Hazardous) (Irritating) Hazardous Liquid and Vapor (Gas under Pressure) Vapor Poisonous if Inhaled Vapor May Be Fatal if Inhaled [See NOTE opposite page.] | Do not breathe vapor. Do not get in eyes, on skin, on clothing. Use only with adequate ventilation. Keep container closed (and away from heat). Have air-line respirator or self-contained oxygen respirator available for emergency. | In case of contact, immediately flush skin or eyes with plenty of water for (at least) 15 minutes; for eyes, get medical attention. Remove and wash clothing before re-use. [See NOTE above.] |
| IV. Materials Giving Vapors Hazardous from Prolonged or Repeated Exposures or Exposure in High Concentrations. | Vapor Harmful Causes Irritation of Eyes, Nose, and Throat | Use only with adequate ventilation. Avoid (prolonged or repeated) breathing (of) vapor. Avoid contact with skin, eyes, and clothing. Keep container closed (and away from heat). | If spilled on clothing, remove and wash before reuse. In case of exposure to high concentrations, remove to fresh air. |
| V. Gases and Vapors Physiologically Inert. | Gas (Vapor) Reduces Oxygen Available for Breathing. Releases Heavy Gas (Vapor) which May Cause Suffocation. | Use with adequate ventilation. Keep container closed. Do not enter storage areas unless adequately ventilated. | If affected by exposure, remove to fresh air. If breathing has stopped, apply artificial respiration. |
| VI. Materials in Dust Form Hazardous from Inhalation or Contact. | Hazardous (Harmful) Dust Harmful if Inhaled Causes Irritation of Skin, Eyes, Nose, and Throat | Do not breathe dust. Avoid breathing dust. Wash thoroughly before eating or smoking. Avoid contact with skin, eyes, and clothing. | In case of contact, immediately flush skin or eyes with plenty of water for (at least) 15 minutes; for eyes, get medical attention. Remove and wash clothing before re-use. |
| VII. Skin Irritants or Corrosive. | Causes Severe Burns Causes Burns May Cause Burns | Do not get in eyes, on skin, on clothing. Avoid contact with skin, eyes, and clothing. Avoid exposure to (concentrated) vapor. | In case of contact, immediately flush skin or eyes with plenty of water for (at least) 15 minutes; for eyes, get medical attention. Remove and wash clothing before re-use. |
| VIII. Materials Causing Skin Irritation after Prolonged or Repeated Contact. | Causes Skin Irritation May Cause Skin Irritation | Avoid (prolonged or repeated) contact with skin. Wash thoroughly before eating or smoking. Avoid exposure to (concentrated) vapor. | In case of contact, flush with (plenty of) water (for eyes, get medical attention). |
| IX. Materials Toxic through Skin Absorption. | (Extremely Hazardous) (Harmful) Solid (Liquid) Rapidly Absorbed through Skin [See NOTE opposite page.] | Do not get in eyes, on skin, on clothing. Avoid contact with skin, eyes, and clothing. | In case of contact, immediately remove all contaminated clothing and flush skin or eyes with plenty of water for (at least) 15 minutes; for eyes, get medical attention. Wash clothing before re-use. [See NOTE above.] |
| X. Materials Toxic if Swallowed. | Poisonous if Swallowed May Be Fatal if Swallowed Harmful if Swallowed [See NOTE opposite page.] | Wash thoroughly before eating or smoking. Wash thoroughly after handling. Do not breathe dust (vapor). Avoid breathing dust (vapor). Do not take internally (See Precautionary Measures, Eq. 12]. | [See NOTE above.] |

*Where required by law

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 6 of 60   Page ID
#:3957
Case 1:11-cv-00406-LEK -RLP   Document 8-8   Filed 06/30/11   Page 13 of 16.   PageID
#:

## Labels for Small Commercial Packages

The principles governing the preparation of warning labels discussed in Part I and the illustrative labels in Part II of this Manual have been developed primarily for bulk packages of chemicals intended for industrial use. The general principles apply, however, to chemicals packaged in small containers. These may include, among others, chemical products in retail packages intended for the ultimate consumer; highly purified chemicals intended for research, testing, or control; and chemicals intended for professional use such as in pharmacy.

As stated in the *General Principles* on page 10, each chemical product presents a distinct problem and must be treated individually in the light of its own characteristics. This same principle will apply to small containers. Small containers may present a problem of less available space for labeling purposes. Careful and selective shortening of warning statements for such containers may be in order if necessary to permit legibility, or if the wording on labels for the chemical in industrial packages is not applicable. Consideration should always be given to (1) the intended or reasonably anticipated handling or use of the particular product, (2) the training and experience of the expected user and (3) the extent to which the hazard is modified by the size or type of container.

The following principles are recommended for condensation of suggested label wording where necessary or advisable.

(1) Retain the *Signal Word*;

(2) Retain the *Statement of Hazards*, shortened if necessary to a practical equivalent;

(3) Consider omission of *Precautionary Measures* if they are clearly indicated or implied from the *Statement of Hazards*, or can be clearly indicated or implied by revising the *Statement of Hazards*;

(4) Consider omission of wording relating to hazards that may be less serious because of the particular characteristics of the package, the nature of the use, and the training and experience of the user. Care must be taken to include precautionary measures for any additional hazard which may be present as a result of such characteristics, use, or training and experience.

(5) Care should be taken that labels prepared in accordance with the above principles include all information required by law (see footnote on page 6).

18

## Labels for Samples and for New Products for Investigational Use

### Samples:

In general, the label for samples of a product should bear the same precautionary information that is on the commercial label, with the exception of possible differences in container instructions. If the product is not in commercial production the label for samples should be prepared in accordance with the principles stated in this Manual.

### New Products for Investigational Use:

Chemical, physical and toxicological data should be obtained on any product before it is distributed so that hazardous properties can be described on the label. However, it may occasionally be necessary to make delivery of a new product for investigational use before all of these data are obtained. For instance, the quantity available may be too small for necessary tests or the product may have to be delivered to investigators for the purpose of obtaining the desired information. These deliveries should be made to qualified investigators only and should be labeled as adequately as possible with the information available. To cover such cases (and such cases only) the following guide is suggested for preparing labels to be used during the period of investigation.

> [NAME OR DESCRIPTION OF PRODUCT]
>
> **FOR INVESTIGATIONAL USE ONLY**
>
> SIGNAL WORD: STATEMENT OF KNOWN HAZARDS
>
> - Appropriate precautionary measures
> - Appropriate instructions in case of contact or exposure
>
> IMPORTANT: The chemical, physical and toxicological properties of this product have not been fully investigated and its handling or use may be hazardous (present additional hazards). Exercise due care.

19

## Container Handling and Storage

Care should always be exercised in handling and storing containers of hazardous chemicals and in removing the contents. The Container Committee of the Manufacturing Chemists' Association, Inc., has recommended the general precautions given below for handling and storing certain classes of containers. Applicable phrases may be selected from these statements. These may be used either as separate labels or in combination with the warning labels given in Part II. Where the properties of the chemical require special or additional precautions, such instructions are indicated in some instances in conjunction with the individual label in Part II.

### Metal Drum Handling and Storage (for liquids and semi-liquids)

Keep plug up to prevent leakage.
Keep drum out of sun and away from heat.
Relieve internal pressure when received and at least weekly thereafter by slowly loosening plug. Retighten immediately.
Never use pressure to empty.
Keep lights, fire, and sparks away from drum openings.
Drum must not be washed out or used for other purposes.
Replace plug after each withdrawal and return with empty drum.
In case of spillage, flush with plenty of water.

### Glass Carboy Handling and Storage

Before moving carboy be sure closure is securely fastened.
Loosen closure carefully.
Keep out of sun and away from heat.
Never use pressure to empty.
Completely drain carboy before returning.
In case of spillage, flush with plenty of water.

### Wooden Barrel Handling and Storage (for liquids and semi-liquids)

Keep out of sun and away from heat.
Store with bilge-bung up.
Never use pressure to empty.
Drain completely.
Keep barrel moist—shrinkage may cause leaks.
In case of spillage, flush with plenty of water.

### Cylinder Handling and Storage

Keep away from heat.
Do not store in sunlight.
Never drop cylinders.
Be sure connections are tight.
*ICC Regulations prohibit refilling cylinder without permission of owner.*
Have airline respirator or self-contained oxygen respirator available for emergency.

### Aerosol Containers

Aerosols in metal cans are used so widely in both industry and in the home that their appropriate labeling is of concern to all. This new type of container for products under pressure should receive more care in handling and storage than the ordinary sealed can under little or no pressure at normal temperatures.

The Precautionary Labeling Committee of the Chemical Specialties Manufacturers Association (50 East 41st Street, New York 17, New York) reviewed the matter carefully and in March 1954 proposed that the following labeling be used on all aerosol metal can containers:

WARNING!

Contents under pressure. Do not puncture.
Exposure to high temperatures may cause bursting.
Keep at room temperature—away from direct sunlight, radiators, stoves, hot water and other heat.
Never throw container into fire or incinerator.

NOTE: Additional requisite cautions for statements as to hazards to persons and property, the safe discharge of contents, etc. will depend upon the particular product.

Appropriate modification of this labeling is suggested for aerosol containers made of other materials.

## MANUAL L-1 4th REVISION

1956

*The Following Label Changes Have Been Made In The 4th Edition*

### PART II

LABELS ADDED
Aluminum Chloride, Anhydrous
Arsenic Trioxide
Dimethylamine, Anhydrous
Hydrogen Peroxide (Over 52%)
Hexamethylenetetramine (Meta)
Phthalic Anhydride
Propylene
Trimethylamine, Anhydrous

LABELS REVISED
Acetic Anhydride
Barium Nitrate
Benzene
Carbon Tetrachloride
Chromic Acid

Dichloroethyl Ether
Diethylenetriamine
Ethylenediamine
Hydrofluoric Acid Anhydrous
Mercuric Chloride
Lead Acetate
Methanol
Morpholine
Perchloric Acid
Sodium Chlorate
Sodium Hydroxide
Sodium Sulfide
Vinyl Chloride

LABELS DELETED
Arsenic Trichloride
Calcium Cyanide

### PART III

LABELS ADDED
Antimony Potassium Tartrate
Aramite
Captan
Chloranil
Chloro-IPC
p-Chlorophenyl-p-Chlorobenzenesulfonate
Copper Compounds
Dalapon
Dichlone
Dichlorodiphenyl Dichloroethane
Dinitro-ortho-Cresol
Endrin
Ethyl Mercury Acetate
Glyodin
Heptachlor
Hypochlorites
IPC
Malathion
MCP
Methyl Mercury Dicyandiamide
Methyl Parathion
Phenyl Mercury Acetate
Potassium Cyanate
Sodium Trichloroacetate
Thallium Sulfate
Warfarin
Zinc Phosphide

LABELS REVISED
Aldrin
Astic
Barium Fluosilicate
Calcium Arsenate
Calcium Cyanide
Carbon Tetrachloride
Chlordane
Cresol
Cyanides, Inorganic
Dichlorodiphenyl Trichloroethane
Dichloroethyl Ether
Dieldrin
Ethyl Mercury Chloride
Ethyl Mercury Phosphate
Ethyl Mercury para-Toluent Sulfonanilide
Hydroxymercurichlorophenol
Hydroxymercurecresol
Hydroxymercurinitrophenol
Lead Arsenate
Magnesium Arsenate
Nabam
Paris Green
Phenyl Mercury Oleate
Sodium Chlorate
Strychnine
Zinc Arsenite

LABELS DELETED
London Purple

## PART II

# Illustrative Warning Labels for Industrial Chemicals

The warning labels in this section have been prepared to demonstrate the practical application of the principles in Part I to a number of chemical products intended for industrial use. The user should familiarize himself with Part I before adapting any of the label statements contained in Part II to his products. The chemicals were selected to illustrate labeling for the major types of hazards commonly encountered. Consequently the listing covers only a relatively few of the hazardous chemicals for which warning labels are necessary. In many cases these labels are applicable to other products some of which are listed with appropriate cross references.

The labeling of radio-active materials, the increasing use of which presents a number of special hazards, is a complex problem beyond the scope of this Manual. In designing labels for these materials, it is suggested that reference be made to Handbook No. 42 published by the U. S. Department of Commerce, National Bureau of Standards, entitled "Safe Handling of Radioactive Isotopes."

The labels are based on the properties of the named chemicals; the presence of other substances, including impurities, may alter these properties and necessitate additional or different precautionary information.

General information regarding the handling and storage of containers is not included on these labels. This subject is discussed under the heading "Container Handling and Storage," page 20.

First aid treatment is given for a few products only. Such information may be desirable on other products. Where "clothing" is mentioned in first aid instructions, it should be understood to mean all articles of clothing, including shoes, garters, and other accessories. Shoes are specifically named in some instructions, because of special hazards arising from absorption of the chemical by leather.

The notation, "MCA Chemical Safety Data Sheet available" appearing with certain labels in this section refers to Data Sheets published by the Manufacturing Chemists' Association, Inc. These publications contain detailed information on the chemical, physical and toxicological properties of the product, as well as information on shipping containers.

23

tainers, labeling, storage, handling and protective equipment. Price and a complete list of available Data Sheets may be obtained from the Association. (See page 78 for list.)

*The warning labels suggested in this Manual should be used in addition to, or in combination with, any label required by law.*

---

## ACETALDEHYDE

### DANGER! EXTREMELY FLAMMABLE
### MAY FORM EXPLOSIVE PEROXIDES
### UNDER AIR PRESSURE

- Keep away from heat, sparks, and open flame.
- Keep container closed.
- Use with adequate ventilation.
- Avoid prolonged breathing of vapor.
- Cool below 68°F. before opening.
- Do not use air pressure to transfer.

MCA Chemical Safety Data Sheet available

---

### GLACIAL

#### CAUSES SEVERE BURNS

- Do not get liquid or vapor in eyes, on skin, on clothing.
- Keep from heat and open flame.
- In case of contact, immediately flush skin or eyes with plenty of water for at least 15 minutes; for eyes, get medical attention.
- This liquid freezes at 63°F., forming hard lumps (which may cause damage when moved).
- Should be maintained above 62°F.
- Thaw only by carefully moving carboy to warm area.

MCA Chemical Safety Data Sheet available

---

## ACETIC ACID, 80%

### DANGER! CAUSES SEVERE BURNS

Do not get liquid or vapor in eyes, on skin, on clothing.
In case of contact, immediately flush skin or eyes with plenty of water for at least 15 minutes; for eyes, get medical attention.

MCA Chemical Safety Data Sheet available

---

## ACETIC ACID, 56%-70%

### WARNING! MAY CAUSE BURNS

Avoid contact with skin, eyes, and clothing.
In case of contact, immediately flush skin or eyes with plenty of water for at least 15 minutes; for eyes, get medical attention.

MCA Chemical Safety Data Sheet available

---

## ACETIC ACID, 28%

### CAUTION! MAY CAUSE BURNS

Avoid contact with skin, eyes, and clothing.
In case of contact, immediately flush skin or eyes with plenty of water for at least 15 minutes; for eyes, get medical attention.

MCA Chemical Safety Data Sheet available

---

## ACETIC ANHYDRIDE

### DANGER! CAUSES SEVERE BURNS
### VAPOR HARMFUL

Do not get liquid or vapor in eyes, on skin, on clothing.
Do not breathe vapor.
In case of contact, immediately flush skin or eyes with plenty of water for at least 15 minutes; for eyes, get medical attention.

MCA Chemical Safety Data Sheet available

25

# EXHIBIT X

Reproduced at the National Archives

6 260



DEPARTMENT OF THE NAVY
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D.C.

IN REPLY REFER TO

BUMED-733-PR
AIO-1/L5
15 January 1960

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Occupational Health Reports (NavMed 576)

Subj:   Occupational Health Hazards; Release No. 22

Ref:    (a)  MANMED 23-21

Encl:   (1)  List of Occupational Health Hazards (July - September 1959)

1.   The Quarterly Occupational Health Reports (NavMed 576) for July through September 1959, submitted in accordance with reference (a), have been reviewed.  Potential health hazards of special interest have been selected from these reports and are forwarded herewith as enclosure (1).

2.   The compilation contained in enclosure (1) is intended as a ready reference to current problems, and in some instances will help avoid duplication in the solution of these problems.  It is also intended to aid Medical Department personnel in the recognition of potentially hazardous materials and processes.  Further detailed information regarding specific hazards noted in enclosure (1) may be obtained from the originating activity.

3.   The information contained herein on the composition of materials is to be treated as manufacturer's "DISCREET" proprietary information, in accordance with SecNav Instruction 5570.1A of 6 April 1957, and is to be used solely for the control of potentially toxic materials.  It is not to be released for any other purpose.

4.   The request for information pertaining to the social and scientific activities of personnel engaged in the Occupational Health Program has been favorably received and is appreciated.  A subtitle for industrial hygiene services provided the Fleet will be included henceforth under the subtitle "Shipboard Industrial Hygiene Surveys and Investigations".

LLOYD B. SHONE
By direction

Copy to:  (2 copies each)
NDS&RCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP 281)
MSTS
CMC

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
July 1959 through September 1959

Release No. 22                                    For Official USE Only

1.  Chemical Health Hazards.

   A.  Inhalation Hazards Due to Gases, Vapors, Fumes and Dusts

      1.  1,1,1-Trichloroethane.  Following a Medical Admission to
the Dispensary an investigation was made on a submarine undergoing repair.
The workman involved had been preparing surfaces and brush painting with
Plasite Paint Formula No. 7144 in the Sanitary Tank which was about four
feet square and six feet deep.  No ventilation was provided to the space
and the workman had about a pint of the paint in the tank with him.  After
being in the tank approximately one hour he was found to be unconscious
and removed to the Dispensary.  A witness said that the workman was wear-
ing an organic vapor respirator at the time of his removal from the tank.

      Plasite Paint contains about 35% 1,1,1-Trichloroethane.  Other
common names for this solvent are Methyl Chloroform, Vythene, Chlorothene
and Magselect.  1,1,1-Trichloroethane is very volatile, requiring little
heat to cause evaporation.  Plasite is an epoxy resin type paint and is
mixed with an amine hardener prior to application.  The exothermic re-
action of the mixture may have been a factor in the workmen's exposure.
The vapor is heavier than air and therefore tends to displace air in
enclosed spaces.  The organic vapor respirator worn by the workmen is
designed to remove vapors from the air when concentrations do not exceed
1,000 parts per million (ppm).  It had a knitted cotton facelet over the
contact area between the face and the mask.  In testing the efficiency
of the respirator it was noted that it was not possible to pull a vacuum
by closing off the inlets to the organic vapor cartridges.  This indica-
ted that the workman was breathing the contaminated air around the facelet.
Because of the potential hazard involved in the Plasite application it
was recommended that air supplied respirators and ventilation be provided
during such work on interior surfaces.  It was also recommended that
organic vapor respirators be used only when applying petroleum spirit type
paint vehicles and that the facelets be removed prior to issue.        (1)

      2.  A request was received to test the cable tanks and cones
of a cable-laying ship for oxygen content and for the presence of any
toxic or injurious gases.  The request was made because of a casualty
occurring on a similar ship operating in the Atlantic.  Oxygen values
ranged from 5.5% to 20.4% and carbon dioxide from 11.7% down to 0.0%.
Carbon monoxide concentrations of about 5 ppm were found in one tank
and its associated cone.  Tests for hydrogen sulfide, chlorinated
hydrocarbons, arsine, phosgene, nitrous gases, and flammable vapors      (19)

--157--              enclosure (1)

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 13 of 60   Page ID #:3964

were all negative. The most serious potential hazard existed in a cone with an oxygen content of 5.5% and a carbon dioxide content of 11.7%. The source of the carbon dioxide has not been established but may be produced by bacterial or chemical action on the whiting used to keep the cable from sticking.                                           (19)

3. <u>Rapid drying primers</u>. A study is in progress to determine the feasibility of the use of rapid drying primers for steel plate. The search is particularly slanted toward obtaining a paint which may be welded upon without producing a faulty weld. At present, zinc chromate primer must be removed in the way of welding because of porosity of the weld. The Industrial Hygiene Division investigated the health aspects of two of these paints, a lacquer primer and an acrylic ester base paint. Application of rapid drying paints always poses an industrial health problem because of the evaporation of solvents. When applied outdoors in the steel yard, sufficient dilution of vapors should occur so that exposure to hazardous concentrations would be limited to those engaged in the actual application. Application of lacquers or acrylic paints elsewhere would require precautions similar to those now used for Saran and epoxy coatings. Tests were made for potential health hazards created by the decomposition of the dried paint film by welding and burning. Tests were made for carbon monoxide, oxides of nitrogen, phosgene, acidic or alkaline gases, and aldehydes were found under laboratory conditions. To date, tests indicate that the normal precautions used in welding or burning, i.e., the proper use of exhaust ventilation or respiratory protection, should prevent exposure. However, should welding or burning take place on a bulkhead or deck coated with material on the opposite side, decomposition of the paint could occur in adjoining spaces with harmful results.                                           (4)

4. <u>Inhalation</u>. The first application of Devran Coating by this shipyard was accomplished without incident. The coating was applied hot (about 160° F.) by spray methods to the interior of submarine ballast tanks. Complete skin protection and the use of air line respirators were required for painters applying the coating. Gloves and charcoal-type respirators were used by painters mixing or carrying the resin. Tests for organic amines and for butyl cellosolve in the exhaust air from the ventilating system and in the area immediately over the mixing tank were well within the accepted permissible limits.                                           (19)

5. Employee inhaled <u>chlorine</u> while attempting to clear the atmospheric vent tube to a chlorinator by blowing into the tube with his mouth. When the obstruction was blown clear the chlorine fed back into the line and the employee inhaled enough gas to cause respiratory discomfort and throat irritation. An investigation of work methods indicated the present practice of clearing plugged chlorine lines by blowing into them should be discontinued; the use of an aspirator was recommended for this purpose. It was further recommended that employees working on chlorine charged lines or equipment wear the gas mask provided.                                           (9)

Case 2:12-cv-03013-SVW-PJW Document 128-21 Filed 02/11/13 Page 14 of 60 Page ID #:3965

Reproduced at the National Archive

6. <u>Trichlorethylene.</u> Employees on a 2nd. deck of a building complained that a strong solvent odor was present in the shop and a number of them felt dizzy and nauseated. Investigation failed to reveal any use of solvents in the shop but there was an unmistakeable odor of trichlorethylene the source of which was finally traced to a shop on the 1st. deck. There a vapor degreaser was found to be improperly used. The rinse nozzle was connected to a source of compressed air and clouds of trichlorethylene vapors were being blown out of the machine. The tremendous amounts of contaminant thus created permeated the work area and channeled through the ceiling to the floor above. The steam pressure was set too high, so that the solvent was overheated. The vapor cut-off thermostat was inoperative. The operator wore a chemical cartridge respirator which apparently was inadequate because he complained of "feeling drunk". The other employees nearby were also affected. The machine was ordered taken out of use until such time as a liquid pressure pump would be installed instead of compressed air for the rinse operation and until other repairs were made to ensure that the vapors are controlled. This was accomplished within a few days. Follow-up tests were made and the vapor concentrations were found to be consistently below 50 parts per million indicating that normal conditions were obtained. (5)

7. <u>Fumes from Burnout Tests.</u> An investigation was made in the Power Section of the Material Laboratory, Bldg. #296, in which is located a high power test station which can apply as high as 100,000 amperes and 500 volts to circuit breakers and other power equipment undergoing test. These tests are made intermittently and personnel must be in the control room at time of test. Any burnouts that occur dissipate fumes and g ses into the open high ceiling area above the test cell. In some instances an air line hose may be used to blow out fumes that still linger in the equipment tested. Under conditions of operation observed, there is no hazard to personnel from inhalation of fumes or gases and installation of exhaust blowers is not considered necessary. (10)

8. Industrial hygiene practices were formulated for the fabrication of the lead shielding for the nuclear waste tanks aboard the USS FULTON (AS-11). These included ventilation, personal protective measures when necessary and good housekeeping. (11)

9. <u>Tricresyl Phosphate.</u> An evaluation was made of the amount of tricresyl phosphate discharged by a vacuum pump, evacuating the insulating void around liquid oxygen containers. In order to drive-off moisture from the void, gaseous nitrogen is fed to the tricresyl phosphate which is used as pump oil. This results in a mist analyzing between 51 and 72 milligrams per cubic meter of tricresyl phosphate at (6) 1 foot downstream from the point of discharge. Recommendations for extension of the exhaust vent and/or provision of a mist eliminator have been

Reproduced at the National Archives

Release No. 22

made. A revaluation after installation of an oil filter cartridge element resulted in a concentration of 1.1 milligram per cubic meter. An additional recommendation calls for a revision of the procedure so as to eliminate any misting of tricresyl phosphate.                        (6)

10.  Inhalation. The use of "Dion-Iso" polyester resin was under study for possible use in the coating of exposed metal framing in plastic fair-waters. The use of this material introduces a serious potential hazard because of the presence of dimethylaniline/is highly toxic with a threshold limit value of 5 ppm and can be readily absorbed through the intact skin. Skin, eyes, & clothing should be thoroughly protected & water flushed when contaminated. Clothing should be removed and washed before reuse. Either adequate ventilation or respiratory protection should be provided.                                          (19)

11.  Three men reported to the Dispensary for personal decontamination after having been accidentally sprayed with Phosphate Ester Fluids. A visit to the work site confirmed the belief that the exposure experienced during this accident was negligible; however, it also indicated the need for better process controls. It was evident that in spite of previous instructions, employees were not following the exposure control measures recommended. They were re-instructed in these measures which are as follows:

      a.  In general, avoid skin contact and vapor, mist or aerosol inhalation.

      b.  Wear protective gloves, face shields, and other protective clothing, when indicated.

      c.  Use catch pans, containing a small amount of water whenever possible. Empty these pans frequently.

      d.  Clean up all spills promptly with soap and water. Use a covered container for disposal of rags.

      e.  Minor spills on the person should be cleaned immediately with soap and water. Employees having the material sprayed in the eyes, mouth, or over large portions of the body should report to the Dispensary for decontamination.

      f.  Machine parts should be cleaned thoroughly before any maintenance involving burning is attempted, and exhaust ventilation provided for such operations.     (2)

12.  Approximately 200 pounds of pentachlorophenol, a wood preservative and insecticide, was sprayed in the basement of the Rope-   (8)

FOR OFFICIAL USE ONLY

walk Building by outside contractors. Several days later Shipyard employees were found repairing sections of pipe in this area without benefit of respiratory protection. Wearing of chemical cartridge respirators was immediately required. Samples taken to determine the atmospheric concentrations of pentachlorophenol showed amounts to 0.036 milligrams per cubic meter. Although this is less than the maximum allowable concentration, even a short exposure caused irritation of eyes and mild headache, and thus reduced production efficiency. The area was posted with a "Warning" sign. (8)

13. The recommendation that methyl chloroform be used as the solvent to wipe hydraulic fluid stains from the walls of the missile room aboard a guided missile cruiser was adopted and proved successful. This cleaning procedure was preliminary to applying an epoxy resin to the same surfaces. For both the solvent cleaning and paint spraying operations, supply ventilation and respiratory equipment provided adequate protection against the health hazards involved. (8)

14. Inorganic Materials. Dust concentrations were measured during application of magnesia and fiber glass lagging. The materials are preformed to fit over pipe fixtures. During application in a confined steam tunnel, magnesia dust was always in excess of 50 million particles per cubic foot while fiber glass did not exceed five million. Respiratory protection is mandatory for the magnesia. The fiber glass is reported to cause itching, therefore skin covering has been suggested (long sleeves, high collars, etc.). (6)

15. De-Oxalum. As previously reported, De-oxalum is a proprietary product used to clean aluminum prior to welding. The use of this material originated with the Philadelphia Naval Shipyard. Further investigation was requested by the Awards Committee at this activity. Tests indicate that De-oxalum may contain secondary butanol in addition to the butyl cellosolve and acidic component. It will decompose with heat, forming considerable sulfur dioxide. There have been some complaints of a tight feeling in the chest by personnel using this material. This tends to confirm the presence of the alcohol since such complaints are common when using the higher alcohols. Therefore, it was recommended that, in addition to the eye protection specified, the material should not be allowed to contact the skin, and it should be used in a well-ventilated area or with exhaust ventilation. Organic vapor cartridge respirators may be necessary. (4)

16. Paint vapors. Investigation was made of a Beneficial Suggestion which advocated that hatches of freshly-painted compartment be propped open about 3/4 of an inch to allow air circulation. At present, freshly painted compartments are closed off and sealed. (4)

Reproduced at the National Archives

Release No. 22                                    FOR OFFICIAL USE ONLY

Oxygen in the compartment is depleted by the oxidation of the paint,
carbon monoxide may be formed, and various contaminants are released
to the air in the form of solvent vapors, oxidation products, etc.
When entering these compartments there is usually considerable eye and
upper respiratory tract irritation. Directives require that tests must
be made by the Gas Free Engineer or his representative, and ventilation
utilized as necessary before entry into such a compartment can be
effected. The amount of ventilation afforded by a 3/4 inch opening
produced by propping one end of a hatch cover open with a wood block
would be negligible. Accordingly, the adoption of the suggestion was    (4)
not recommended.

    17. Following receipt of reports of the presence of benzol
in JP-4, samples were taken from 4 aircraft arriving for overhaul.
There was no benzol found in any fraction.                                (15)

    18.  A detailed industrial hygiene survey of Shop 51 was
made.  Some of the operations have varying degrees of health hazards
associated with them.  Precautionary measures were recommended and
adopted on the following operations and areas:

    a.  Control of fumes and dust and handling chemicals
        in Battery Repair Shop

    b.  Removal of radioactive markers

    c.  Handling electric plastic sealing & insulating
        compounds

    d.  Handling toxic chemicals in the Plating Section

    e.  Control of dust and solvent vapors in Motion
        Picture Repair Section

    f.  Control of fumes in Silver Soldering both,
        ICE Section

    g.  Installation of exhaust ventilation at buffing and
        grinding wheels, ICE Section

    h.  Operation of Detrex Degreaser, ICE Section

    i.  Disposal of radioactive luminous paint,
        Engraving Section

    j.  Noise sound pressure levels and frequency analyses

    k.  Labeling of hazardous chemicals and materials         (10)

Case 2:12-cv-03013-SVW-PJW Document 128-21 Filed 02/11/13 Page 18 of 60 Page ID #:3969

19. Several employees were having difficulty with fumes while burning out boiler tubes in a confined area aboard ship. Two employees had been overcome. Carbon monoxide was suspected and on sampling, high concentrations of carbon monoxide were found. A discussion was held at a shop supervisors meeting on the above hazard. They were instructed in the effects of carbon monoxide and reminded of the need of adequate ventilation during burning operations.                    (3)

20. <u>Carbon Monoxide.</u> An exhaust fume problem in a large aircraft assembly building was partially resolved when two large capacity diesel power units were installed in the outside of the building to supply electric power to two production lines. Prior to this, as many as 4 gasoline-driven auxiliary power units had to be used at each aircraft because of insufficient electrical capacity of the building. Under those conditions, concentrations of carbon monoxide approaching or exceeding the MAC were frequently encountered.                    (6)

21. An investigation was made to determine the carbon dioxide hazard from a new 35 cubic foot dry ice storage tank located in a large industrial work room. The tank was open at the top with a heavy insulated blanket covering the dry ice. Although the carbon dioxide concentration within the tank was over 25% with the blanket removed, it was never above 0.5% at the breathing level 1 foot above the tank and general room ventilation was sufficient to maintain the carbon dioxide concentration of the room air within permissible limits. It was recommended that long handled tongs be provided and used for the removal of the blocks of dry ice, thus eliminating the possibility of anyone reaching or climbing into the tank.                    (9)

22. Employees using teflon coated electronic wire questioned the plastic as a source of throat irritation resulting from solder operations. Due to the size of wire, type of operation, and materials used no hazard could be found in the operation.                    (15)

23. While welding on its exterior hull no fume generation was noted to occur within a saran-coated gasoline tank aboard an AO. Heat from the welding of outside rivet-heads did not appreciably penetrate through the two 3/4 inch plates to cause decomposition of the saran resin.                    (8)

24. <u>Carbon dioxide shielded welding.</u> Further tests were made of inert gas shielded electrode welding utilizing carbon dioxide gas as the shield. Tests were made while repairing a defective casting under a portable canopy in a dry dock. No positive ventilation was used. Natural ventilation was good. The Draeger test for oxides of nitrogen (4) indicated a trace. Carbon monoxide was negative, except over the head

Reproduced at the National Archives

RELEASE No. 22

of the welder in the smoke plume (100 parts per million). The welder wore an air-supplied sock hood. His protection was considered adequate. In this connection investigation was made of a Beneficial Suggestion advocating a long linear (about 2 inches by 30 inches) exhaust hood for welding with carbon dioxide shielded arcs. It was pointed out that this would be effective only for a linear weld and in no case would it prevent exposure to ozone which is formed, not only at the arc, but several feet distant from the arc by the action of the intense ultra violet radiation. The principle of low velocity-high volume air movement as suggested was correct. It was recommended that a square or rectangular hood be utilized.                                                                (4)

25.  Welding within a lower deck compartment aboard a destroyer was stopped when a heavy concentration of xylene vapors was found constituting a health and fire hazard. Temporary exhaust ventilation which had been installed during the spray painting of an adjacent ammunition storage compartment had been removed before sufficient drying and to exhaust solvent vapors.                                          (8)

26.  Investigation of a number of eye "flash" burns to welders working on the inert-gas metal arc process showed that welders were not wearing protective sideshields on their safety glasses and as a result did not have adequate protection against the scattered ultra-violet radiation given off by other arcs in the work area. The need for this sideshield protection is emphasized by the increased number of "flashes" reported to the Dispensary, particularly in confined areas where welders are working in close proximity to each other. As a corrective measure it has been recommended that welders have their safety glasses, worn under their hoods, equipped with sideshields. This applies to both prescription and non-prescription safety glasses.       (9)

27.  Shop 11-26 recently began an extensive aluminum welding project using aluminum alloy No. 55-56 containing 5% magnesium. Sixty-one S, (61S), aluminum alloy containing about 1% magnesium was formerly used. The employees noted: (a) an increase in fumes, both by odor and vision; (b) a different light glow from the arc; (c) sparks on cleaning a hot welded area with a wire brush; (d) erythema and burning of the skin. The major health hazards associated with this welding process are ozone gas and ultraviolet radiation. Ozone gas causes nose and throat irritation and lung congestion. It can be extremely hazardous in confined areas. Ultraviolet radiation causes skin burns & visible light intensity is also increased in this welding process.

The same health hazards exist with each of the above alloys. On a comparative study, using an Ultraviolet Photometer, the ozone       (3)

concentration appeared to be increased with the 55-56 alloy.  The increased
light intensity and sparks are due to the increased magnesium content.  The
following recommendations were made:  (a) the instructions given in BuShips
Instruction 6260.4, of 10 September 1958 should be followed;  (b) cover all
exposed skin surface of the welder;  (c) personnel with exposed body surfaces
should not remain in the vicinity of the direct light rays;  (d) use a No. 12
glass in the face shield;  (e) welding should be performed only with adequate
ventilation; and (f) ventilation should be supplemented with air supply res-
pirators if necessary.                                                      (3)

   28.  Wood Preservative, Pentachlorophenol - Painters in the
Material Laboratory will use this paint on the roof of the building.  The
cognizant supervision was advised that skin contact with, or inhalation or
vapors from, this preservative should be avoided by the use of suitable pro-
tective clothing and equipment.                                            (10)

   B.  Health Hazards Due to Contact with Skin

   1.  Experiments were recently conducted in the Shipyard in the
application of 100% reactive epoxy coatings.  The unusual features of the
coatings are the absence of solvents and the use of diethylamine triamine
adduct for the hardener.  The adduct is made by reacting the diethylamine
triamine with some of the resin which results in a faster curing rate.  This
should help to lower the vapor concentrations and reportedly results in a
reduced skin-irritant potential.                                           (19)

   2.  Two welders have developed rather severe dermatosis of
both hands with what appears to be sensitization to chrome leather welding
gloves.  Standard stock unlined welding gloves have been used for a long
period of time without difficulty.  At present both employees are wearing
cotton work gloves under asbestos mittens with good results.  As soon as
these skin conditions clear the use of lined welding gloves will be given
a trial.                                                                    (9)

   3.  Five employees using "Clarco" disinfectant for cleaning
floors were affected by skin irritation, one severe enough to require
treatment by a physician.  The disinfectant is reported to contain isopro-
panol and chlorophenyl-phenol soap.  Patch tests with the material indicate
it to be a primary irritant in the recommended dilution, possible because
of unreacted phenol.  The use of disinfectant has been discontinued.        (19)

   4.  A few cases of dermatitis have occurred during the quarter,
some of which were traceable to possible cross-infection and others to
personnel allergies or nervous conditions.  The cross-infection occurred
in a group of assemblers working on a single aircraft and forced into very (4)
close quarters.  One of the crew had a previous history of skin irritations

Reproduced at the National Archives

or infections and observed poor standards of personal hygiene. It was significant that all other members of his crew excepting a part-time worker acquired similar conditions, two of them being severe enough to be treated at the Dispensary. Another case of allergic origin resulted in persistent skin irritation whenever the patient approached her regular working environment. A study of the materials handled failed to reveal any primary irritant. Employee was given leave for alleviation of her condition and the medical officer will see to reassigning her to a different type of environment. (6)

5. Three men reported to the Dispensary complaining of a burning sensation on their hands experienced as a result of contacting a fluid while working on an oxygen generator being prepared for shipboard installation. It was immediately determined that this fluid was a concentrated solution of potassium hydroxide leaking from a line and there was no warning plaque on the machine. It was further determined that this machine had been received containing potassium hydroxide and inadvertently stored on its side. Warning signs were posted, the machine cleaned, and it was suggested that the manufacturer be contacted in order to prevent future incidents. (2)

6. A group of sailors were becoming "sunburned" after cleaning salt water voids aboard ship. These voids are painted with bituminous paints as a rust preventive. This paint is a type of asphalt coal tar pitch. The photosensitizing effect of this paint is commonly known in shipyards. Detailed information on the subject is found in "Occupational Diseases of the Skin", by Schwartz, Tulipan and Peck. (3)

7. Two cases of apparent sensitization to epoxy resin (Palmer) were reported during the quarter. A dermatitis of the hands and forearms appeared after only a few hours of resin application to a propeller shaft. Full protective clothing, including rubber gloves, was worn. A similar operation conducted approximately 3 months earlier resulted in hand and forearm dermatitis in the same individuals during the third week of handling the Palmer resin. It was recommended that the men involved not be assigned to future epoxy jobs. (13)

8. Several employees from one of our shops used benzene to clean Mine Sweep cables before patching. The procedure used was to soak a cloth with the solvent and wipe the area to be patched. This material is extremely flammable and the vapor is very toxic. Chronic poisoning can result from daily exposure over prolonged periods. Its use can cause an irritation of the skin due to defatting effort. Chronic poisoning can also result through skin absorption. It was recommended that personnel be cautioned to prevent inhalation of the vapor and to be required to wear rubber gloves while using this material. (3)

-166-

Reproduced at the National Arch

Release No. 22                                           FOR OFFICIAL USE ONLY

9.  A painter developed an erythematous area after spraying "Komul", a bitumastic paint.  The paint contains coal tar and a tar distillates that photosensitize the skin.  The painter did not use protective cream and thereby became sunburned when his skin was exposed after painting.  The use of proper protective creams was suggested for all painters spraying resins.

10.  A joiner applying an epoxy resin deck coating has developed a sensitivity to this resin.  Employee wore rubber gloves and used protective cream on his hands; both arms were affected as well as small areas on one leg and one ankle.  This employee was recently transferred here and gave a history of previous sensitization to epoxy resins.  He has been assigned to other duties to avoid contact with uncured epoxy resins.  (9)

11.  A mixture of kerosene, white lead and trichloroethylene was reported to have caused a mild dermatitis on the hands of a machine shop employee.  This mixture, used in a steel cutting process, was said to be necessary for this work and further, that direct hand contact, without gloves, was unavoidable.  A recommendation that methyl chloroform be substituted for the trichloroethylene and that a protective hand cream be used, was accepted.  (8)

12.  Five cases of dermatitis occurred during the application of epoxy resins.  Investigation revealed that in four cases there was a disregard of the health procedures established for handling of epoxy resins.  The other employee was found to have been sensitized to the resin and was removed from further exposure.  The remaining four cases were given treatment and additional indoctrination.  (11)

II.  Physical Health Hazards

    A.  Exposure to Excessive Heat

        1.  A study was made of the upper sections of the Machine Shop to determine temperature and humidity conditions existing during the summer months.  Although the results did not indicate serious adversity recommendations were made to improve working conditions to maintain production efficiency.  (8)

    B.  Exposure to Nonionizing Radiation Hazards

        1.  During this quarter the nuclear reactor of SSGN-587, USS HALIBUT, was brought to initial criticality and the reactor and associated systems were successfully tested at all power levels.  No unusual or severe health physics problems developed.  None of the workers acquired more than a minimal exposure to ionizing radiation.  (2)

-167-.

Reproduced at the National Archives

Release No. 22                                    FOR OFFICIAL USE ONLY

2. Microwaves. Under the provisions of a BuMed Instruction requesting eye examinations of radar employees, all the personnel in the radar shop were so examined. Two (2) employees were found with abnormalities; one (1) showed cataracts of both eyes which may have been orginally produced prior to his employment at this Station, however, he indicated previous experience as a radioman in the U. S. Navy; the other showed certain opacities of senile character. A survey of their work areas with a germanium diode tester indicated microwave intensities in the order of 0.001 to 0.004 watts per square centimeter during operation of a powerful radar set in a separate area of the shop. Both employees were transferred to "cooler" areas of the shop and were further shielded with metallic partitions resulting in no reading in the detector.

Stray radiations were found in the radar shop as indicated in the paragraph above. These were judged to be within the accepted limits of microwave exposure and resulted from reflections or refractions of microwave beams directed to outside targets through glass windows. Structural members of the building caused some of these rays to bounce back. Recommendations have been made to install absorbing screens around radar antennas in such orientation as to prevent the bounce-back effect.      (6)

3. As a practical safeguard to avoid excessive exposure to radar waves, Neon Lights (N. E. 51, Stock #GF. 6240.223-9100) are being used. These neon lights will glow when exposed to microwaves producing approximate energy of 5 or 6 milliwatts per square centimeter which are below the threshold limit of 10 milliwatts per square centimeter.      (20)

4. Radar Modulator Unit An-SPS-29, containing high voltage Thyratron Tubes (12 kvp), was monitored aboard the USS MANLY for presence of x-radiation. Readings were taken using "Cutie Pie" ionization chamber encased in a "cage" covered by a double-thickness aluminum screen to prevent RF interferences. Readings in the compartment and in front of the modulator unit with doors open were less than 1mr/hr. Film badges placed on the inside of door panels and on one operator represented 6-8 hours exposure, film badge (duPont 552 packet) readings were negative.

5. Since instrumentation is not avail/to continuously monitor the area in the vicinity of the antenna where shipyard cranes are required to operate, it is desirable to provide these crane operators with a qualitative measuring device that will show the presence of microwave radiation in the energy range that may constitute a health hazard for continuous exposure.

(12)

It is known that miniature neon lamps, such as the GE series NE-51 will glow in the presence of radar microwaves in this energy range. It is recommended that they be installed against the outside front glass

-169-

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 24 of 60   Page ID #:3975

Reproduced at the National Arena

window of the cab in full view of the operator. (12)

C. Exposure to Excessive Noise

1. Acoustical measurements on several hydraulic test benches indicate that generally ear protection is needed by the operators of such equipment. The noise exhibits one or more peaks in some octave bands which indicates that either pure tones or narrow frequency ranges exist and thus render the noise more hazardous. For instance, a bench with a measured level of 98 decibels has a hazard equivalent to 108 decibel level. It is felt that wearing of ear plugs is advisable for most of the personnel in the vicinity of these benches and it is mandatory for the operators. This situation presents a difficult enforcement problem and is best solved by installation of acoustical shields when funds will be available. (5)

2. Under the hearing conservation program it is intended to have information on the hearing of every industrially employed person. Overall audiometric surveys of large segments of the Station conducted on a division-wide basis have been initiated. Three divisions have been completed with another one in process. (6)

3. Measurements were made in the metal building at the O&R Jet Test Cell Area. Employees inside the building complained of vibrations in the chest as a result of the operations. The noises were not found to be excessively high for operations of this type. Personnel were informed the vibrations are not injurious and ear defenders are required during the operation. (15)

4. Modification of an existing test cell to accommodate the J-57 engine with afterburner was completed recently. An evaluation of sound attenuation was made by Sound Control Incorporated; sound reduction was not acceptable. Design of the engine support was such that the engine exhaust was approximately 10 feet from the attenuator inlet. Modification is in progress to permit operation essentially as designed. (16)

5. Preliminary checking on the effectiveness of a (Maxim Div. of Emart Company), portable sound attenuating device was done utilizing the A4D-1 aircraft (J-65 engine). It was found that sound intensity was increased forward and the side; and decreased aft of the muffling device. Tail pipe temperature was elevated about 12° probably because of back pressure built up by entry resistance. Alignment was imperfect (inherently so with this attenuator and the A4D) and the attenuator entry grill is of significant area with a consequent build-up of temperature. Indications are that portable mufflers or attenuators of this design are not usable withhout considerable modification. (16)

-169-

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 25 of 60   Page ID #:3976

Reproduced at the National Archives

6. A noise study was conducted at the Ground Control Approach Facility located near the intersection of the two main runways in the direct path of noise produced in the flight test line, 1500 feet away. A continuous recording indicated a weighted average overall noise of 92 decibels with peaks varying from 108 to 117 decibels. The 20 military persons attached to that facility have been included in the audiometric program and hearing protection has been recommended.                    (6)

7. Several estimates were made of the expected free-field noise produced by the Regulus II missile utilizing data issued by the manufacturer of other naval sources. It was concluded that noise of the order to 150 decibels may be encountered in areas where personnel will have to perform certain adjustments. Recommendations were made to add water cooling to a standard portable aircraft exhaust muffler, so as to enable afterburner runs exceeding the capability of the muffler. Actual noise readings of the Regulus II made subsequently at Point Mugu indicated the noise to be of the 140 decibel intensity.                    (6)

8. An attenuation pad consisting of a length of cable and two plugs to be inserted in the corresponding sockets of a sound level meter was manufactured with the assistance of the Navy Electronics Laboratory, San Diego. The device provides 30 decibels attenuation thus extending the range of the sound level meter to 170 decibels.                    (6)

D. Illumination Problems

1. Due to complaints of excess glare from military personnel a survey was made of an office located on an outlying field. Lighting is furnished by overhead fluorescent fixtures equipped with diffusers and furnishing a minimum of 30-40 f.c. of light on the working surfaces. The walls are painted a cream-yellow. Work in the office is done on yellow cards and visual difficulty is encountered due to poor contrast. In order to reduce glare it was suggested that the walls be painted with a dull finish, light green paint.                    (15)

2. A program for the relamping of certain production areas has been initiated. A survey was recently completed in the second floor of an industrial building where light levels were low, requiring considerable amount of auxiliary lights. At this time the general level of illumination was found to be in excess of 50 footcandles. Because of the extremely high visual demands of certain operations many of the auxiliary lights were recommended to be retained to yield levels in the 100-200 footcandles suggested by the Illuminating Engineering Society for similar tasks.                    (6)

3. Glare from Fluorescent Red Orange Paint, Color 633, Hi-   (20)
Visibility, was responsible for eye fatigue among several of the 30 spray

-170-

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 26 of 60   Page ID #:3977

Reproduced at the National Archives

painters using this type paint.  Tinted glass protective eyewear was recommended as suggested by BuMed and BuAer.  Personnel also complained that difficulty was experienced in removing the fluorescent paint from the skin.  Protective skin cream (PLy #2) and SBS #30 waterless skin cleanser were recommended and used with good results.                    (20)

        4.  Large grinding machines are located on the hanger decks of carriers undergoing conversion.  The illumination appeared inadequate. Measurements were taken of the illumination furnished by the lights loca-located on the grinding wheel shield.  The intensities on the tool rest ranged from 20- 4. footcandles, apparently depending on the type of bulb installed.  With the grinder lights turned off, no detectable reading could be obtained on the light meter, indicating that general illumination was practically non-existent.  This created a hazard because it is required that lights be turned off when the machine is not in use.  A person approaching the machine could not tell whether the grinding wheel was still rotating from previous use or not.  The latest recommended illumination intensity for rough rinding is 100 footcandles to be fur- nished by combination of general and supplemental illumination.  It was therefore recommended that the bulbs installed on the grinding machines be of a type to furnish a maximum possible illumination and that general illumination in the area be provided at a level of at least 30 and pref- erbly . 50 footcandles.                                       (4)

III.  Ionizing Radiation Health Hazards


        1.  A survey was made to determine the radiation level in unrestricted areas in the Material Laboratory around Radiographic Room #310.  Radiation levels were measured during lead camera type and open source exposures using a 500 mg. radium source.  Lead shielding was varied to determine the reduction in radiation levels obtained by the use of various types of lead shielding.  Data obtained from the survey   (10) disclosed the following:

        a.  Camera Type Exposures.  The maximum radiation levels recorded in the unrestricted areas was 0.28 mr/hr with the camera elevated at 15 inches above the floor.  The camera was shielded on the bottom at floor level with 12 x 16 inch area of 2 inch thick lead bricks and with a 4x8x2 inch lead brick on top.

        b.  Open Source Exposure.

        (1)  The maximum radiation levels recorded in the

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 27 of 60   Page ID #:3978

unrestricted areas were 5.0 mr/hr with the source 15 inches above the floor and shielded by an area of 12x16 inches of 2 inch lead bricks on the floor directly below the source and an area of 10x10 inches of 2 inch lead bricks 15 inches above the source. This shielding is understood to be standard practice.

(2) Measurements made after adding $1\frac{1}{2}$ inch thickness of lead covering an area of 5x5 feet under the 12x16x2 inch lead shield resulted in a maximum recorded level of 1.1 mr/hr in the second floor area directly below the source. This is the same location where the 5.0 mr/hr reading had been previously obtained.

The results obtained from this survey indicate that it is permissible to use the camera type of exposure at any time of the day since the shielding provided attenuates the radiation level to a value below 2 mr/hr in unrestricted areas as required by the Atomic Energy Commission. In regard to the open source exposure, this type of operation is permitted only during off hours providing shielding as indicated in subparagraph b (2) above, adequate portable panel shields installed between the source and the north, west, and east walls of Room #310 and adequate shields above the source are maintained. This shielding is required to retain the "unrestricted" ratings of other areas around Room #310. In regards to the shielding required above the source, it is considered that an additional $\frac{1}{2}$ inch thickness of lead used together with the 2 inch bricks presently employed will assure compliance with the Atomic Energy Commission regulations. It was understood that a new method of shielding will be provided in the near future. This shielding will be placed closer to the source. The effect of the new type of shielding will be surveyed and if found satisfactory will then be used as standard in open source exposures. It was recommended that supervisory personnel check and approve the application of shielding prior to exposing the various sources to assure maximum safety of laboratory personnel.                                                            (10)

2.  This office assisted Code 74 of BuMed in exposing film badges to AN/SPS-8A and Mark-25 radar scopes. Duplicate film packets on the AN/SPS-8A exposures were forwarded to the Commanding Officer, Naval Medical Research Laboratory, Bethesda, Maryland. Dosage recorded on duPont 552 film was not detectable even on film placed on the antenna for 15 minutes. Pocket dosimeters (IM-9D/PD-200 mr scale) were placed in all locations for the same time interval; no dosages (less than 1 mr) were observed.                                                             (12)

3.  Radioactive Luminous Paint Containing Radium Salts.
Radioactive luminous paint has been used by the Engraving Section of Shop 51 to paint numbers on telephone dials. Since this paint is no longer used the shop on recommendation of the Medical Department disposed of it through an Atomic Energy Commission approved waste disposal    (10)

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 28 of 60   Page ID #:3979

Reproduced at the National Archives

concern. Measurements with radiac set AN/PDR-27 revealed traces of radio-
active residues where parts had been stored, mixed or used. All areas
where contamination was found were wiped by an employee wearing rubber
gloves, using small squares of cloth watted with a wash solution contain-
ing a detergent and chelating agent, Versene. More stubborn areas were
scrubbed with a 1-inch square brush and then wiped repeatedly. Some
areas, such as those on porous wood which could not be cleaned as above
were removed by sawing away around that area and removing that section of
wood. This procedure was also followed in the case of a linoleum-topped
table and a masonite covered work bench. All cloth used, brush, sawed-
off pieces and rubber gloves were collected in a plastic bag and disposed
of in a radioactive disposal can in an unfrequented open area to await
removal by a disposal contractor. All areas were cleaned until the read-
ing was less than 0.05 mr/hr and a wipe test using damp filter paper
showed no removal of radioactivity from the surface.

It was recommended that radioactive material, chemicals or paints
should not be used until the Industrial Hygiene Division has investigated
proposed use and recommended control measures necessary to minimize ex-
posure of personnel and contamination of work areas.                    (10)

4. Colbalt 60, Cesium 137 and Radium 226. New carrying
cases are being built for the radioisotopes used for shipboard radiography.
These are designed to conform with U. S. Atomic Energy Commission, AECU-
2967 Radiation Safety in Industrial Radiography with Radioisotopes. This
specified that the level of radiation from gamma emitters should not
exceed 200 mr/hr at the surface of the outside of the container and/or
10 mr/hr at a distance of one meter from the source. One carrying case
built to carry 2,000 millicuries of cesium 137 has been completed and was
checked for compliance with the requirement. A Gamma meter read 200 mr/hr
at the surface of the container. As other containers are built they
will also be checked for conformance with AECU-2967.                    (1)

5. Platonium 239. A barge used for the disposal of radio-
active waste at sea became contaminated from a leaking container. A cement
block approximately 4 feet square and 8 feet long was delivered by truck
to the enclosure reserved for the storage of radioactive waste. Soluble
plutonium apparently percolated through the cement, contaminating the
truck bed and eventually the barge.

A survey of the 5 hopper areas of the barge was made to deter-
mine the extent of contamination. The contaminated barge areas were
heavily rusted. When taking samples it was noted that surface readings
were reduced about ten times by scraping with paint scrapers. Total con-
tamination was estimated to be about 100 microcuries located for the most
part in two of the five hoppers.                                        (1)

FOR OFFICIAL USE ONLY

Decontamination of the most highly contaminated areas by scraping appeared to be possible. A vacuum cleaner was designed and built from commercial vacuum cleaner parts and sheet metal. A second vacuum cleaner was borrowed from the Naval Radiation Defense Laboratory. The filters installed were capable of filtering out particles down to 0.3 microns in diameter.

The barge was drydocked and allowed to dry out. Areas of contamination in excess of 500 d/m/150 square feet were outlined with chalk. Heavy Kraft paper was laid over the bottoms of the hoppers and secured to the edges with pressure sensitive tape. The marked areas were scraped a square foot at a time. The scraped surfaces and the surface of the Kraft paper were then cleaned with the vacuum cleaners. Occasional slight contamination was found on the booties worn by personnel entering the hoppers.

All personnel entering the hoppers were required to wear Scott Pressure-Demand air supplied respirators. These respirators were found to be excellent for both protection and comfort.

After the highly contaminated areas were decontaminated the hoppers were wet sandblasted. Air contamination during sandblasting was well within the maximum permissible concentration for airborn plutonium.

A complete report can be obtained by writing the Industrial Hygienist of the Command.                                             (1)


6 . A radiological environmental survey has been initiated in order to establish the background levels in the Pearl Harbor area. Samples of air, potable water, harbor water, soil, vegetation, and harbor mud, are collected periodically and examined for gross beta activity. The frequency of sampling has been limited by the lack of adequate personnel and equipment, but it is expected that these deficiencies will be corrected within the near future.                                       (19)

7 . A group of 10 Passive Defense trainees were engaged in certain exercises involving isotope handling. Photodosimetry indicated total exposures varying from 0 to 0.02 milliroentgens.        (6)

8. Because of the very infrequent use of the Radium Painting room, it was planned to make that area available to an instrument shop (6) and to remove or tie-up part of the present exhaust ventilation system

Reproduced at the National Archives

<u>Release No. 22</u>                                     <u>FOR OFFICIAL USE ONLY</u>

to the instrument shop ventilation which will operate with a large degree
of recirculation.  This proposal has been strongly opposed because of the
possibility of diseminating residues that may exist in the present system
and because there is still need for limited radium handling facilities. (6)

   B.  <u>X-Rays</u>

      1.  Ten (10) film badges were given varied exposures to a
known amount of x-ray radiation using an AN/PDR 2 radiac set.  On develop-
ing and reading the film badges the error was found to be about 10% on
the high safe side.  This was probably due to using exposure graft No.
B 552-180 with film No. B 552-205.  This information was discussed with
the Industrial X-ray Technicians.  They appear to have an increased con-
fidence in their film badge radiation exposure results.                   (3)

   C.  <u>Alpha Particles</u>

   D.  <u>Gamma Particles</u>

      1.  During trial operation of ANSPS/29 radar unit aboard ship,
film badges were posted on and around the power components, as well as
on Electronic Ship personnel working in the area as a protective measure
against the possible over exposure to X-y radiation.  Films evaluated
after 2 to 3 hours of exposure revealed little or no density readings
above control films, while film exposed for approximately 40 hours indi-
cated up to 0.03 roentgens of X-- radiation.                              (8)

   E.  <u>Isotopes</u>

      1.  This shipyard became aware that under the Atomic Energy
Commission license for operating the various radioactive isotopes, the
disposal of low level wastes even if performed in accordance with NAVMED
p-1325 is a violation of Title 10 of the Federal Register (Chapter 1,
Part 20).  Consequently this office recommended the contracting of an
AEC authorized contractor for disposing of this waste.  It is believed
that the contractor, Nuclear Engineering Corporation, Kearney, New Jersey,
is performing a function more expeditiously and economically than has been
done in accordance with Bureau directives.                                (12)

   F.  <u>Radioactive Waste Material</u>

      1.  Because of security requirements, the previous radiological
disposal area had to be relocated at a point beyond certain distance from
a classified installation.  The new area was cleared of underbrush, sur-
rounded by a wire fence and a pad-locked gate and will enclose the
reinforced concrete cylinders where radioactive waste material is deposited
for final cement sealing and ocean disposal.  Since the previous area    (6)

-175-

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 31 of 60   Page ID #:3982

was active from the time the liquid wastes were disposed, a very small level of ground contamination exists. Therefore it was recommended that the previous area be left as is, without access to any unauthorized person, and that it be permanently charted as contaminated in all future condition maps. Two (2) employees are currently collecting and disposing of radio-active waste material, mostly electronic tubes. Their photodosimetry was normal.                                                          (6).

IV.   Shipboard Industrial Hygiene Surveys and Investigations

    A.   Surveys

      1.   A ventilation survey was made on a ship under conversion. Readings from a number of 5 inch flexible tubes indicated an average ventilation rate of 456 cfm. The method used to obtain this ventilation rate may be of general interest. Seven (7) platforms are installed along the hull at the third deck level to hold the ventilation machinery. Holes for 16 inch ventilation ducts are cut in the hull of the ship. These are joined to vertical 16 inch ducts which extend from the main deck to the tank tops. Each level has four to six branches as required for attaching the 5 inch ventilation tubing. The system was designed so that any part of the ship could be reached with 60 feet of 5% ventilation tubing.     (1)

V.   Substitution of Toxic Solvents by Less Toxic Material

VI.   Notes

    This section will include items of interest ranging from the scientific to the social aspects of the Occupational Health Program.

    A.   Miscellaneous

      1.   Investigation of contamination of Liquid Oxygen (over 30 ppm $CH_4$) revealed that the Samplers were contaminated with $CH_4$, $CO_2$ and $N_2O$ as analyzed with the Beckman Infrared Spectorphotometer IR4. After proper purging no contamination was found in the samplers. The Samplers were procured from the Naval Air Station, Alameda, in a contaminated state. BuAer was notified to alert other activities that might have received the same lot of Samplers.                               (20)

      2.   A considerable part of the Industrial Hygienist's time, in addition to their most important function (to evaluate environmental occupational health hazards and recommend engineering and personal control measures for the prevention of illness and absenteeism), is occupied in investigating conditions alleged to be uncomfortable or health hazardous. These investigations are important. They often result in preventing     (15)

Reproduced at the National Archives

Release No. 22                                    FOR OFFICIAL USE ONLY

unjust compensation claims by producing facts substantiating the lack of basis for a complaint. In practically all instances these investigations of complaints or alleged health hazards result in alleviating fear of employees and thus contributes to production efficiency and morale. Following is an example of such an investigation:

A crystal etching shop (ammonium bifluoride solution) has ceased operations and the work space has been used by an electronics shop for a number of months. Several employees complained of nausea on a Saturday following a routine work week. The area was cleaned before operations transferred and only the sinks are in place. No complaints of this type had been made during the previous years the shop was used. Personnel were informed symptoms could not be caused by hazardous conditions in the shop.                                                            (15)

3. Enlisted personnel aboard the Norfolk Reserve Fleet became intoxicated due to lack of proper protective equipment while spraying. Proper protection and ventilation requirements were enumerated to the personnel in order to prevent the condition recurring.

4   The Gyro-Compass Shop was razed in a beautification program. While most of the rubble was still on the site, the area was monitored for mercury vapor in the air. The air concentrations ranged from .0 to 0.4 mg/m$^3$ using a Kruger Mercury Vapor Detector Model #23. Chemical analysis of the dirt in the building revealed only micro quantities present. Years ago the building had been used to manufacture antifouling paint when mercury oxide was a common ingredient in that paint. After clearing the area and leveling the ground, dirt samples showed no mercury nor was there any air concentrations in the air concentrations in the area. A Beneficial Suggestion recommending that the demolished building material be specially handled due to the mercury hazard was returned disapproved.                                         (12)

5. Malfunctioning of sensitive guidance instruments has been attributed to the presence of dust particles in the system. Because the presence of particulate matter in atmosphere is one of the possible sources of these particles industrial hygiene methods were used to determine the dustiness of the air in a new, air conditioned, instrument shop. The dust counts ranged from .75 to 2.5 million particles per cubic foot of air. The dust electrostatically precipitated on a hemocytometer cell ranged in size from submicron particles to pieces as large as 500 microns. These values are far in excess of the criteria for the instrument shop which specify less than 0.25 million particles per cubic foot of air with the particles not to exceed 0.3 microns in size. This excessive dust loading is, of course, not significant in terms of a health hazard, but is tremendously important in terms of the integrity of the aircraft (5)

-177-

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 33 of 60   Page ID #:3984

instruments or of guidance systems.  Thus, by applying standard industrial hygiene methodology it was possible to locate the dust sources within the shop, as well as other channels of entry and to make recommendations for changes in work methods, relocation of potentially dusty or particle generating processes, improvements in the air cleaning systems, etc., which will result in the eventual control of this problem.                          (5)

6.  Urinary leads were performed on a weekly basis for a group of men cleaning gasoline tanks on an outlying island.  This laboratory work was considered highly desirable because of the occurrence of several cases of lead poisoning on the previous occasion when these tanks were cleaned.  Samples were shipped by air in polyethylene bottles and arrived without spillage or leakage.  All lead values were within normal limits, and no symptoms of lead poisoning developed during or after the tank-cleaning job.                                             (19)

7.  A case of metal-fume poisoning occurring during shipboard welding on galvanized material is believed to have been due to an unauthorized change in the temporary ventilation set-up.  One of the two "suckers" used in the area was reversed so as to blow air into the compartment to provide a more comfortable working environment.  The cross currents so produced interfered with fume collection by the remaining "sucker".  Supervisory personnel are taking steps to prevent a recurrence of such an unauthorized change in ventilation set-ups.            (19)

8.  A request was received from the Fairmount Glass Works of Indianapolis to advise on heat control at their glass manufacturing operations.  The request was peculiarly channeled through the Secretary of Defense on down to this Command.  A letter giving general guidelines on the control of radiant heat which was judged to be the major contributor to the problem and references for literature and specialists that may be directly available to the Indiana glass industry, was prepared for the signature of the Commanding Officer.                       (6)

9.  A paper presented at the meeting in Chicago indicated that propane gas may contain too little odorant to warn of explosive mixtures.  This information was imparted to the Shipyard since we use propane at this activity.  Tests are underway to determine the concentration of the odorant in the local propane.                          (4)

10.  An instruction for labeling of hazardous chemicals has been published by the Naval Air Basic Training Command, and will be implemented by subordinate activities at an early date.            (15)

11.  A Beneficial Suggestion was investigated which advocated revision of several of the Navy-wide standard labels.  It was found that writing on some labels is illegible because of the color of the   (4)

Case 2:12-cv-03013-SVW-PJW   Document 128-21   Filed 02/11/13   Page 34 of 60   Page ID #:3985

Reproduced at the National Archives

label.  The Beneficial Suggestion was approved.  However, it was noted that these labels are Navy-wide in distribution and must be changed by the originator of the present system.                                      (4)

12.  A leaking drum of hydrofluoric acid Stock No. G6810-236-5671 was reported from the Supply Department bulk storage area.  Investigation revealed that 5 additional drums were potential leakers as indicated by bulging and general appearance of the drums.  These 6 drums were drawn and used by the plating shop.  Stock quantity will be limited not to exceed a normal 6 months supply with isolated storage in a well ventilated area.  Personnel in the area have initial indoctrination on potential hazards, preventive measures and first aid procedures.      (16)

13.  We are attempting to maintain a continuous health educational program for our asbestos workers.  The shop has been most cooperative in this effort.  The film, "The Air We Breath", was obtained from MSA and shown on four occasions to small groups of these employees.  This educational movie was followed by a short discussion of the hazards of breathing asbestos fibers and the use of dust respirators.            (3)

14.  A Safety Order was written providing specific instructions for the storage, use, handling, and cleanup of mercury.  In each section of the instructions it was stressed that the basic principal of controlling exposure to mercury is containment.                                    (2)

15.  A pre-operational environmental survey for background radiation levels in the Shipyard area was initiated July 1st. in preparation for future nuclear submarine overhaul.  Air, river water, potable water and rainfall samples are being collected.  The Shipyard program is coordinated with a State Health Department survey which will cover areas outside the confines of the Shipyard.  A total of 8 weeks of on-the-job training in radiation protection procedures is being received by three members of the Industrial Hygiene Division at Portsmouth Naval Shipyard in conjunction with the Nautilus overhaul.                          (13)

16.  The U. S. C. Safety Supervisor requested information about the hazards involved in cleaning up a dry spill of Calcium Hypochlorite. It was recommended that the Calcium Hypochlorite be removed by dry methods and that workmen doing the cleaning be provided with respiratory protection                                                          (1)

B.  Personal

1.  An excellent article titled, "Radiation Hazards Aboard A Guided Missile Cruiser", by Johnson, W., Kindsvatter, V. H., and Shaw, C. C., appeared in the United States Armed Forces Medical Journal,   (BuM)

-173-

Release No. 22                                              FOR OFFICIAL USE ONLY

Volume X, No. 5 of May 1959. Victor H. Kindsvatter is the senior civil service industrial hygienist of the medical department of the Philadelphia Naval Shipyard. Several other industrial hygienists have had articles published in such periodicals as the Armed Forces Medical Journal, Safety Review, and professional industrial hygiene publications in the past year. Among these are Mr. Ernie Storlazzi of Boston Naval Shipyard, on welding; Dan Bessemer of Bremerton Naval Shipyard, in ventilation control of duplicating processes; Harry Gilbert, New York Naval Shipyard, on inert gas electric welding; Alfredo Salazar, Naval Air Station, San Diego, on industrial hygiene surveys in "Safety Review", to mention a few. Beginning this year - 1960 - the Notes will list the articles and publications, so that readers of these releases will be informed of articles published by U. S. Navy officer and Civil Service Industrial Hygienists.

        2.  An article by Mr. Jack McElhiney, senior industrial hygienists of the San Francisco Naval Shipyard, on an unusual experience in the decontamination of a radioactive waste disposal barge will appear in the Naval Medical News Letter, Volume #35, No. 3, of 5 February 1960.(L)

        3.  Mr. Charles P. Bergtholdt of the Naval Weapons Plant, Washington, D. C., has developed an interesting and effective pictorial presentation of the industrial health program conducted at the Weapons Plant. The presentation consists of attractive posters depicting the various services and functions of an occupational health team.        (18)

        4.  Ships and those naval activities not having industrial hygienists attached can obtain the services of a qualified industrial hygienist for a periodic industrial hygiene survey by requesting the Commanding Officer of the nearest naval activity having an industrial hygienists for this service. Requests are processed via the cognizant District Commandant, (see NCPI 88.8-4) and Manual of the Medical Department (CH 26-10). Any financial arrangements required are made by the Commands. During the quarter some of the surveys reported are as follows:

        Bermuda
        USNAS Oceana                        Mr. Herbert J. Worsham

        NAS Whidbey Island                  Mr. D. J. Bessemer

        Naval Research LAB                  Mr. Ray McClure

        USS HOLMES COUNTY (LST 836)  Mr. Alfredo Salazar & Harry Utes

        ARC- Cable Layer Ship               LCDR Wm. H. Dentler, MSC, USN

        USN Underwater OrdSta, R.I.  Mr. Salazar DiLustro

Reproduced at the National Arch

<u>Release No. 22</u>                              <u>FOR OFFICIAL USE ONLY</u>

USN STA Key West                Mr. Roland Byrd

Medical & Dental X-ray
aboard ships berthed
in Shipyard - Norfol            Mr. Seymour Levinson

NavSupCen Oak  nd               Mr. Jack McElhiney

USS ANTIETAM Survey             CDR Ray Nebelung, MSC, USNR

USN TraCen, Bainbridge          LT C. J. Jordan, MSC, USN

5. A survey was made by the Norfolk Naval Shipyard industrial hygienists of the concentration of mercury vapors in the Cardio-Pulmonary Function Laboratory at the U. S. Naval Hospital, Portsmouth, Virginia.  (12)

6. A noise survey is being conducted aboard the USS ANTIETAM. Sound measurements are being made at various locations on the flight-deck and throughout the ship.                                               (15)

7. The industrial hygiene division of the medical department, Portsmouth Naval Shipyard, has expanded considerably to provide the extensive monitoring, laboratory, and industrial hygiene advisory services necessitated by refueling and overhaul of the SS(N) NAUTILUS and completion of the nuclear powered submarine SS (N) SEADRAGON.  To provide industrial hygiene coverage on a three shift, seven day week basis, has required a division staff total of fifty-one,- forty-four of whom were directly employed in the radiological health monitoring and the rest for supportive laboratory and general industrial hygiene duties.    To supplement the small permanent staff, 34 Production Department employees were detailed to the division and trained for radiological monitoring work.

There are several principle radiation or contamination areas subject to industrial hygiene monitoring control.   At the USS (N) NAUTILUS for work in the reactor compartment a personnel change barge has been provided.

This barge contains facilities for issuing protective clothing, film badges and dosimeters, a clothing change area with lockers, and a health physics room with facilities for industrial hygiene survey instruments, laboratory bench for scalers to count air samples, swipes, and other samples, and located to enable control of personnel both in and out of the lower reactor compartment.  This is the control point of industrial hygiene service for the NAUTILUS overhaul.  All work areas are continuously monitored for radiation level, air concentrations, and surface swipes for loose contamination.  All personnel leaving contamination (9)

-181-

FOR OFFICIAL USE ONLY

areas are monitored to assure radioactive cleanliness, and all equipment
or waste is monitored and appropriately tagged.                            (9)

8.  Herman Schulz, formerly associated with the New York
State Department of Labor, Division of Industrial Hygiene, has been
appointed to fill the vacancy of Assistant Industrial Hygienist.          (10)

9.  Four new positions have been established in the
Industrial Hygiene Division of the Medical Department for the following:
Industrial Hygienist, GS-11, Health Physicist, GS-11, Radio Chemical
Technician, GS-7, and Clerk Stenographer, GS-4.  It is expected that the
positions will be filled within the next quarter.                        (19)

10.  Courses of instructions in Industrial Health were given
classes of Flight Surgeons and Aviation Medical Technicians at the
School of Aviation Medicine.                                             (15)

11.  Mr. Harry F. Roegner reported aboard as an industrial
hygienist trainee on 24 August 1959.                                      (4)

12.  The annual industrial hygiene survey of the U. S. Naval
Underwater Ordnance Station, Newport, Rhode Island, was conducted by
the Industrial Hygienist of the Naval Air Station, Quonset Point.        (20)

13.  The industrial hygienist recently spent two weeks at the
Portsmouth Naval Shipyard in on-the-job training in the Industrial Hygiene
Division of the Medical Department, for nuclear work.  An opportunity
was afforded to observe the procedures for contamination control and
personnel protection during overhaul work on the NAUTILUS.  Information
was also obtained on the organization of the Health Physics Branch,
personnel matters, field and laboratory equipment, analytical procedures,
dosimetry, medical clearance, waste disposal, and limits of exposure
and contamination.                                                       (19)

14.  Radiac coordinators from various shipyards and other naval
installations visited this shipyard for training in regard to the neutron
calibrating range developed here.  A brief talk was given on the Health
Physics aspects of the range.                                            (2)

15.  Included in a Middle Management  upervisor raining  ourse
were talks by the Industrial Hygienists and the Health Physicist to
acquaint the trainees with the philosophies, terminologies, and activities
of the respective disciplines.                                           (2)

VII.  Composition Data  ( information will be found on separate page)

-182-

VII. Composition Data

A.  The following data is to be treated as "Commercially Discreet" information and is to be used for official purposes only:

1.  In accordance with SECNAV Instruction 6260.3 and BUSHIPS Instruction 6260.3 on labelling toxic materials.  The following new materials were introduced into the shipyard and assigned a label accordingly:

Penetone Formula 426 - cresylic acid 15%, chlorinated solvents 45% label BuSandA 9987.

Pero-Klean Marine Cleaner #801 - high flash aromatic hydrocarbon oil, label BuSandA 9987.

Miracle Mastic Type P - solvent is Petrolene, label BuSandA 9988.

Hy-Temp Block Insulation - diatomaceous earth 63-70%, asbestos fiber 12-15%, no label.

Foster 81-33 Fire Resistive Adhesive - xylol 41.5% by volume, alkyd short oil 23%, BuSandA 9988.

Carlon PVC Cement and Primer - tetrahydrofurance 66%, label BuSandA 9988.

Fabertite - Contains coal tar, label BuSandA 9987.               (12)

2.  Other products:

Pressure Sensitive Tape, No. 428C, manufactured by the Minnesota Mining and Manufacturing Company contains no ketones, phenols, aldehydes or other material that would be suspected of causing skin irritation or sensitivity.                                                   (9)

Porselon #600 is a two component coating manufactured by Protex-A-Cote Incorporated.  Segment #1 contains 50% resin and 50% technical grade amyl acetate by volume.  Segment #2 contains 50% aliphatic amine and 50% amyl acetate by volume.  The combustion products would contain amines, carbon monoxide, carbon dioxide and cyanides.             (9)

Formula 121X paint.
                This formula contains more solids than Formula 121 and in addition contains a significant amount of tricresyl phosphate.                                                        (4)

Release No. 22                                        FOR OFFICIAL USE ONLY

Aircosil Flux.  Used in silver soldering.  Qualitative tests for boron were positive.  Fluorides were present (approximately 10%).  PH of the mixture is about seven.  It contains about 65% water.  Appears to be similar to Handi-Flux which contains about 11% fluorides and has a pH of 6.8.  Flame tests showed no sodium or calcium.        (4)

Pitt Chem Thinner - manufactured by the Pittsburgh Coke and Chemical Company is a high boiling heavy grade solvent naphtha (aromatic).        (9)

Glass Cote Sealer - distributed by Robert J. Elliot, Boston, Massachusetts, was found to contain excessive amounts of Xylene. No        (8) precautionary measures for use of this material was stated on the label.

Durapox - a two component epoxy resin product is manufact red by the Durant Paint, Incorporated, Revere, Massachusetts.  Durasol is the name of the associated polyamine hardener.        (8)

Stripper C86-67D.  Turco Products Co.  Contains 48% sodium monosilicate pentahydrate, 48% sodium trisilicate and 4% sodium resinate and cresylic acid added.        (6)

Cleaner, Mil-C-16553, Type I - A clear solution of ammonium and amine soaps with or without a hydrocarbon solvent.        (5)

Acrylic cellulose - nitrate lacquer, Mil-L-19537 - Methyl methacrylate, diisooctylphthalate, ketone, alcohol, toluene.        (6)

Denatured ethyl alcohol, JAN-A-463 - Ethyl alcohol to which has been added dye or denaturant (C-1 grade).        (6)

Potting compound MIL-S-8516B - Base, polysulfide rubber, 55% in aromatic hydrocarbon.  No benzene shall be used.        (6)

Turco 2822.  Turco Products Company - A general paint remover and desealant for neoprene and thiokol adhesives.  Contains chlorinated hydrocarbons.        (6)

Acrylic lacquer, Mil-L-19538 (Aer) - Methyl ethyl ketone, methyl isobutyl ketone, octane, isophorone; cellosolve acetate, toluene, nitrocellulose compounds, methyl methacrylate, dioctyl phthalate.        (6)

Acrylic thinner, Mil-T-19544 (Aer) - Cellosolve acetate, 20%, methyl isobutyl ketone, 40% and toluene 40%.        (6)

Alodine 1200 - Mixture of chromic acid, simple and complex fluorides and phosphoric acid.        (6)

-184-

Reproduced at the National Archives

Release No. 22                                     FOR OFFICIAL USE ONLY

Black phenolic resin, Mil-R-3043 - it shall not contain chlorinated compounds or benzol and shall not have an irritating or nauseating odor. (6)

Camouflage lacquer, Mil-L-0060B - a cellulose nitrate lacquer.  (6)

Cellulose nitrate lacquer, Mil-L-7178 - Non-oxidizing phthalic alkyd resin, diisooctyl phthalate butyl acetate, ethyl acetate, butyl alcohol, toluene, naphtha.  (6)

Cellulose nitrate thinner, T-T-T-266A - may contain methyl isobutyl carbinol, methyl ethyl ketone, methyl isobutyl ketone, toluene.  (6)

Cellulose acetate butyrate dope, Mil-D-5551D - Cellulose acetate butyrate, plasticizer, butyl acetate, diacetone, ethyl acetate and methyl ethyl ketone.  (6)

Cellulose acetate butyrate thinner, Mil-T-6097A - Butyl acetate and diacetone alcohol.  (5)

Compound grease cleaning solvent, "gunk:, Emulsion Type II, Phenolic.  Fatty acid soap 51%, cresylic acid 16%, butyl alcohol 1%, hydrocarbon oil (Kerosene) 32%.  (6)

Day Glo fluorescent paint, Mil-P-21563 (Aer) - Acrylic resin and aromatic thinners.  Contains no ketones, cellosolve acetate or mineral spirits.  (6)

Deoxidene - Phosphoric acid (75%), butyl cellosolve and 1% nonionic wetting agent.  (6)

Nacconol detergent wetting agent - Sodium alkyl aryl sulfonate. National Aniline and Chemical Company  (6)

Nubelon enamel (Glidden Paint Co.) - A silicone epoxy paint with accelerator added.  Cures at 425 - 450° F.  (6)

Parko Lubrite - Phosphoric acid for surface treatment (205-210° F.)

Nokorode 731 - referred to locally as Paralketone, Mil-C-16173A Corrosion preventive solvent cut back.  ' skin irritant.  60% asphaltic base, 40% mineral spirits.  Lion Oil Company.  (6)

Polyurethane (Magna) S.6N. (Sherwin-Williams Co.) - Polyisocyanate reacted with hydroxyl bearing resins in a solvent system, reported as non-toxic and non-irritating.  (6)

Preservation oil, Mil-O-6083 - a petroleum base oil with tricresyl phosphate and inhibitors.  Tricresyl phosphate is a toxic material.  (5)

-185-

FOR OFFICIAL USE ONLY

    Preservation Oil AN-C-124C. - a corrosion preventive compound
(non-volatile) dispersed in petroleum solvent. Benzol and chlorinated
hydrocarbons are excluded.        (6)

    Pretreatment coating (Glidden) MIL-C-8514 (a) Glidden Paint Co.
Polyvinyl butyral resin, zinc chromate, magnesium silicate, lampblack,  (6)
butyl alcohol, ethyl alcohol, acid component, phosphoric acid, water,
ethyl alcohol.
    The resin:  polyvinyl alcohol, 10-20%, polyvinyl acetate 1-1.5%,
volatile 80-92%.        (6)

    Rubber Adhesive, MIL-A-5092A - reclaimed rubber, neoprene or
Buna-N is an aromatic solvent (Toluene).        (6)

    Rubber, Goodyear, Chemigum, MIL-S-7502B, Class B-2 (Aer),
Goodyear Rubber Company. A synthetic rubber of the polysulfide type and
a curing compound not dependent upon solvent evaporation.    (6)

    Spraylat (Spraylat Corp.) - plasticized resins and less than 1%
ammonia sprayed as a translucent protective coat on plexiglass canopy.  (6)

    Strippers C-67D, MIL-R-7751A - for stripping steel or anodized
aluminum; sodium monosilicate pentahydrate 48%; sodium trisilicate 48%;
sodium resinate 4%; pH-11.5-12.5; 22.5-25% by wt. sodium peroxide.    (6)

    Stripper C-86 - Cresylic acid.

    Transpo. Turco Products Co. - a two phase cleaner containing    (6)
methylene chloride and cresol in the lower layer and water in the upper.

    Turco, 3002A. Turco Products Co. - a phosphoric acid brightener.

    Turco, 3087C - a phosphoric acid brightener for aluminum.    (6)

    Turco, 4228 - a strong caustic for grease and carbon removal.

    Vinyl paint for silk screen process MIL-D-8634A and MIL-F-8793,
ASG - Vinyl resins and plasticizer 20%; isophorone ½%, petroleum naphtha
20%.

    Westcoat clear #202, Jan-C-149-Type II, Western Coating Company
(Improperly referred to as Eronel). It is a cellulose acetate butyrate
compound corrosion preventive. Also contains plasticizers and stabilizers.

    Sealant, Mil-S-7502 - a synthetic rubber of the polysulfide type
sealing compound and a separate curing agent.        (6)

Release No. 22                                    FOR OFFICIAL USE ONLY

*  Numbers in parenthesis listed throughout this Report refer to the
following stations:

          (1)  NSY San Francisco, California
          (2)  NSY Mare Island, California
          (3)  NSY Long Beach, California
          (4)  NSY Puget Sound, Bremerton, Washington
          (5)  NAS Alameda, California
          (6)  NAS San Diego, California
          (8)  NSY Boston, Massachusetts
          (9)  NSY Portsmouth, New Hampshire
          (10) NSY New York, New York
          (11) NSY Philadelphia, Pennsylvania
          (12) NSY Norfolk, Virginia
          (13) NSY Charleston, South Carolina
          (14) NAS Norfolk, Virginia
          (15) NAS Pensacola, Florida
          (16) NAS Jacksonville, Florida
          (17) NAS Corpus Christi, Texas
          (18) NWP Washington, D. C.
          (19) NSY #128, Pearl Harbor, Hawaii
          (20) NAS Quonset Point, Rhode Island
          (21) NAD Crane, Indiana

                                                  enclosure (1)

                            -197-

INDEX TO "OCCUPATIONAL HEALTH HAZARDS"
Release No. 22

Acidic gases, in decomposition of paint, p. 158, item 3
Acrylic cellulose - nitrate lacquer MIL-L-19537, p. 184, item 2
Acrylic ester base paint, p. 158, item 3
Acrylic lacquer, MIL-L-19538 (Aer), p. 184, item 2
Acrylic thinner MIL-T-19544 (Aer), p. 184, item 2
Aircosil flux, p. 184, item 2
Alcohol, p. 184, item 2
Alcohol, ethyl, p. 186
Alcohol, ethyl, denatured, p. 184, item 2
Aldehydes, in decomposition of paint, p. 158, item 3
Alkaline gases, in decomposition of paint, p. 158, item 3
Alkyd short oil, p. 183, item 1
Alodine 1200, p. 184, item 2
Aluminum alloy No. 55-56, welding of, p. 164, item 27
Aluminum alloy 61S, p. 164, item 27
Aluminum, cleaner for, p. 161, item 15
Amine hardeners, in Plasite paint, p. 157, item A-1
Amines, p. 183, item 2
Amine soap, p. 184, item 2
Amines, organic, from Devran coating, p. 158, item 4
Ammonia, p. 186
Ammonium bifluoride, p. 177, item 2
Ammonium soap, p. 184, item 2
Amyl acetate, p. 183, item 2
AN/PDR 2 radiac set, p. 175, item B-1
ANSPS/29 radar unit, p. 175, item D-1
AN/SPS-8A radar scope, p. 172, item 2
Arsine, in cable tanks and cones, p. 157, item 2
Asbestos dust, hazards (movie film), p. 179, item 13
Asbestos fiber, p. 183, item 1
Asphalt coal tar pitch, burns from, p. 166, item 6; p. 167, item 9

Battery repair shop, control of fumes, p. 162, item a
Benzene, protection against, p. 166, item 8
Benzol, in JP-4 fuel, p. 162, item 17
Black phenolic resin MIL-R-3043, p. 185
Boron, p. 184, item 2
Buffing and grinding wheels, ventilation for, p. 162, item g

Buna-N, p. 186
Butanol, in De-Oxalum, p. 161, item 15
Butyl acetate, p. 185
Butyl alcohol, p. 185; p. 186
Butyl cellosolve, p. 185
Butyl cellosolve, in De-Oxalum, p. 161, item 15
Butyl cellosolve, from Devran coating, p.158, item 4


Cable tanks and cones, oxygen content, p. 157, item 2
Calcium hypochlorite, disposal of, p. 179, item 16
Camouflage lacquer MIL-L-00680B, p. 185
Carbon dioxide, p. 183, item 2
Carbon dioxide, as contaminant in liquid oxygen, p. 176, Sect. VI, item 1
Carbon dioxide, in cable tanks and cones, p. 157, item 2
Carbon dioxide, in dry ice storage tanks, p. 163, item 21
Carbon dioxide shielded welding, p. 163, item 24
Carbon monoxide, p. 183, item 2
Carbon monoxide, formation in paint drying, p. 162, item 16
Carbon monoxide, from burning out boiler tubes, p. 163, item 19
Carbon monoxide, from gasoline power units, p. 163, item 20
Carbon monoxide, in cable tanks and cones, p. 157, item 2
Carbon monoxide, in carbon dioxide shielded welding, p. 163, item 24
Carbon monoxide, in decomposition of paint, p. 158, item 3
Carlon PVC Cement and Primer, p. 183, item 1
Cellosolve acetate, p. 184, item 2
Cellulose acetate butyrate dope MIL-D-5551D, p. 185
Cellulose acetate butyrate thinner MIL-T-6097A, p. 185
Cellulose nitrate lacquer MIL-L-7178, p. 185
Cellulose nitrate thinner T-T-T-266A, p. 185
Cesium 137, carrying cases for, p. 173, item 4
Chemicals, hazardous, labeling of, p. 162, item k; p. 178, items 10-11
Chlorine, p. 158, item 5
Chlorophenyl-phenol, skin irritation from, p. 165, item 3
Chlorothene, SEE 1,1,1-Trichloroethane
Chrome leather welding gloves, dermatitis from, p. 165, item 2
Chromic acid, p. 184, item 2
Clarco disinfectant, skin irritation from, p. 165, item 3
Cleaner, MIL-C-16553, Type I, p. 184, item 2
Coal tar, p. 183, item 1
Cobalt 60, carrying cases for, p. 173, item 4
Compound grease cleaning solvent, "gunk:, Emulsion Type II,
   Phenolic, p. 185

-189-

Cresol, p. 186
Cresylic acid, p. 183, item 1; p. 184, item 2; p. 185; p. 186
Cyanides, p. 183, item 2

Day Glo fluorescent paint, MIL-P-21563, p. 185
De-Oxalum, p. 161, item 15
Deoxidene, p. 185
Detrex degreaser, p. 162, item h
Devran coating, p. 158, item 4
Diacetone, p. 185
Diacetone alcohol, p. 185
Diatomaceous earth, p. 183, item 1
Diethylamine triamine, p. 165, item 1
Diisooctylphthalate, p. 184, item 2; p. 185
Dimethylaniline, in metal coatings, p. 160, item 10
Dioctyl phthalate, p. 184, item 2
Dion-Iso polyester resin, p. 160, item 10
Dry ice storage tank, carbon dioxide in, p. 163, item 21
Durapox, p. 184, item 2
Durasol, p. 184, item 2
Dust, in air, determination of, p. 177, item 5

Epoxy coatings, p. 165, item 1
Epoxy resins, dermatitis from, p. 166, item 7; p. 167, items 9, 10, 12
Eronel, p. 186
Ethyl acetate, p. 185
Ethyl alcohol, p. 186
Exposure graft No. B 552-180, p. 175, item B-1

Fabertite, p. 183, item 1
Fatty acid soap, p. 185
Fiber glass lagging, dust concentration, p. 161, item 14
Film No. B 552-205, p. 175, item B-1
Fluorescent red orange paint, color 633, eye fatigue from, p. 170, item 3
Fluorides, p. 184, item 2
Formula 121X paint, p. 183, item 2
Foster 81-33 Fire Resistive adhesive, p. 183, item 1
Fumes, from burnout tests, p. 159, item 7

Gamma particles, exposure to, p. 175, item D
Gasoline tanks, lead poisoning from cleaning of, p. 178, item 6
Glass Cote Sealer, p. 184, item 2

Reproduced at the National Archives

Handi-Flux, p. 184, item 2
Heat, excessive, exposure to, p. 167, item A
Hydraulic fluid, solvent for, p. 161, item 13
Hydrocarbons, chlorinated, in cable tanks and cones, p. 157, item 2
Hydrofluoric acid, p. 179, item 12
Hydrogen sulfide, in cable tanks and cones, p. 157, item 2
Hy-Temp Block Insulation, p. 183, item 1

Illumination problems, p. 170-171
Insulating compounds, protection in handling, p. 162, item c
Isophorone, p. 184, item 2; p. 186
Isopropanol, skin irritation from, p. 165, item 3
Isotopes, radioactive, disposal of, p. 175, item E-1

J-57 engine, noise from, p. 169, item 4
JP-4 fuel, benzol in, p. 162, item 17

Kerosene, p. 185
Kerosene, dermatitis from, p. 167, item 11
Ketone, p. 184, item 2
Komul, bitumastic paint, burns from, p. 167, item 9

Lacquer primer, p. 158, item 3
Lampblack, p. 186
Lead, excretion of, p. 178, item 6
Lead, shielding for nuclear waste tanks, p. 159, item 8
Lead, shielding for radiation, p. 171-172
Liquid oxygen containers, tricresyl phosphate in mist, p. 159, item 9
Liquid oxygen, contamination of, p. 176, Sect. VI, item 1

Magnesia, dust concentration, p. 161, item 14
Magnesium, in aluminum alloy, p. 164, item 27
Magnesium silicate, p. 186
Magselect, SEE 1,1,1-Trichloroethane
Mark-25 radar scope, p. 172, item 2
Mercury oxide, in antifouling paint, p. 177, item 4
Mercury, protection against, p. 179, item 14
Mercury vapor, p. 177, item 4
Metal-fume poisoning, p. 178, item 7
Methane, as contaminant in liquid oxygen, p. 176, Sect. VI, item 1
Methyl chloroform, SEE 1,1,1-Trichloroethane
Methylene chloride, p. 186
Methyl ethyl ketone, p. 184, item 2; p. 185

Methyl isobutyl carbinol, p. 185
Methyl isobutyl ketone, p. 184, item 2; p. 185
Methyl methacrylate, p. 184, item 2
Microwaves, eye injury from, p. 168, item 2
Microwaves, measuring device for, p. 168, item 5
Mineral spirits, p. 185
Miracle Mastic Type P, p. 183, item 1
Motion Picture Repair Section, control of dust and solvent vapors in, p. 162, item e

Nacconol detergent wetting agent, p. 185
Naphtha, p. 185
Neon lamps, as indicators for microwaves, p. 168, item 5
Neon lights, as indicators of microwaves from radar, p. 168, item 3
Neoprene, p. 186
Nitrocellulose compounds, p. 184, item 2
Nitrogen, in evacuating moisture from LOX containers, p. 159, item 9
Nitrogen oxide, as contaminant in liquid oxygen, p. 176, Sect. VI, item 1
Nitrogen oxides, in carbon dioxide shielded welding, p. 163, item 24
Nitrogen oxides, in decomposition of paint, p. 158, item 3
Nitrous gases, in cable tanks and cones, p. 157, item 2
Noise, analyses of pressure and frequency, p. 162, item j
Noise, exposure to, p. 169-170
Nokorode 731, p. 185
Nubelon enamel, p. 185

Octane, p. 184, item 2
Oxygen, depletion in paint drying, p. 162, item 16
Oxygen generator, potassium hydroxide in, p. 166, item 5
Oxygen, in cable tanks and cones, p. 157, item 2
Ozone, in carbon dioxide shielded welding, p. 164, item 24
Ozone, in welding, p. 164, item 27

Paint, radioactive luminous, disposal of, p. 162, item i; p. 172, item 3
Paints, bituminous, burns from, p. 166, item 6; p. 167, item 9
Paint, vapors, hazards in drying, p. 161, item 16
Paralketone (MIL-C-16173A), p. 185
Parko lubrite, p. 185
Penetone Formula 426, p. 183, item 1
Pentachlorophenol, p. 160, item 12; p. 165, item 28
Pero-Klean Marine Cleaner #801, p. 183, item 1

Petrolene, p. 183, item 1
Petroleum naphtha, p. 186
Phenol, skin irritation from, p. 165, item 3
Phosgene, in cable tanks and cones, p. 157, item 2
Phosgene, in decomposition of paint, p. 158, item 3
Phosphate ester fluids, protection against, p. 160, item 11
Phosphoric acid, p. 184, item 2; p. 185; p. 186
Phthalic alkyd resin, p. 185
Pitt Chem Thinner, p. 184, item 2
Plasite Paint Formula No. 7144, p. 157, item A-1
Plating Section, handling of chemicals in, p. 162, item d
Plutonium 239, disposal of, p. 173, item 5
Ply #2 protective skin cream, p. 171, item 3
Polysulfide rubber, p. 184, item 2
Polyurethane (Magna) S. &W., p. 185
Polyvinyl butyral resin, p. 186
Porselon #600, p. 183, item 2
Potassium hydroxide, contamination in oxygen generator, p. 166, item 5
Potting compound MIL-S-8516B, p. 184, item 2
Preservation oil M-C-124C, p. 186
Preservation oil, MIL-O-6083, p. 185
Pressure Sensitive Tape, No. 428C, p. 183, item 2
Pretreatment coating MIL-C-8514, p. 186
Primers, rapid drying, p. 158, item 3
Propane gas, odor concentration, p. 178, item 9

Radar, eye injury from, p. 168, item 2
Radar, microwaves, measuring device for, p. 168, item 5
Radar Modulator Unit An-SPS-29, p. 168, item 4
Radar, protection against, p. 168, item 3
Radar scopes, p. 172, item 2
Radiant heat, control of, p. 178, item 8
Radiation, exposure to, p. 171-176
Radiation, protection against by lead shielding, p. 171-172
Radiation, protection procedures, p. 179, item 15
Radiation, ultraviolet, in welding, p. 164, item 27
Radioactive markers, removal of, p. 162, item b
Radioactive waste, disposal of, p. 175, item F-1
Radium 226, carrying cases for, p. 173, item 4
Radium salts, in paint, p. 172, item 3
Regulus II missile, noise from, p. 170, item 7
Rubber adhesive MIL-A-5092A, p. 186
Rubber, Goodyear, Chemigum MIL-S-7502B, Class B-2 (Aer), p. 186

Saran-coated gasoline tank, fumes from welding of, p. 163, item 23
SBS #30 waterless skin cleanser, p. 171, item 3
Sealant - MIL-S-7502, p. 186
Sealing compounds, protection in handling, p. 162, item c
Silver soldering booth, control of fumes in, p. 162, item f
Sodium alkyl aryl sulfonate, p. 185
Sodium monosilicate pentahydrate, p. 184, item 2; p. 186
Sodium peroxide, p. 186
Sodium resinate, p. 184, item 2; p. 186
Sodium trisilicate, p. 184, item 2; p. 186
Spraylat, p. 186
Stripper C-86, p. 186
Stripper C 86-67D, p. 184, item 2
Strippers C-67D, MIL-R-7751A, p. 186
Sulfur dioxide, in decomposition of De-Oxalum, p. 161, item 15

Teflon, in soldering of wire, p. 163, item 22
Tetrahydrofuran, p. 183, item 1
Thyratron tubes, p. 168, item 4
Toluene, p. 184, item 2; p. 185; p. 186
Transpo., p. 186
1, 1, 1-Trichloroethane, p. 157, item A-1; p. 161, item 13; p. 167, item 11
Trichloroethylene, dermatitis from, p. 167, item 11
Trichloroethylene, from vapor degreaser, p. 159, item 6
Tricresyl phosphate, p. 183, item 2; p. 185
Tricresyl phosphate, in mist from liquid oxygen tank, p. 159, item 9
Turco 2822, p. 184, item 2
Turco 3002A, p. 186
Turco 3087C, p. 186
Turco 4228, p. 186

Ventilation, aboard ship, p. 176, Sect. IV
Versene, in disposal of radioactive paint, p. 173, item 3
Vinyl paint for silk screen process MIL-D-8634A and MIL-P-8793, p. 186
Vinyl resins, p. 186
Vythene, SEE 1, 1, 1-Trichloroethane

Welding, flash burns in, p. 164, item 26
Westcoat clear #202, Jan-C-149-Type II, p. 186
White lead, dermatitis from, p. 167, item 11
Wood preservative (pentachlorophenol), p. 165, item 28

Reproduced at the National Archives

Xylene, p. 184, item 2
Xylene vapors, from spray painting, p. 164, item 25
Xylol, p. 183, item 1
X-radiation, protection against, p. 175, item D-1
X-rays, protection against, p. 175, item B-1

Zinc chromate, p. 186
Zinc chromate primer, p. 158, item 3

EXHIBIT Y



NAVSUP Publication 4500
COG I Stock No. 0588-005-0000
VOL. I of I

# CONSOLIDATED

# HAZARDOUS

# ITEM LIST

RECEIVED

OCT 7 1969

USNS POPE T-AP110

**IMPORTANT NOTICE**

This publication supersedes NAVSUP Publication 4500 of 1 September 1967 and FMSONOTE 4410 of 7 March 1968.

1 OCTOBER 1969

## FOREWORD

The CHIL (Consolidated Hazardous Item List) covers items in the Navy Supply System designated as hazardous to life and/or property, not elsewhere classified or identified by specific instructions.

This publication contains (1) identification data, (2) labeling data in accordance with MIL-STD-755A, and (3) ship stowage requirements in conformance with NAVSHIPS Technical Manual 250-000, Chapter 9300.

The CHIL does not cover items which are under the control of specific instructions with regard to marking, identification, use, handling, and/or storage. Items excluded are in the following categories:

   Ammunition, Explosives, and Warfare
   Chemicals and Gases

   Conventional Bulk Fuels

   Drugs and Chemicals used or dispensed
   by Medical Department Pharmacies

   Reagents and Chemicals used by Clinical
   and Chemical Laboratories

The CHIL does not provide for shipping label information. Information and requirements for labeling and/or marking of containers for shipment are covered in NAVAIR MANUAL 15-03-500, and Agent T. C. George's TARIFF No. 19.

NAVY FLEET MATERIAL SUPPORT OFFICE
MECHANICSBURG, PA, 17055

---

## Consolidated Hazardous Item List

### INTRODUCTION

#### GENERAL

The Navy CHIL (Consolidated Hazardous Item List) is published to:

1. Provide all Navy users with a consolidated listing of potentially hazardous items in the supply system.

2. Provide a standard set of codes and definitions to identify the hazardous nature of these items.

3. Provide warning labeling criteria/requirements in accordance with MIL-STD-755A.

4. Provide shipboard stowage requirements in accordance with NAVSHIPS Technical Manual, 250-000, Chapter 9300.



| TABLE OF CONTENTS | Page |
| --- | --- |
| INTRODUCTION | III |
|    Identification Codes and Definitions | IV |
|    Labeling Codes and Definitions | VIII |
|    Stowage Codes and Definitions | XI |
|    Section Formats | XVIII |
|    Maintenance | XXI |
| SECTION A – FIIN Sequence | A-1 |
| SECTION B – Nomenclature Sequence | B-1 |
| SECTION C – Hazardous Classification Code Sequence | C-1 |
| SECTION D – Hazardous Item Change History | D-1 |

III

Consolidated Hazardous Item List

INTRODUCTION

IDENTIFICATION

## 1. General.

Any material which softens, flows or melts over a range of temperatures (no precise melting point) shall be considered as a liquid (e.g, greases, waxes, pastes and soft, syrupy amorphous material).

## 2. Codes and Classifications.

| STD NAVY CODE | HAZARDOUS CLASSIFICATION |
|---|---|
| B | FLAMMABLE COMPRESSED GAS |
| C | CORROSIVE LIQUID |
| F | FLAMMABLE LIQUID |
| G | COMBUSTIBLE LIQUID |
| H | HAZARDOUS SUBSTANCE |
| J | OXIDIZING MATERIAL |
| M | MAGNETIC MATERIAL |
| P | POISON |
| Q | EXTREMELY FLAMMABLE LIQUID |
| R | RADIOACTIVE MATERIAL |
| S | COMBUSTIBLE AND TOXIC SUBSTANCE |
| T | TOXIC SUBSTANCE |
| W | NONFLAMMABLE COMPRESSED GAS |
| X | RADIOACTIVE AND MAGNETIC MATERIAL |
| Z | FLAMMABLE SOLIDS |

## 3. Definitions.

COMBUSTIBLE AND TOXIC SUBSTANCE – Code S

Any liquid which presents a combined hazard due to its combustibility (over 80 and including 150 degrees F) and its toxicity.

COMBUSTIBLE LIQUID – Code G

Any liquid which gives off flammable vapors above 80 degrees F to and including 150 degrees F as determined by flash point with Tagliabue's Open-Cup Method as used for testing burning oils.

IV

Consolidated Hazardous Item List

INTRODUCTION

IDENTIFICATION

CORROSIVE LIQUID – Code C

Any acid, alkaline, caustic liquid and other corrosive liquids which when in contact with living tissue, will cause severe damage to such tissue by chemical action; or which in case of leakage, will materially damage equipment, cargo or other inanimate surfaces by chemical action; or are likely to cause fire when in contact with either organic matter or with certain chemicals.

EXTREMELY FLAMMABLE LIQUID– Code Q

Any liquid which gives off flammable vapors at or below a temperature of 20 degrees F, as determined by flash point with Tagliabue's Open-Cup Method as used for testing burning oils.

FLAMMABLE LIQUID – Code F

Any liquid which gives off flammable vapors, above 20 degrees F. to and including 80 degrees F., as determined by flash point with Tagliabue's Open-Cup Method as used for testing of burning oil.

FLAMMABLE COMPRESSED GAS – Code B

Any gas which when mixed with air in any proportion will burn and which has one or more of the following criteria; (1) an absolute pressure in the container either exceeding 40 pounds psi at 70 degrees F or exceeding 104 pounds psi at 130 degrees F, or both; or (2) Reid vapor pressure (for flammable liquids) exceeding 40 pounds psi at 100 degrees F.

FLAMMABLE SOLIDS – Code Z

Any solid material, other than one classified as an explosive, which is liable to cause fire through friction, absorption of moisture, spontaneous chemical changes, retained heat from manufacturing or processing, or which can be ignited readily and when ignited burns with a self-sustained flame; or any solid material which is liable to cause fire through friction, percussion or an electrical spark if it ignites and burns at an ambient temperature of 80 degrees F or less.

V



---

Consolidated Hazardous Item List

INTRODUCTION

IDENTIFICATION

**HAZARDOUS SUBSTANCE – Code H**

Any substance or mixture of substances which does not meet the definitions as stated herein, but which is (1) toxic, (2) corrosive, including materials which are marked, "mildly corrosive, or "corrosive when wet"; (3) an irritant; (4) a strong sensitizer; (5) combustible (over 150 degrees F), (6) products which generate pressure through decomposition, heat or other means, such as mercury batteries, liquid yeast, polymerizable materials, (7) any liquid under pressure, not elsewhere classified, and (8) compressed gas cylinders labeled as empty, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a direct result of any customary or reasonable anticipated handling or use.

**MAGNETIC MATERIAL – Code M**

Any magnetic material or device, such as magnets or magnetrons, which emit magnetic fields of sufficient force to require special handling precautions to prevent damage to magnetically sensitive instruments.

**NONFLAMMABLE COMPRESSED GAS – Code W**

Any material which will not burn when mixed with air in any proportion and which in addition, has an absolute pressure in the container exceeding 40 pounds psi at 70 degrees F or exceeding 104 pounds psi at 130 degrees F, or both.

**OXIDIZING MATERIAL – Code J**

Any substance such as chlorate, permanganate, peroxide or a nitrate that yields oxygen readily to stimulate the combustion of organic matter; or any material which readily furnishes oxygen for combustion and fire producers which react explosively or with evolution of heat in contact with many other materials.

**POISON – Code P**

Any substance or mixture of substances in any form that may be harmful or fatal when taken into the body orally in relatively small amounts; when inhaled; or when in continuous contact with the bare skin. Except when human experience indicates otherwise, laboratory determinations falling within any of the following categories apply:

VI

---

Consolidated Hazardous Item List

INTRODUCTION

IDENTIFICATION

**POISON (cont'd)**

(1) Produces death within 14 days in half or more than half of a group of 10 or more laboratory white rats each weighing between 200 and 300 grams, at a single dose of 50 milligrams or less per kilogram of body weight, when orally administered; or when inhaled continuously for a period of one hour or less at an atmospheric concentration of 200 parts per million or less by volume of gas or vapor or 2 milligrams or less per liter of mist, fume or dust, provided such concentration is likely to be encountered by man when the substances are used in any reasonable foreseeable manner.

(2) Produces death within 14 days in half or more than half of a group of 10 or more rabbits tested in a dosage of 200 milligrams or less per kilogram of body weight, when administered by continuous contact with the bare skin for 24 hours or less.

**RADIOACTIVE MATERIAL – Code R**

Any material, combination of materials, or device which emits alpha, beta, gamma, and/or neutron (ionizing) radiation or which gives off dust, fumes, gases, and/or vapors emitting these radiations, and which has a level of activity within any of the following:

(1) A specific activity greater than 0.002 microcuries per gram, or

(2) A level of activity within the range specified for each radioactive isotope listed in Military Specification MIL-M-19590, or

(3) A level of radioactivity greater than one tenth of one milliroentgen per hour (mr/hr) above background as determined by an end-window beta-gamma radiacmeter (AN/PDR-27 series or other instrument of equivalent sensitivity) held approximately one inch from the surface being surveyed.



**RADIOACTIVE AND MAGNETIC MATERIAL – Code X**

Any material, combination of materials or device which presents a combined hazard due to its magnetic and radioactive properties.

**TOXIC SUBSTANCE – Code T**

Any substance which has the inherent capacity to produce personal injury or illness to persons coming in contact with the substance or exposure to dangerous vapors, dust fume or mist given off by the substance through ingestion, inhalation or absorption through the body surface during utilization or processing.



VII

Consolidated Hazardous Item List

INTRODUCTION

LABELING

## 1. Purpose.

The purpose of MIL-STD-755A labels is to warn users and handlers of the potential dangers involving the use of the material in the container, for each of the listed items. Materials to be labeled are those issued to the actual consumer (shop, office or unit). Label application includes the labeling of the original container and any other container to which the material may be subsequently transferred.

## 2. Labels.

| HAZARDOUS CLASSIFICATION | | | |
|---|---|---|---|
| CLASS | LABEL | CLASS | LABEL |
| 1 | FIRE HAZARD | 5 | CORROSIVE |
| 2 | FIRE HAZARD AND TOXIC | 6 | RADIOACTIVE |
| 3 | TOXIC | 7 | FIRE HAZARD-OXIDIZER |
| 4 | POISONOUS | | |

## 3. General.

The MIL-STD-755A labels supplement labels/markings required under DOT (ICC) regulations for the identification of dangerous materials offered for shipment by common carrier, or any other label/marking applied by the MCA (Manufacturers Chemist Association), NFPA (National Fire Protective Association), and/or manufacturer. These supplemental labels shall not cover, or cause to deface or remove any other hazardous labels/markings affixed to the containers in accordance with the preceding regulations.

A hazardous item may be assigned two classes of labels dependent upon its composition/formulation. For example, an item, identified as corrosive and found to be poisonous, shall bear both a class 4 and class 5 label.

An illustration of each label, corresponding definition, and Cog I stock number is provided on pages IX and X.

VIII

---

CONSOLIDATED HAZARDOUS ITEM LIST

## CONSOLIDATED HAZARDOUS ITEM LIST

### WARNING LABEL GUIDE

| Class | Label | Description | Precautions | Label Size | Stock No. / Cog 0106 |
|---|---|---|---|---|---|
| 5 | WARNING! IRRITANT AND **CORROSIVE** CONTAINS AVOID SKIN CONTACT CAUSES SKIN BURNS | CORROSIVE. Agents which upon contact with tissues of the body surface will cause injury or destruction of those tissues. | Avoid floors, mists, and vapors of the materials. Keep away from clothing and body, especially face and eyes. Wash off with plenty of water immediately after contact. | ¼ in.  1-½/2 in. | 514-0480  514-0481 |
| 6 | **DANGER** CAUTION! RADIOACTIVE MATERIALS | RADIOACTIVE HAZARD. Emits various amounts of alpha, beta, gamma or neutron radiation or which may give off dust, fumes, gases or vapors emitting those radiations. | Keep away unless specifically authorized to handle. Avoid unnecessary handling. Prevent spills or breaks immediately. | ¼ in.  1-½/2 in. | 514-0480  514-0481 |
| 7 | DANGER! **FIRE HAZARD** CONTAINS | FIRE HAZARD - OXIDIZER. Any material which readily furnishes oxygen for combustion/fire producing which react explosively or with explosion of heat in contact with many other materials. | Store separately. Keep away from flammable or combustible material. Avoid spills. If spilled, wash away with plenty of water. | ¼ in.  1-½/2 in. | 514-0480  514-0481 |



## Consolidated Hazardous Item List

### INTRODUCTION

### STOWAGE

#### 1. General.

Stowage requirements and special conditions specified herein are in accordance with those specified in NAVSHIPS Technical Manual 250-000, Chapter 9300, and related sections. In the event of differences in stowage requirements between NAVSHIPS Technical Manual and this publication, the requirements of the NAVSHIPS Technical Manual are to prevail.

#### 2. Classification.

Shipboard stowage facilities for materials in portable containers are broadly described within the three classifications of material as Dangerous, Semisafe, and Safe. A fourth classification, identified as Restricted Dangerous Materials, serves to identify items which are not to be carried aboard ship. The classifications as employed in this publication provide for the following:

Dangerous. Applicable to materials which require isolated/specific stowage precautions/locations due to the high hazard of the material with respect to health, flammability, and/or reactivity. These materials are generally marked in accordance with the criteria for labeling/marking materials in the DOT system.

Semisafe. Primarily applicable to all combustible materials having a flash point, and which require special precaution/stowage requirements for ship safety. Although normally exempt from DOT labeling/marking, materials such as fuel oils, lubricating oils, greases, and waxes present a potential hazard to life and equipment when stowed aboard ships.

Safe. Applicable to materials which require no special precautions/stowage requirements in that they present a low hazard to health and no particular hazard due to combustibility and/or reactivity.



Restricted Dangerous. Applicable to those materials specifically not authorized for ships and/or nuclear powered submarine stowage. Certain items may be of a low degree of hazard but are restricted because of possible improper observance of precautions.



Consolidated Hazardous Item List

INTRODUCTION

STOWAGE

3. Stowage Codes and Definitions.

Each of the items listed in this publication has been assigned a stowage code either in the broad classification of dangerous, semisafe, safe, and restricted dangerous or in the specific stowage condition for materials such as acids, alcohols, calcium carbide, calcium hypochlorite, compressed gases, gasolines, magnets and radioactive electron tubes or radiacs which present different and specific stowage problems. Stowage requirements for shipboard hazardous materials are classified and coded as:

| CLASSIFICATION | STWG CODE |
|---|---|
| Acid | AC |
| Alcohol | AL |
| Calcium Carbide and Calcium Phosphide | CO |
| Calcium Hypochlorite and Bleaching Powder | OL |
| Compressed Gases | CG |
| Dangerous Materials | DM |
| Film (Nitrate Base) | NF |
| Gasoline | GA |
| Magnetic Materials | MM |
| Radioactive Materials | RM |
| Restricted Dangerous Materials | RD |
| Safe Materials | SM |
| Semisafe Materials | SD |

4. Definitions.

ACIDS — Code AC

Liquid acids, carried in glass containers, should be stowed in boxes, chests, or lockers lined with lead or other suitable acid resistant material. Exceptions are those items listed as safe materials (e.g., boric acid and oxalic acid). Compartments containing liquid acid should be located below the full-load waterline. The deck and lower part of the bulkheads are to be provided with a watertight lead lining. Medical acids must be stowed in lead-lined containers in the medical storeroom.

XII

Consolidated Hazardous Item List

INTRODUCTION

STOWAGE

ALCOHOL — Code AL

Alcohol must be stowed in a locker provided for the purpose within the paint and flammable liquid storeroom. It must not be carried elsewhere except as required for current operations. For medicinal purposes, alcohol and flammable liquids must be stowed in small containers in a double locker in the paint and flammable storeroom, except that a pint or quart container may be carried in the medical storeroom or pharmacy. 

CALCIUM CARBIDE AND CALCIUM PHOSPHIDE — Code CG

Calcium carbide and calcium phosphide must be stowed in a storeroom containing nonflammable stores and located so that there will be no danger of their being exposed to moisture. Weather deck stowage in watertight lockers is also considered satisfactory.

CALCIUM HYPOCHLORITE AND BLEACHING POWDER — Code OL

Calcium hypochlorite and bleaching powder (chlorinated lime) must be stowed as follows:

(1) Stow in a clean, cool, dry compartment or storeroom which is not adjacent to a magazine and is at a safe distance from any heat source. It must be located so that there will be no danger of exposure to moisture. 

(2) These materials are to be isolated from any flammable material or material which will support combustion. They are not to be stowed in the same compartment or storeroom with acids or other chemicals.

(3) They may be stowed in a storeroom or other suitable space above the waterline, provided that conditions specified under (1) and (2) above are met. Weather deck stowage in watertight lockers is also considered satisfactory in this respect, provided that the other conditions specified above are met, and provided that the location is sheltered and protected from the direct rays of the sun. 

Periodic inspections must be made to ensure that all stowed containers are tightly sealed and that exteriors of cans are free from corrosion. All defective containers must be removed from storage and either consumed by immediate use or otherwise disposed of.

XIII

Consolidated Hazardous Item List

INTRODUCTION

STOWAGE

COMPRESSED GASES - Code CG

In general, weather deck stowage will be provided for flammable and explosive gases. However, in specific cases, below deck stowage is approved depending on the particular type, mission, and arrangement of the vessel. In such cases, these approved locations are shown on the plans of the vessel. Compressed gases aboard all vessels, except cargo vessels, shall be stowed only in compartments designated by the Naval Command as shown in applicable plans for the vessel.

When compressed gas is stowed on the weather deck, precautions shall be observed not to stow oxygen and chlorine in close proximity to fuel gas cylinders. The stowage area must be protected against accumulation of snow/ice, and during summer screened from the direct rays of the sun. The stowage area shall be as remote as practical from navigation, fire control and gun stations. Other flammable materials, especially grease and oil, shall be kept out of the stowage area.

When compressed gas is authorized for stowage in compartments, materials such as oxygen and chlorine shall be stowed away from flammable gases. Inert or nonflammable gases may be stowed in any compartment designated for compressed gas storage. Particular attention should be given to location of cylinder stowage to prevent fumes from leaking cylinders from entering ventilation air-intakes leading to spaces where personnel may be affected or flammable gases cause explosions.

Cylinders in actual use or attached to welding, fire fighting, medical refrigeration apparatus, etc., ready for use are permitted below decks outside of the stowage compartment. Fire extinguishers employing gases and fire extinguishing cylinders permanently connected to fixed fire extinguishing systems, as well as gases and chemical cannisters for oxygen-breathing apparatus, may be stowed in the vicinity in which they are to be used.

Though "empty" cylinders with valves securely closed and valve protection caps in place are comparatively less hazardous than full cylinders where stowage is concerned, empty cylinders shall be handled and stowed using the same precautions as for full cylinders. This is important since it is specified in NAVSHIPS Technical Manual 250-000 that cylinders of some gases are not to be completely exhausted but should be considered empty when the gas pressure falls to about 25 psi gage.

XIV

Consolidated Hazardous Item List

INTRODUCTION

STOWAGE

DANGEROUS MATERIALS, Not Elsewhere Specified - Code DM

This category includes those materials with considerable fire hazard or other dangerous characteristics not subject to specific stowage requirements. It encompasses all DOT and ICC classified and labeled material not elsewhere specified. Excluded from consideration because of their special stowage requirements are materials such as dangerous acids, alcohol, calcium carbide, calcium phosphide, calcium hypochlorite (chlorinated lime), compressed gases, nitrate-based film, gasoline, and radioactive materials. Dangerous Materials under this code may be categorized as follows:

(1) All flammable liquids, except as otherwise allowed herein, must be stowed in the paint and flammable liquids storerooms. Liquids placed in this storeroom are preferably stowed in five gallon containers.

(2) Except as otherwise allowed herein, extremely flammable liquid stowage shall follow the requirements set forth for flammable liquids.

(3) All other dangerous materials, not elsewhere specified, such as corrosive liquids (alkaline), flammable solids, oxidizing materials, and poisons should have isolated stowage from other dangerous materials and from each other, especially powerful oxidizing materials and low combustible materials. For instance ordinary glycerol and potassium permanganate, when simply blended at room temperature for a few minutes, react violently to produce a hot fire.



GASOLINE - Code GA

Except when specifically authorized to the contrary, gasoline carried in drums or cases as cargo shall be stowed on the weather deck, well clear of the galleys and heated spaces and arranged so that they may be readily thrown overboard.

On vessels where gasoline in drums or cases is authorized to be carried as cargo in holds or between decks, it shall be stowed in a hold separated by oil-tight steel structure from all other cargo, with direct access to the weather deck, and not adjacent to boiler or machinery spaces and uptakes. The drums shall be well secured, utilizing wood dunnage, to prevent movement that might cause sparks or rupture of drums. The greatest care should be taken to see that only tight containers are stowed.



Consolidated Hazardous Item List
INTRODUCTION

STOWAGE

GASOLINE (cont'd)

Gasoline when carried in cans for ship's own use shall be stowed in the paint and flammable liquids storeroom. When two such storerooms are provided, the total quantity shall be equally divided. In vessels having no flammable liquid storeroom, gasoline shall be carried in drums or cans on the weather deck and so located and stowed that the containers may be readily thrown overboard. Weather deck storage shall not be in the vicinity of hatches, galleys, heat-producing spaces, ventilation inlets or exhausts from such spaces, ready service magazines, in or close to the line of fire of guns. Whenever practical, subject to the foregoing, weather deck stowage shall be near the stern of the vessel. Quick release type racks, where fitted, should be inspected frequently to ensure proper functioning.

On vessels having not more than four P-250 emergency fire pumps, one of the two 7-1/2 gallon containers furnished with each unit shall be filled with fuel mixture and stowed in a rack adjacent to each pump. On vessels provided with more than four P-250 pumps, the quantity shall be increased on the basis of one 7-1/2 gallon filled container for each two additional pumps.

The permanently attached tanks for all portable pumps such as the handybilly pump shall be kept filled with fuel mixture.

MAGNETIC MATERIALS – Code MM

Magnets and magnetrons require strict compliance with handling and stowage precautions in order to prevent damage to magnetically sensitive instruments.

NITRATE BASE FILM – Code NF

Small quantities of 16mm and 35mm motion picture film of the nitrate-base type may be stored in the training aids lockers. Large quantities are stowed in a storeroom protected by sprinkling or in the paint and flammable liquids storeroom.

RADIOACTIVE MATERIALS – Code RM

Radiation sources contained in separately packaged units are to a certain extent additive. Therefore the items shall be stored as far away from personnel as feasible. Storage shall be arranged to orient any concentrated location of the radiation source within a container surface at a maximum distance from other concentrated surfaces in the storage location.

VIII

Consolidated Hazardous Item List
INTRODUCTION

STOWAGE

RADIOACTIVE MATERIALS (cont'd)

Areas where radioactive material is stored will be conspicuously marked and entry to the area restricted in accordance with current instructions, directives and regulations in affect. (Extract from ESOINST 5100.3 and FASOINST 4450.11).



RESTRICTED DANGEROUS MATERIALS – Code RD

Certain materials by nature are not suitable for shipboard usage or stowage. These may be restricted from all ships or one or more type of ships. For example:

(1) Materials such as benzene (benzol), carbon tetrachloride, DDT Xylene emulsion, hydrocyanic acid gas, and methyl bromide are not to be stored aboard any ship.

(2) Materials such as steel wool and mercury batteries are not to be stowed aboard submarines.

SAFE MATERIALS – Code SM

Materials considered safe in that they are not subject to spontaneous combustion and present no particular hazard due to reactions which might arise from broken containers.

SEMISAFE MATERIALS – Code SD

Materials which are considered safe as long as contained in unopened, nonleaking containers, it being understood that in the event of leakage, any spilled material would be cleaned up with reasonable promptness and the leaking containers disposed of. Applicable to all material not DOT classified for affixing of labels, but which are considered hazardous within the Naval Supply System.



Except as otherwise specified, all combustible materials classified as semisafe must be stowed in the paint and flammable liquids storerooms. Whenever practical, storerooms are located below the full load waterline, near either end of the vessel, not adjacent to a magazine.

XVII