# EXHIBIT 10

*David Sclafani*
*US District Court – Central District of California*
*Docket No. 2:12-cv-03037-SVW-PJWx*

## AFFIDAVIT AND REPORT OF SAMUEL A. FORMAN, M.D.

### I. BACKGROUND

1. I am a medical doctor specializing in preventive medicine and occupational medicine. I received a B.A. degree from the University of Pennsylvania majoring in history and biology, graduating *magna cum laude* in 1973. I attended Cornell Medical School, graduating with an M.D. degree in 1977. I also received a degree in public health in 1977 as a result of a joint program with the Harvard School of Public Health. Thereafter, I became board certified in occupational medicine after attending a residency at the Harvard School of Public Health.

2. From 1973 to 1977, I participated in Ensign 1975, a Navy program that permitted me to engage in active duty service and obtain hands-on training during the summers between medical school sessions. My participation in this program gave me background and experience different from that of many other prospective medical officers at that time, because very few medical officers engage in operational and administrative rotations as part of their service and training. In the summer of 1974, I engaged in a midshipmen cruise aboard the *USS Shreveport* (LPD-12) for the purpose of obtaining a general understanding of ship operations outside the medical department. I attended training classes and observed activities in all parts of the ship including the engineering department, command information center, commissary department, supply and repair divisions, and aviation division. In the summer of 1975, I did a rotation at the

Navy Bureau of Medicine and Surgery ("BUMED"), known at times as the Naval Medical Command.  While there, I participated in medical administration in the office overseeing all medical training for the Navy and worked directly with a number of high-ranking officers in BUMED, including William M. McDermott, who at that time held the rank of Captain but who later became Deputy Commander of the Naval Medical Command.  During this rotation, I had an extended assignment to analyze Navy expenditures for medical education at civilian universities to ensure the Navy's needs were being met.  In the summer of 1976, I did a clinical rotation on the general and internal medicine wards at San Diego Naval Hospital, the largest military hospital in the world.  By the time I graduated medical school, I had already accumulated approximately six months of active duty service from my summer internships.  These internships gave me a fundamental understanding of the needs of sailors at sea, a general understanding of ship operations, including ship propulsion systems, and insight into the leadership and administrative side of the Navy.

3.  In 1977, I graduated from medical school and went on full-time active duty in the Navy.  I performed my internship at the Bethesda Naval Medical Center in Bethesda, Maryland during 1977 and 1978.  I remained on active duty in the Navy until 1983.  Thereafter, I continued to work for the Navy as a civilian employee until 1986.  My qualifications and credentials are more fully described in my curriculum vitae (Exhibit A).

4.  Over the course of my active duty service in the Navy, I served aboard Navy ships whose primary purpose was to fulfill national defense missions of the United States.  Assignments aboard ship, involving duty at sea, included, in addition to the *Shreveport* in

the North Atlantic, *USS Duluth* (LPD-6) in the Eastern Pacific, and *USS St. Louis* (LKA-116) in the Western Pacific.  At all times, these ships were performing missions and activities aimed at preparing for or deterring combat.  In the military setting, a major goal of training is combat readiness.  This training is intended to simulate combat and combat conditions.  For example, the Navy hands out "battle efficiency" ribbons to ships that perform well in war exercises.  Even combat support ships are required to remain ready to assist ships and sailors on the front line and, at times, these support ships must themselves go into harm's way.  To achieve its mission, the Navy had to be willing to put life and limb at risk not just on the front line but also in support operations.

5.  One of the highest profile operations in which I was involved occurred aboard the *St. Louis*, which was an amphibious attack transport ship deployed at the time to the Western Pacific for the purpose of carrying Marines, cargo (including heavily armored Marine Corps vehicles used in amphibious assault), equipment and supplies to Navy shore-based facilities.  In March 1979, President Carter ordered the Navy to rescue a wave of Vietnamese and Southeast Asian refugees who were escaping communist Vietnam and local pirates into the South China Sea.  The *St. Louis* was the first ship of the Seventh Fleet to arrive on the scene.  Fortunately the *St. Louis* was able to perform this mission without exchanging hostile fire; however, in order to perform this humanitarian rescue operation, the *St. Louis* had to travel just outside the twelve mile international limit and sail directly into an area threatened by actively hostile Communist interests.  This situation represented an intense Cold War scenario, one of but many types of hazardous scenarios and missions for which the Navy must be prepared.

6.   In the course of my active duty service, I also worked in Navy shore facilities, including shipyards such as the Long Beach Naval Shipyard.  These facilities contributed to the defense of the country by engaging in industrial efforts to construct, repair and overhaul the Navy's combat and combat support vessels.  My role was to ensure that the Navy personnel and civilians involved in these efforts performed their duties as safely as possible.

7.   From 1980 to 1982, I ran an occupational health clinic at the Naval Weapons Station at Seal Beach, California, and assisted in the medical programs at the Long Beach Naval Shipyard.  Among other responsibilities, I assisted in the asbestos medical surveillance program for over 2,000 federal Civil Service employees and uniformed sailors.  At any one time, I was following 200 cases of asbestos disease.

8.   In 1982, I was assigned to the Naval Environmental Health Center at Norfolk, Virginia.  While stationed there, I designed occupational medicine programs with regard to Navy-specific occupational diseases, performed health hazard evaluations, inspected the occupational health programs of government facilities as part of the Navy Occupational Safety and Health, or "NAVOSH," program, carried out epidemiologic studies, and trained Navy doctors and nurses in occupational medicine.

9.   In 1983, a JAG officer for the Naval Medical Command requested that I become part of a team to locate, digest and organize government documents for production in asbestos litigation.  Over the next year and a half, I investigated the Navy's historical handling and knowledge of various industrial hygiene issues, including asbestos disease.

10.  In 1985, pursuant to Navy orders, I completed my review of Navy knowledge and practice in industrial hygiene, including its awareness of and response to health hazards of asbestos, as a formal assignment.  My search for documents took me to the National Archives, other warehouses and storage facilities for records of the Navy's Bureau of Medicine and Surgery.  I was given full security clearances for and unimpeded access to these facilities.  I also conducted research at private facilities such as Harvard University's Countway Library of Medicine's section for rare books and manuscripts.

11.  From my review of countless Navy documents and my studies while employed by the Navy, I acquired extensive knowledge as to the state of Navy knowledge and awareness regarding the hazards of asbestos.

12.  Following my research, and with the approval of the U.S. Navy's Bureau of Medicine and Surgery, I published an article entitled "U.S. Navy Shipyard Occupational Medicine Through World War II" in the *Journal of Occupational Medicine*, Vol. 30, No. 1 (Jan. 1988) (Reference 1).

13.  Though I no longer hold any formal position with the Navy, since I left I have been asked on a number of occasions to speak to Navy medical and safety personnel on issues relating to the history of occupational medicine and industrial hygiene in the Navy.

14.  I also am currently a Visiting Scientist in the Department of Environmental Health at the Harvard University School of Public Health.

## II.  DISCUSSION AND OPINIONS

### A.  Navy Occuptional Health and Industrial Hygiene Organization

15.  The Navy has always taken responsibility for the health and safety of its uniformed and civilian personnel.  It has consistently exercised its discretion regarding hazard recognition and appropriate controls in Navy workplaces.  As Navy Captain Ernest W. Brown, M.D., recognized as the architect of the Navy's formal occupational health program prior to World War II, wrote in 1940:  "One of the most important concerns of the Medical Department of the United States Navy today is industrial hygiene, especially in navy yard practice."  (Reference 2).

16.  This commitment was reflected in numerous other Navy statements and documents.  In 1943, Secretary of the Navy, Frank Knox, in a statement co-signed by the Chairman of the U.S. Maritime Commission, E. S. Lamb accompanying "Minimum Requirements for Safety and Industrial Health in Contract Shipyards," stressed the Navy's commitment in this regard:

> The necessity for conserving manpower and promoting the physical welfare, health, and safety of what shortly will amount to one million workers in shipyards required that careful observance of standards for the prevention of accidents and protection of health be accorded.  Aside from the weight which must be given humanitarian consideration, it is simply good common sense that as much care and attention be given to protecting the human factors in the war production program as is given machines.

(Reference 3).  Similarly, in a 1955 Naval Institute publication called *The Human Machine*, Captain Charles W. Shilling of the Navy Medical Corps described the "paramount importance" of Navy health:  "[T]he medical component of the Navy has a heavy responsibility" with a mission to promote physical fitness, prevent and control diseases and injuries and treat and care for the sick and injured.  (Reference 4).

17.  While the formal titles have varied over the years, the most senior Medical Corps officer in the Navy is the Navy Surgeon General, who is also the Chief of BUMED

and who reports to the Chief of Naval Operations ("CNO").  The Navy Surgeon General has responsibility to spell out health programs, including prevention and injury care, for sailors and civilian workers (as appropriate).  Medical Corps, allied health professions and enlisted hospital corpsmen are responsible for advising operational line commands to carry out preventive practices and to provide specialized industrial hygiene services.  It is the responsibility of the Navy line authorities (the operational chain of command) to carry out these recommendations.

18.  Given the breadth and sophistication of its military and industrial activities, the Navy recognized the need to establish departments and bureaus with specific expertise in scientific and technical areas of importance.  The Navy Medical Department (which encompasses BUMED, among other organizations)

> is actively concerned with all phases of life in the Navy and advises all components of the Navy on matters which may affect the health and well-being of naval personnel. . . .  There is a Medical School, a Dental School, and a Medical Research Institute at the National Naval Medical Center, Bethesda, Maryland. There are also numerous other research units established in connection with operational activities throughout the world. . . .  [T]he Medical Department and all of its component parts are working with the operational forces of the Navy, in all areas of naval importance.

(Reference 4 at 275 and 276).

19.  In addition to monitoring all health programs including industrial hygiene in both a quantitative and qualitative way, the Navy's Medical Department also originated extensive research activities:

> As it is with other component parts of the Navy, research is an intimate part of the Medical Department activity, the importance of which cannot be overemphasized. Through research we assist in the development of new equipment, new and better methods of care and treatment of various diseases and injuries; help in the problem of adjustment of naval personnel to all of the new and strange environmental situations in which they are placed; and, in general, provide the knowledge necessary for more efficient operation of the Navy.

> Research under the cognizance of the Bureau of Medicine and Surgery is accomplished in a large medical research institute, in several research laboratories, fleet and shore-based units, and in various naval hospitals.  The scope of this research is extremely broad and parallels the total activity of the Navy.

(Reference 4 at 277).

20.  A 1956 Navy training document entitled "Naval Orientation" described the scope of BUMED's responsibilities:

> The Bureau of Medicine and Surgery is responsible for safeguarding the health of personnel of the Navy; the procurement of all medical and dental materials; research in medicine and dentistry; evaluation of the performance characteristics, from the physiological standpoint, of equipment designed for the use in naval service; the determination of standards of sanitation and hygiene; the professional education and training of medical personnel; and the establishment of professional medical and dental standards for clinical methods and procedures.

(Reference 5 at 177).

21.  Among the tasks of BUMED in connection with its research and monitoring activities was the distillation of the results of that experience into practical guidance for the rest of the Navy.  The translation of the results of that experience into practices and procedures for Navy personnel, and the communication of those practices and procedures, necessarily involved the exercise of judgment by BUMED in determining what topics, and what specific information on those topics, should be disseminated to Navy personnel.  Personnel recipients included officers, enlisted, civil servants and contractors.  The communication of such information was designed to ensure that recipients received precisely, and only, what was deemed appropriate in light of their duties and responsibilities, and the overall mission and operations of the Navy.

22.  As a consequence of the Navy's approach to such matters, the knowledge of any individual Navy sailor – even an officer with command responsibilities – with

respect to an issue like the hazards of asbestos cannot be taken as representative of the broader knowledge of the Navy on the topic.  By design, that individual would have possessed only that knowledge necessary, in the view of BUMED, to the performance of his or her duties.  Put differently, regarding asbestos – as with many other health and safety issues – there was extensive information regarding potential hazards and potential protective measures that were consciously not shared with the vast majority of Navy personnel who were deemed not to have a need to know.

23.  As a General Medical Officer, I was not permitted to deviate from the standardized programs developed by the Navy Surgeon General for the health of Navy personnel, without approval from a more senior Navy officer except in extraordinary circumstances, such as if a ship was isolated or out of contact with more senior, knowledgeable and experienced officers.

24.  All Navy personnel including medical officers must follow their chain of command to maintain good order and discipline.  Enlisted personnel are indoctrinated during boot camp and training with the understanding that they must conduct all activities "the Navy way," meaning that Navy orders and instructions supersede any information or directions received from any source outside the Navy.  Sailors must follow orders trusting that their chain of command will have the mission of the Navy in mind and will address safety as best as possible.  Unlike in the civilian community, all military personnel who refuse to perform an order could be subject to various penalties pursuant to the Uniform Code of Military Justice ("UCMJ").  Absent extraordinary circumstances, the Navy demands and enforces rigid adherence to the chain of command.  It does so because it is the military's method for institutionalizing strategic considerations, highly specialized

expertise, and prior experience and then transforming this information in an effective and predictable way into programs and orders for all personnel to follow.

25.   Collective and uniform communication and implementation of Navy programs and orders are key to the Navy's operational flexibility.  The Navy has numerous sailors with specialized capabilities.  The Navy also maintains many ships and multiple shipyards with specialized capabilities.  The Navy strives to ensure that each sailor is consistently trained, and that each  ship in its fleet is predictably constructed so that it can rely on both the sailors and the ships to perform critical operations without endangering sailors any more than is necessary to achieve mission success.

### B.  Navy Knowledge of Asbestos-Related Health Issues

26.   Consistent with the Navy's interpretation of the importance of industrial hygiene and occupational health, the Navy's programs in these areas have paralleled, and at times led, the development of occupational medicine and industrial hygiene in general, and asbestos-related issues in particular.  The Navy's knowledge in the areas of asbestos and associated health conditions has been quite complete when compared to available knowledge over time, and at least by the early 1940s, the Navy had become a leader in the field of occupational medicine relating to, among other things, asbestos dust inhalation exposure.

27.   As early as 1922, the Navy recognized, as exemplified by its instructions to officers published in the *Navy Medical Bulletin*, the health hazards associated with airborne asbestos dust and the appropriate protective measures to prevent asbestos exposure.  These included the use of water to dampen dust, exhaust systems to remove

dust, enclosed chambers to prevent escape of dust and respirators.  (Reference 6).  The Navy's knowledge of potential asbestos-related health problems, and of the means to control against them, continued to expand throughout the following decades, as senior Navy officers actively assessed, evaluated, controlled, and made recommendations concerning Navy policy regarding disease and injury prevention, including asbestos related occupational health hazards.

28.  The Navy's health and safety apparatus on the eve of World War II was described in the 1939 Handbook of the Navy Hospital Corps published by the Bureau of Medicine and Surgery under the direction of the Secretary of the Navy:

> The United State Navy is one of the largest of the industries maintained by this Government.  An organization has been set up in the Navy to protect its personnel, both civilian and naval.  A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy.  He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations and the like.  He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities.  A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented.  Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization.  It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of the medical personnel for such purposes.  Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea.  In each of these places a variety of health hazards exist.  It is therefore necessary that this [sic] personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.

(Reference 7).

29.  The Handbook of the Navy Hospital Corps also explained that all Navy yards have a commandant who "is responsible to the Navy Department for the protection of

employees, as well as Navy personnel, under his command.  He is familiar with . . . the health and accident hazards presented."  Thus, the Commandant was "responsible for the appointment of the safety engineers [who will] make inspections and recommend proper protective measures."  The Handbook further called for the Navy medical officer to "advise the safety engineer and instruct the employees in safety measures and encourage them to cooperate in protective measures."  These safety measures included required "masks for asbestos workers."

30.  Also in 1939, the Annual Report of the Surgeon General of the Navy addressed the "Hazard of Asbestos," and described asbestosis as "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods."  The Report noted the risk from "continued exposure to present occupational conditions" at Navy facilities, and directed appropriate methods for preventing such exposures, recommending the use of local exhaust ventilation to control asbestos dust exposure for insulators in the fabrication shop.  (Reference 7).

31.  At about the same time, Navy Captain E.W. Brown undertook an assessment of asbestos exposure, and its prevention, in Navy yards.  In an article entitled "Industrial Hygiene and the Navy in National Defense" published in 1941, Captain Brown prescribed appropriate measures for the prevention of asbestos exposure.  These included use of respirators, local exhaust ventilation, and wetting of asbestos containing materials. (Reference 2).

32.  The Navy has historically directed all aspects of policy and procedure addressing the health and safety of Navy personnel.  This direction has encompassed policies, practices and procedures to protect workers from dangers posed by exposure to

asbestos.  Indeed, the Navy has on several occasions over time rejected offers of assistance from other leaders in the field.

33.  For example, in 1941, the U.S. Labor Department's Bureau of Labor Standards offered to conduct inspections of health and safety conditions in Navy shipyards.  Navy leaders rejected this offer.  In a memorandum to Navy Surgeon General McIntire, Commander Charles S. Stephenson, head of the Division of Preventive Medicine within the Navy's Bureau of Medicine and Surgery, offered "[n]otes for consideration when you call on Assistant Secretary [of the Navy Ralph A.] Bard." Commander Stephenson advised Admiral McIntire that Assistant Secretary Bard

> asks specifically what the policy is concerning invitation of…the Bureau of Labor Standards, Labor Department into the Navy Yards to make a survey of the welding and other hazards. I told him that we had never done that sort of work and recommended against it, as I know who [the Bureau of Labor Standards] intends to send if it should be done.

Navy leaders recognized that other government departments had a high level of expertise, while rejecting the offers of assistance:

> I gave Mr. Bard and the two officers present a complete story of the beginning of this controversy from the Federal Administrator's letter:  that is, that the United States Public Health Service had four teams of traveling scientists alleged to be able to make surveys of all of the Navy Yards and make recommendations for the correction of such hazards as were discovered.

He then emphasized:

> I told Mr. Bard that this was not considered the best policy, due to the fact that we had medical officers in the Yards and that in practically all instances recommendations of sound character had been made by medical officers.  We saw no need of inviting the United States Public Health Service on its own invitation to do this job.

(Reference 9).

34.  The Navy's reluctance to accept these offers of assistance was based on concerns regarding possible upset of labor relations, and also for security at Navy facilities.  Stephenson's memorandum makes clear that these concerns originated at the highest levels of Government:

> Likewise, I told him that I had spoken to you and that you had indicated that President Roosevelt thought that this might not be the best policy, due to the fact that they might cause disturbance in the labor element.

(President Roosevelt was familiar with the structure and operation of the Navy's shipyards and other facilities – and in particular with the functioning of the Navy during wartime – from his tenure as Assistant Secretary of the Navy from 1913 until 1920. Admiral McIntire was President Roosevelt's personal physician in addition to being the Surgeon General of the Navy.)

35.  Stephenson's positions were taken even in light of knowledge that not all industrial hazards were adequately controlled at Navy facilities:  "I doubt if any of our foundries would be tolerated if the State industrial health people were to make surveys of them."  Asbestos, too, was discussed as an issue:  "I am certain that we are not protecting the men as we should."

36.  Health and safety issues, including those relating to asbestos exposure, continued to be a major focus of the Navy and the United States Maritime Commission throughout World War II.  In 1943, the Navy, along with the Maritime Commission declared its responsibility for the safety and health of their workers and took charge of implementing and staffing safety and health programs for those workers.  Following extensive discussion with various constituencies, the Navy and the Maritime Commission jointly issued "Minimum Requirements for Safety and Industrial Health in Contract

Shipyards" ("Minimum Requirements").  (Reference 3).  The specific requirements

imposed by the document enunciated for private and contract shipyards expectations that

were already in effect and implemented at the Navy's own facilities.

37.  The Minimum Requirements identified asbestos-related disease as a potential

hazard of shipyard work, explaining that exposure could result from handling, sawing,

cutting, molding and welding rod salvage around asbestos or asbestos mixtures.  The

document advised that such jobs "can be done safely with:

> 1.  Segregation of dusty work and,
>
> 2.  (a)  Special ventilation:  Hoods enclosing the working process and having
> linear air velocities at all openings of 100 feet per minute, or
>
>> (b)  Wearing of special respirators.
>
> 3.  Periodic medical examination."

The Minimum Requirements also warn that jobs involving exposure to asbestos require

"respiratory protective equipment," in particular a "dust respirator."  A ventilation

supervisor (the safety engineer) was required to be trained to handle the entire ventilation

program in the yard, which was to include classes, demonstrations and short talks on

proper procedures.

38.  The Minimum Requirements further called for employee safety training:  "the

time for the safety training of an employee to start is at the inception of his employment."

"Employees shall have in their possession, and be instructed in the proper use of, all

necessary personal protective equipment before being started on any job."  Safety bulletin

boards were to be located at each hull and shop, with "[s]afety posters and other material

on the bulletin boards" changed at least semi-monthly.  The type of safety posters used in

these worker educational campaigns included materials reinforcing the use of masks for

protection against disease-causing dusts.  One such poster stated, "His mask keeps him on the job."  (Reference 10).

39.  This commitment by the Navy to address the asbestos-related health concerns of Navy workers, as set forth in the 1939 Handbook of the Hospital Corps and the Minimum Requirements document, is further evidenced by dozens of other documents generated by the Navy and consultants it retained during the war years.

40.  Later in the war, following extensive study of asbestos-related health issues, Dr. Philip Drinker, a Harvard professor and Chief Health Consultant to the Division of Shipyard Labor Relations and consultant to the Navy Surgeon General since 1941, wrote on January 31, 1945 to Captain Thomas J. Carter at the Navy's Bureau of Medicine and Surgery.  In his letter, he reported on analyses of airborne dust collected at Bath Iron Works, a leading contractor for construction of Navy vessels.  Dr. Drinker summarized the results of the analysis:  "This evidence is enough to indicate a fairly serious dust risk at Bath and to make it very probable that the same sort of thing will be found in other plants and yards where the same type of [asbestos] pipe covering materials are used." (Reference 11).

41.  In addition to asbestos health concerns revealed at Bath Iron Works, experience in some of the contract shipyards also came to the attention of Dr. Drinker and Navy authorities:

> I suggested to Admiral Mills that it would be very desirable for Navy to examine men handling the preparation of [asbestos] pipe coverings and their installation in at least two Navy Yards and two Navy contract yards as this is much more a Navy than a Maritime problem because the materials are used especially on Navy vessels with high pressure steam power plants.  Admiral Mills agreed that such studies would be wise before Navy or Maritime accepted this asbestos risk as being significant in our general ship construction program.

(Reference 11).

42.  Dr. Drinker and his Navy colleagues published the results of the study he had suggested in W.E. Fleischer, et al., "A Health Survey of Pipe Covering Operations in Constructing Naval Vessels," 28 *Journal of Industrial Hygiene & Toxicology* 9-16 (Jan. 1946).  (Reference 12).  The study reaffirmed the Navy's position regarding acceptable occupational dust exposure levels and dust control strategies.  They offered the conclusion that "[asbestos] pipe covering is not a dangerous trade."

43.  The conclusions of this study were carried into practice in Navy workplaces following World War II.  The January 1947 issue of the Navy's *Safety Review* publication noted that "[e]xposure to asbestos dust is a health hazard which cannot be overlooked in maintaining an effective industrial hygiene program."  (Reference 13).

44.  Also during the second half of the 1940s, the American Conference of Governmental Industrial Hygienists ("ACGIH") evaluated the issue of asbestos exposures.  This entity, comprised entirely of industrial hygienists with links to the government and academia, published threshold limit values for acceptable exposures to asbestos dust in the workplace.  These standards were periodically updated over the years.  Representatives of the Navy, trained as industrial hygienists, participated in the ACGIH.  In recognition of the potential hazards associated with exposure to asbestos dust, a 1955 Navy Bureau of Medicine instruction adopted the ACGIH's threshold limit value for exposure to asbestos dust among Navy personnel.  (Reference 14).  The 1955 threshold limit value as promulgated in the Navy instruction was the same level to which the Navy had sought to control exposures during World War II.

45.  During the 1950s, the Navy continued to prescribe safe work practices to address potential shipyard hazards associated with exposure to asbestos dust.  For example, a 1950 General Safety Rules Manual issued by the Puget Sound Naval Shipyard instructed workers to "[w]ear dust type or air-fed respirators for . . . handling amosite [asbestos] insulating materials. . . ."  (Reference 15).

46.  In 1957, the Navy convened at the Boston Naval Shipyard a "Pipe and Copper Shop Master Mechanics' Conference" to address issues of concerns to those in the pipefitters' trade.  At the conference were personnel from all twelve Navy shipyards and the Navy's Bureau of Ships in Washington, D.C.

47.  The prepared remarks of a Long Beach Naval Shipyard official, included in the Minutes of the Conference reflect the Navy's stated policy that pipe insulators and laggers who handle asbestos products should wear respirators:

> Asbestos, when handled dry, produces vast amounts of silica dust. . . .  [T]he material can be dampened to reduce the amount of dust liberated.  However, the specified type of amosite [asbestos] for use on cold water piping is water repellent.  Also material which must be removed from an existing installation is dry and powdery, being an excellent dust producer. . . .
>
> [D]uring 1956 eleven deaths from asbestosis were reported on the Pacific Coast alone. . . .
>
> I know that two of my insulators are now afflicted with this condition. How many more will become afflicted is something which I hesitate to predict.
>
> Again the solution is obvious. Remove the cause by substituting other products. . .
>
> In the meantime, the answer is the wearing of respirators by all who handle asbestos products.

(Reference 16).

48.  A New York Naval Shipyard official added that if those working with asbestos insulation have not been "told . . . to put on masks, you are more or less the cause of their trouble."  That same official added:

> I think everyone, who has people doing this type work, should warn their people regarding the handling of this material.  With the proper handling of it on the job, and it has always posed a very big problem, because the men don't want to wear the masks, or get this dread disease.  It is difficult to protect them.  After a couple of years of mandatory wearing masks, I think they should realize the danger.  I think everyone ought to enforce the wearing of masks.  Don't forget this is something that injures people's health.  We should do something about it – and fast, and I am convinced that what we are doing is not enough.  We should not have people handle this material withou[t] protection.

49.  On January 7, 1958, the Department of the Navy issued a "Safety Handbook for Pipefitters," which explicitly addressed the asbestos hazard and again set forth Navy policy for controlling this hazard.  (Reference 17).  This handbook – one of many safety handbooks issued by the Navy – stressed that "[a]sbestos dust is injurious if inhaled," and warned those working with asbestos insulation materials to "[w]ear an approved dust respirator for protection against this hazard."

50.  The early 1960s brought still further development of the Navy's policies and practices to protect workers from asbestos-related health concerns.  For example, Captain H.M. Robbins, a Navy physician, and W.T. Marr, a Navy industrial hygienist from the Long Beach Naval Shipyard, published the article entitled "Asbestosis" in the October 1962 issue of the Navy's internal *Safety Review* publication.  The article addressed the potential for exposure to asbestos aboard ships:

> Aboard ship, a great variety of insulation is performed.  Insulation blocks are shaped with a saw, pads are supplied to fittings, insulation cement is applied to blocks and covered with asbestos cloth.  These and other operations take place in nearly all compartments; however, most work is done in the machinery spaces. By far the greatest potential exposure to asbestos fibers occurs during ripout of old insulation for ship overhaul or reconversions.

The article concluded that "[t]he worker's best protection is to avoid careless creation of dusty conditions, use damp material when possible, and wear respiratory protection constantly."  (Reference 18).

51.  In 1968, the Navy came under scrutiny for its handling of asbestos-related health issues.  On July 30, 1968, Murray C. Brown, Medical Director of the Public Health Service, wrote to Vice-Admiral R.B. Brown, the Chief of the Navy's Bureau of Medicine and Surgery, stating that "[o]ne of our grantees, Dr. Irving Selikoff of New York University, has recently completed a study of non-insulation shipyard workers' exposure to asbestos," and that "Dr. Selikoff reports he has some interesting data and has requested that we arrange an information meeting with your Department and the U.S. Department of Labor to discuss his findings."  (Reference 19).  On December 5 of that same year, Admiral Brown reported to others in the Navy health establishment that "Doctor I.J. Selikoff of Mount Sinai Hospital, through the news media, stated that he has warned the Navy and other Federal departments of his findings relating to the unusual incidence of asbestosis among shipyard asbestos workers.  The newspaper articles stated that the Federal agencies including the Navy have not publicized the hazards."  (Reference 20).

52.  In a "Hazard Analysis" commissioned in response to this external criticism of the Navy's safety practices, Commander Rosenwinkel of the Navy's Bureau of Medicine assured that:

> [T]he Navy's shipyards have for many years been aware of the hazards of asbestos and have initiated appropriate safety precautions.  Insofar as possible, all fabrication work [with insulation] is performed in the shops where adequate safety precautions can be observed.  These precautions include controlled ventilation, use of respirators, and wetting down of the material.  During "rip out" operations, respirators are worn and ventilation is controlled as far as possible.

Similar language was prepared "for inclusion in a statement to be issued by Rear Admiral

J.J. Stilwell, Shipyard Management Directorate":

> The United States Navy is well aware of the hazards of asbestos to its employees engaged in ship construction and ship repair at naval shipyards.  Hazard control measures implemented by the shipyard medical departments and practices are in accordance with accepted standards of industrial hygiene practices in the United States.  Stringent efforts are directed at keeping the concentration of air borne asbestos dust below the level recommended by the American Conference of Governmental Industrial Hygienists.  An energetic periodic physical examination program insures the health of personnel exposed to this hazard.

> For more than two years, the Naval Ship Systems Command and the Commander of Boston Naval Shipyard have been cooperating with a prominent investigator in a study whose ultimate goal is to define safe working conditions with respect to air borne asbestos.  Upon the development of further objective, well founded recommendations for the control of this hazard, the Naval Ship Systems Command, in cooperation with the Bureau of Medicine and Surgery, will take the necessary steps to implement them at the naval shipyards and all naval activities.

(Reference 21).  The message was clear, and consistent:  the Navy would handle asbestos

issues in its own way and through its own channels.

    53.  The development of the Navy's policy towards asbestos-related health issues,

and of its program for addressing asbestos exposure to Navy personnel, continued into

the 1970s.  On February 9, 1971, the Commander of the Navy's Ship Systems Command

issued to numerous Navy bureaus and commands its Instruction 5100.26.  That document

began by recognizing that:

> [t]he most critical use of asbestos in the Navy from a safety viewpoint is in the fabrication, installation, repair or removal of pipe and boiler insulation materials.  Some workers sustain accidental contacts either while employed in various capacities where asbestos products are processed or when working in plant areas in which an environmental pollution of the air exists due to asbestos.

In light of these concerns, the purpose of the document was "to prescribe appropriate

safety precautions during the use of asbestos," and it decreed that:

> [t]he following safety precautions will be observed by all supervisors and workers engaged in the fabrication, installation and/or removal (ripout) of asbestos-containing insulation material.  The provisions of this instruction will be effective as of this date.  The provisions in this instruction are considered as minimum health and safety requirements.  More stringent restrictions may be applied by local commanders.

The document then listed nearly fifty specific work practices to be employed to protect workers from asbestos exposure in handling or working in the vicinity of asbestos-containing products.  (Reference 22).

54.   The Navy was committed to maintaining complete control over existing military specifications, policies and procedures with respect to asbestos-containing materials and worker practices with those materials.  The Navy maintained a fierce autonomy over hazard recognition and control, because the Navy considered itself the ultimate authority on naval systems and military workplaces.  Regardless of the source of other information, the Navy viewed its unique knowledge as a strategic advantage in addressing hazard identification and control in its workplaces.

55.   In the effort to achieve its mission, the Navy made trade-offs between the use of asbestos and the potential health impact on personnel.  In the Navy's judgment, the beneficial aspects of asbestos from an engineering standpoint (technical performance, cost, weight, etc.) made it the best thermal insulation available and a critical war material.  As knowledge of asbestos health risks evolved, the Navy made sensitive military mission-related decisions about deriving the benefits of asbestos while controlling its risks.  Moreover, when the hazards of asbestos became more fully known to the Navy and the scientific community in the late 1960s, the Navy determined not to do an immediate fleet-wide elimination of asbestos.  At the time, Navy leaders were concerned that a large scale, immediate asbestos removal program would pose at least three

problems: excessive cost; mission impairment; and increased health hazards to removal crews from disturbing fixed, in-place asbestos.

56.  The Navy asserted for itself the role as final arbiter of what was best with respect to industrial hygiene in its unique workplaces to carry out its national defense mission.  The Navy's reasons for this approach include: harmonizing industrial hygiene with its overall operations; maintaining security of its facilities; and unifying communications to its workers.

57.  The Navy rejected participation from manufacturers in its efforts to alert its personnel to potential asbestos hazards in Navy operations.  The Navy pursued the issue in its own way.  Professor Drinker recorded:

> I met with the manufacturers of the materials used at Bath and they stated they would be glad to get out a brief statement of precautions which should be taken in the light of their own experience and that they would inform their competitors that I had asked them to do so.  I understand that neither Navy nor Maritime wants any change in the specifications as the performance with the present materials is entirely satisfactory.  From a health standpoint we do not believe any specification changes are needed.

(Reference 11.)

58.  BUMED, through a litany of instructions, bulletins and other communications, developed work practices and procedures designed to take what BUMED deemed to be appropriate precautions against workplace and environmental hazards to Navy personnel.

59.  Not surprisingly, in my research, I have not located a single instance in which the Navy, at any time during the 1930s through the 1960s, instructed or permitted a supplier of engineering equipment to a vessel or facility to affix or provide any asbestos-related warning with its equipment.  The Navy has not depended on equipment warnings

23

in its workplaces concerning long-term occupational health issues. Rather than depending on equipment signage or labeling, the Navy put its efforts into work practice training, specifications for materials being used in its unique workplaces, and the hierarchy of industrial hygiene controls.

60. The Navy's approach to the protection of its personnel from health hazards – and the lack of a role for equipment manufacturers in that process – is exemplified by the Uniform Labeling Program, SECNAV [Secretary of the Navy] Instruction 6260.3. (Reference 23).

61. The Uniform Labeling Program had as its stated purpose "to standardize on [sic] labeling requirements for hazardous chemical products. . . ." (Reference 23). It did not not require any actions of parties outside of the Navy, including manufacturers of equipment. It is also clear that the Navy's Uniform Labeling Program was strictly an internal document. In other words, the program was designed by the Navy, for implementation by the Navy. It was not intended as a set of requirements governing the activities of outside parties. The Uniform Labeling Program is an internal Navy program whose addressees are Navy Commands: "Scope: The instruction applies to the labeling of all hazardous materials throughout the Naval Establishment wherever distribution of hazardous chemical and materials is made to the actual consumer (shop, office, or unit)"

62. The internal nature of the Uniform Labeling Program is evident from its provisions:

> (a) The Navy Department Standardization Office was directed to assign a Navy project to "standardize the printed labels in respect to quality of paper, size,

color, shape, insignia, wording, and design; quality of the glue; specifications for inks including colors of inks); and other related matters."  (Reference 23 at 4.a.);

(b) The Navy's Bureau of Supplies and Accounts was directed to "initiate procedures to have the necessary labels stocked as General Store items for use by all naval activities."  (Reference 23 at 4.b.);

(c)  Classification of hazardous chemicals was to "be accomplished through the joint efforts of the technical bureaus in that each Bureau shall be responsible for passing on those aspects, of any single item, which fall within its technical purview."  (Reference 23 at 4.c.).

(d)  The document listed the responsibilities of a Navy Safety Precautions Board, and of Navy bureaus and offices, and of the Marine Corps, in implementing the program.  (Reference 23 at 4.d & 4.e.).

63.  The Uniform Labeling Program expressly states that it does not impose any requirements on manufacturers of products.  Consistent with its focus on chemical materials and substances, the document makes reference to container labeling that may be necessary for intrastate or interstate shipping, and to labeling by "manufacturers of chemicals" in accordance with Manufacturing Chemists' Association guidelines. (Reference 23 at 2.a.).

64.  The Uniform Labeling Program was prompted by "[t]he rapid development of new chemical products and the introduction of new chemical processes," and by the Navy's view that "[w]arning labels affixed to containers of hazardous chemicals are one of the most practical means of accomplishing th[e] objective" of ensuring that Navy

personnel take "precautionary measures . . . during the handling of toxic and dangerous chemicals."  (Reference 23 at 3).

65.  Throughout the SECNAV Instruction describing the Uniform Labeling Program, the focus is on chemical products, and on the appropriate labeling for containers of chemical products.  The document includes as an enclosure an alphabetical listing of materials it covers, all of which are toxic chemicals or materials.  There is no mention of or suggestion that the program has any applicability to equipment such as pumps or valves, or to products such as gaskets or packing, or does the Uniform Labeling Program anywhere mention asbestos.

66.  The documents referenced in the Uniform Labeling Program also refer to labeling of containers of hazardous chemicals.  For instance, there is reference to the Manufacturing Chemists' Association's Manual L1, "A Guide for the Preparation of Warning Labels for Hazardous Chemicals."  (Reference 24).  Like the Uniform Labeling Program itself, Manual L1 expressly states that it is intended to provide information to "every person using, handling or storing *chemicals*."  It expresses the view that "[t]he most practical means" of disseminating such information is "by warnings affixed to containers of hazardous *chemicals*."  (Reference 24 at 5 (emphasis supplied)).  There is nothing in the document to suggest that it relates to instructional or other documentation accompanying machinery or equipment, or that it relates to finished products such as gaskets or packing.

67.  That the Uniform Labeling Program imposed neither internally within the Navy nor on manufacturers of machinery or equipment any responsibility for labeling of asbestos-containing materials is belied by the Navy's own implementation of the program

26

is exemplified by a January 15, 1960 Occupational Hazards Release (Reference 25) summarizing significant information on occupational health and industrial hygiene from through the Navy and distributed by the Chief of the Navy's Bureau of Medicine and Surgery.  The document reported on the review by a Navy shipyard of new products "[i]n accordance with SECNAV Instruction 6260.3 and BUSHIPS Instruction 6260.3 on labelling toxic materials."  With respect to "Hy-Temp Block Insulation," an insulating material containing 12-15% asbestos, the Navy concluded as follows:  "No label."  The fact that the Navy determined that no hazard label was appropriate for an asbestos-containing insulation material of the type whose hazards it had been aware of and discussing since the 1920s is inconsistent with the notion that the Navy sought, or would have accepted, asbestos-related warnings affixed to equipment or machinery or in technical documentation relating to such items.

68.  The Navy's 1969 Consolidated Hazardous Item List, NAVSUP Publication 4500 (Reference 26) issued more than a decade later, had the same focus and purpose as the Uniform Labeling Program.  The document expressly governed the labeling of "containers," and it states that the purpose of labeling it requires is "to warn users of the potential dangers involving the use of the material in the container."  (Reference 26 at VIII).  There was no suggestion that the document applied to equipment or its manufacturers.  Like the Uniform Labeling Program, the Consolidated Hazardous Item List is an internal Navy document, describing procedures intended to be implemented by the Navy.

69.  Nor were military specifications among the means by which the Navy sought to protect its personnel against long-term health issues such as asbestos exposure.

Rather, protection against such hazards was undertaken, through the Navy's Bureau of Medicine & Surgery, through a comprehensive system aimed at identifying evaluating potential threats to the long-term well-being of Navy personnel and developing appropriate training and procedures to mitigate those threats. While military specifications were outward looking – directed to vendors outside the Navy – development and implementation of protective measures regarding asbestos was viewed as an internal Navy issue.

70. The language in military specifications governing technical manuals for equipment is consistent with my overall experience that the Navy did not view manufacturer labeling or warning as an important, or in many instances an appropriate, means of protecting against exposure to ubiquitous, well-known, long-term potential health hazards such as asbestos. For example, MIL-M-15071D, dated June 6, 1961 and governing "Manual, Service (Instruction Books) for Shipboard Electrical and Mechanical Equipment" stated that use of cautionary language "should be as sparing as is consistent with real need." (Reference 27 at para. 3.3.6).

71. Consistent with my experience that the Navy saw little value, and much potential for confusion, in extensive use of caution labels addressing common hazards or conditions, particularly when no threat of immediate injury or harm to individuals or equipment was present, the Navy's directed that warnings in technical manuals be "sparing." Rather than depending on equipment signage or labeling, the Navy put its efforts into work practice training, specifications for materials being used in its unique workplaces, and the hierarchy of industrial hygiene controls.

72.  The kinds of warnings the Navy did permit in equipment technical manuals underscore that the Navy's focus in this regard was on immediate hazards to life and equipment operation as being appropriate for inclusion in equipment manuals.  Such warnings were related to materials that presented immediate hazards to life and equipment, including, for example, solvents which have long been recognized as material that present both inhalation and flammability hazards.  Both of these hazards can, of course, result in immediate, severe injury or damage.

73.  Similarly, carbon tetrachloride which, while a solvent, is not flammable, is hazardous based in part on its potential to break down and release toxic phosgene gas at elevated temperatures.  The release of phosgene gas, which was used as a chemical weapon during World War I, presents a risk to users or others in the vicinity of poisoning.

74.  The potential for immediate injury due to inhalation or explosion presented by solvents presents a hazard fundamentally different from the type of disease risk that the Navy has long known to be associated with exposure to asbestos.

75.  An acute injury or accident hazard of the type associated with solvents is a type of "safety" risk long viewed by the Navy as the responsibility of safety officer and the line command.  By contrast, asbestos presents a long-term, environment threat to "health" of personnel.  The Navy has traditionally handled such health risks under the technical purview of the medical department.  The fundamental distinction between safety and industrial health is evident, for example, from the "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" (Reference 3), which present separately "Minimum Requirements for Industrial Health" and "Minimum Requirements for Safety."

76.  As a consequence, the fact that the Navy permitted, or perhaps required, warnings regarding solvents in some equipment technical manuals does not mean that the Navy likewise wanted, or would have permitted, asbestos-related cautionary language in those documents during the period in question.

**B.  Gaskets and Packing**

77.  With specific reference to potential hazards associated with the handling of asbestos-containing gaskets and packing, I am aware from my research and from my personal experience in the Navy that these materials were regarded as negligible sources of asbestos exposure.  For example, a December 9, 1968 U.S. Department of the Navy Memorandum regarding  "Hazards of Asbestos" stated that

> [a]ll of the asbestos in [gasket and packing materials] is fabricated as cloth, rope or compressed sheet with binders, so that the items are not friable when they are cut.  Thus, these items do not cause dust in shipboard applications.  In addition, in many instances, they are received already incorporated in the finished assembly such as a valve, and do not require fabrication by the shipyard.  For these reasons, packings and gaskets containing asbestos are not considered to be a significant health hazard.

(Reference 21).

78.  This conclusion was reaffirmed in the published literature by P.G. Harries, who made extensive study of asbestos exposure in shipyards in the United Kingdom.  In "Asbestos Dust Concentrations in Ship Repairing:  A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards," *Ann Occup Hyg 14*:  241-254 (1971), Harries concluded that asbestos-containing gaskets, which he referred to as "high temperature jointing and packing materials," presented "[n]o health hazard in forms used in shipyard

applications."  He also noted that "[n]o substitute heat-resistant material is available" for asbestos in these applications.  (Reference 28).

79.  A 1973 publication of the International Agency for Research on Cancer – *Biological Effects of Asbestos* – stated that "[t]here is no conceivable health risk in the use of asbestos-based gasket materials."  (Reference 29 at p. 325).  Well-known asbestos researcher and health advocate Dr. Irving Selikoff wrote, in his 1978 book *Asbestos and Disease* that "[h]igh temperature jointing and packing materials" containing "[a]sbestos fiber" and "[c]ompressed asbestos fiber" present "[n]o health hazard in forms used in shipyard applications."  (Reference 30 at p. 267).

80.  The lack of concern for asbestos exposure from asbestos-containing gaskets and packing expressed in Navy documents and the writings of researchers such as Harries and Selikoff is entirely consistent with my experience as a uniformed and civilian Navy occupational medicine physician.

81.  In addition to the documents referenced and discussed above, the development of the Navy's knowledge of asbestos-related health issues and of appropriate workplace practices and controls to prevent exposure to elevated levels of airborne asbestos also is reflected, among others, in the documents listed on Exhibit B, which comprise part of the bases for my opinions on these topics.

## III.  CONCLUSIONS

82.  The Navy made its decisions with respect to the use of asbestos in accordance with Navy operating requirements and in furtherance of Navy missions, and in light of the Navy's knowledge of associated health hazards at the time and of its perception of the requirements of federal law.  The Navy's extensive and evolving knowledge of the hazards of exposure to asbestos and the means to control those hazards were weighed by the Navy against the benefits provided by its use. These benefits included meeting national defense needs in a standardized, efficient and low-cost manner that would not delay or hinder ship availability, especially during times of war.  The Navy was informed in this decision-making by close contacts and liaison with relevant academic communities, professional organizations and other government agencies.

83.  Similarly, the Navy's handling of and programs regarding workplace safety and hazard communication, as they related to asbestos and other issues, reflected the Navy's balance of various considerations, including combat readiness, maintenance of the necessary command structure, the needs of discipline and the hierarchy of risks presented by life and work aboard a combat vessel.  In general, the Navy chose to address long-term workplace health issues in the course of training for various trades and jobs, rather than using labeling or other written materials to accompany products into the workplace.

84.  The Navy's occupational health program in no way depended upon, required or sought advice from equipment manufacturers regarding long-term occupational health issues, including those posed by exposure to asbestos dust.  I have not uncovered – nor

would I have expected to based on my research and experience and the extent of the

Navy's knowledge in these areas – situations in which the Navy solicited from suppliers

of shipboard equipment any information or guidance regarding the appropriate methods

for the prevention of exposure to asbestos.   Given the Navy's state-of-the-art knowledge

concerning asbestos related hazards and its robust safety and health program, it would be

unreasonable to assume that the Navy would have accepted any advice pertaining to

asbestos related safety precautions from a manufacturer of equipment.

85.  My opinions set forth herein are held to a reasonable degree of scientific

certainty.

Signed under the pains and penalties of perjury this  _30TH_  day of
_November_, 20 _12_

Samuel A. Forman, M.D.

REFERENCES:

1    S. Forman, "U.S. Navy Shipyard Occupational Medicine Through World War II," *Journal of Occupational Medicine*, Vol. 30, No. 1 (January 1988)

2    E. Brown, "Industrial Hygiene and the Navy in National Defense," *War Medicine*, Vol. I (1941)

3    Navy Department & Maritime Commission, "Minimum Requirements for Safety and Industrial Health in Contract Shipyards" (January 20, 1943)

4    C. Shilling, *The Human Machine*, Naval Institute (1955)

5    Naval Orientation, NAVPERS 16138-C (1956)

6    L. Dublin et al., "Instruction to Medical Officers, *Naval Medical Bulletin* (1922)

7    *Handbook of the Hospital Corps*, Navy Bureau of Medicine & Surgery (1939)

8       *Annual Report of the Surgeon General of the Navy* (1939)

9       Memorandum for Admiral McIntire from C.S. Stephenson (March 11, 1941)

10      Navy Poster, "His mask keeps him on the job"

11      Letter to Navy Bureau of Medicine & Surgery from P. Drinker (January 31, 1945)

12      W. Fleischer et al., "A Health Survey of Pipe Covering Operations in
        Constructing Naval Vessels," 28 *Journal of Industrial Hygiene & Toxicology*
        (January 1946)

13      "Asbestos Dust," Safety Review, Navy (January 1947)

14.     BUMED Instruction re Threshold Limit Values (November 7, 1955)

15      General Safety Rules, Puget Sound Naval Shipyard (1950)

16      Minutes of Pipe and Copper Shop Master Mechanics Conference, Boston Naval
        Shipyard (May 8-10, 1957)

17      NAVORD Instruction 5100.21 (January 7, 1958)

18      W. Marr, "Asbestos," *Safety Review* (October 1962)

19      Letter to R. Brown, Navy Bureau of Medicine & Surgery, from M. Brown, U.S.
        Public Health Service (July 30, 1968)

20      Department of Navy Memorandum re Newspaper Articles Appearing on Shipyard
        Asbestos Workers (December 5, 1968)

21      Department of Navy Memorandum re Hazards of Asbestos (December 9, 1968)

22      NAVSHIPS Instruction 5100.26 (February 9, 1971)

23      SECNAV Instruction 6260.3

24      Manufacturing Chemists' Association, Manual L1, "A Guide for the Preparation
        of Warning Labels for Hazardous Chemicals

25      Department of Navy Memorandum re Occupational Health Hazards Release No.
        22 (January 15, 1960)

26      Consolidated Hazardous Item List, NAVSUP Publication 4500 (1969)

27      MIL-M-15071D, "Manual, Service (Instruction Books) for Shipboard Electrical and Mechanical Equipment" (June 6, 1961)

28      P. Harries, "Asbestos Dust Concentrations in Ship Repairing:  A Practical Approach to Improving Asbestos Hygiene in Naval Dockyards," *Annals of Occupational Hygiene* (1971)

29      IARC, *Biological Effects of Asbestos* (1973)

30      I. Selikoff et al., *Asbestos and Disease* (1978)

# SAMUEL A. FORMAN, M.D.
11 Clinton Road
Brookline, MA 02445-5812

(617)-306-2403 cell        sforman@hsph.harvard.edu

---

## EMPLOYMENT

**2005 - present**   **Oak and Ivy Health Systems, Inc.,** Brookline, MA
President
Consulting services encompassing, quality management, disease management, intensive case management, business strategy, health care operations, epidemiology and toxicology.

Management and teaching for the Initiative for Productivity and Health Management at the Occupational and Environmental Medicine Residency of Harvard School of Public Health (adjunct faculty).
Co-director of *Leadership for Productivity and Health Management*

Knowledge development and dissemination concerning historical issues of relevance to society and to medicine. Current book project is the American Founders biography of Dr. Joseph Warren.

**2003 - 2004**   **Healthways, Inc.,** Westboro, MA
Senior VP and Medical Director
Medical direction for high-risk case management, comprising StatusOne services offered as a product line of Healthways, Inc.

**1997 - 2003**   **StatusOne Health Systems, Inc.,** Westboro, MA
Senior VP, Chief Medical Officer, Founder and Board Secretary
Consulting, software and Internet services helping risk-bearing health organizations care for their frailest members.  Develop predictive models, consult on the organization and execution of medical management services, formulate client relationships, contribute professional papers and monographs, evaluate competitive offerings, and represent StatusOne to medical audiences.
Company acquired by Healthways, Inc., September 2003.

**1995 - 1997**   **Blue Cross and Blue Shield of Massachusetts**, Boston, MA
Medical Director, Clinical Improvement
General management responsibilities for pharmacy, home care, and several health care joint ventures.  Lead clinical improvement projects involving all specialties in a 100,000 member integrated delivery system.  Leadership of 150 people.  Occupational medicine liaison with Raytheon Corporation.  Provide general internal medicine care.

**1986 - 1993**   **Procter & Gamble Company**, Cincinnati, Ohio
Consultant, later Associate Director, Occupational Health
Manage U.S. self-insured health programs for 30,000 employees comprising the detergent, paper, pharmaceutical and food divisions.  Build epidemiologic function, design, contract for, and execute studies.  Model programs reapplied worldwide.  Manage 5 physicians, 3 nurses plus support staff.  Deliver clinical services to technical center staff and senior management.  Direct 70 site clinics and 60 part-time physicians.

Samuel A. Forman, MD                                          Curriculum vitae

1984 - 1986            **Coastal Emergency Services, Inc**.
                       Clinical services as emergency room physician and ambulatory family
                       medicine at several Virginia community hospitals.

## MILITARY SERVICE

1982 - 1986            **Navy Environmental Health Center**
                       Norfolk, Virginia
                       Lieutenant Commander, later GS-14 Consultant in the occupational
                       medicine division
                       Set standards, review complicated disability claims, apply statistical
                       methods to health care delivery, inspect clinics for QA and UR, lecture
                       on professional topics, perform epidemiologic studies and health hazard
                       evaluations, represent naval occupational medicine on selected issues to
                       outside organizations, manage development and implementation of
                       clinical information management system.

1980 - 1982            **Naval Regional Medical Center**
                       Long Beach, California
                       Occupational Medicine Service; Head, Seal Beach Naval Weapons
                       Station clinic.  General and occupational clinical and preventive
                       programs for 2,200 workers and 250 military personnel at conventional,
                       nuclear capable, and special weapons industrial base.  Manage
                       asbestos medical surveillance program at Long Beach Naval Shipyard.

1978 - 1979            **USS St. Louis** (LKA-116) and **USS Duluth** (LPD-6)
                       Based at San Diego, California
                       Ship's physician
                       Western Pacific operations, general office and emergency practice.
                       Vietnamese refugee assistance.

## EDUCATION

1993 - 1995            **Yale** University School of Management,
                       New Haven, Connecticut
                       **Master of Business Administration**
                       Concentration in Organizational Behavior and Operations.  Total quality
                       management, health administration, finance, marketing, accounting and
                       statistics.
                       Coordinator of Yale/Columbia Graduate School of Business Negotiation
                       Colloquium.

1979 - 1980            **Harvard** University School of Public Health,
                       Boston, Massachusetts
                       **Master of Science**
                       Residency in Occupational Medicine

1977 - 1978            **National Naval Medical Center**,
                       Bethesda, Maryland
                       Internal medicine rotating internship
                       Assistant senior intern.

1976 - 1977            **Harvard** University School of Public Health,
                       Boston, Massachusetts
                       **Master of Public Health**

Samuel A. Forman, MD                                          Curriculum vitae

1973 - 1977                **Cornell** University Medical College,
                           New York, New York
                           **Doctor of Medicine**
                           MD-MPH program.

1970 - 1973                **University of Pennsylvania**,
                           Philadelphia, Pennsylvania
                           **Bachelor of Arts** magna cum laude
                           Majors in American history, history of science and biology.

## PUBLICATIONS

(Book) Forman, SA: *Dr. Joseph Warren – On the Road to Bunker Hill*, Pelican Publishers, 2011, in preparation.

Coberley C, Hamar B, Gandy B, Orr P, Coberley S, McGinnis M, Hudson L, Forman S, Shurney D, Pope J: "Impact of Telephonic Interventions on Glycosylated Hemoglobin and Low-density Lipoprotein Cholesterol Testing" Am J Managed Care 13(4): 188-192, 2007.

Forman S: "Targeting the Highest Risk Population to Complement Disease Management" Health Management Technology 49-50, Jul 2004.

Forman SA, Lynch JP: "High Risk Geriatric Population Management" J Am Geriatric Assoc S111, May 2001.

Lynch J, Forman SA, Graff S, Gunby M: "High Risk Population Health Management: Achieving Improved Patient Outcomes and Near-Term Financial Results" Am J Managed Care 6(7):781-791, 2000.

Forman S: "Medicare Risk Plans and Disease Management Vendors" Disease Management and Health Outcomes 7(1):1-4, 2000.

(Book) Forman SA, Kelliher M: *Status One: Breakthroughs in High Risk Population Health Management,* Medical Management Series, Jossey Bass Publishers, San Francisco 1999.

Borron SW, Forman SA, Lockey JE, Lemasters GK, Yee LM: "Dust and Mirrors or Corruption is in the Eye of the Beholder," American Journal of Industrial Medicine 34:409-410, 1998.

Forman SA, Kelliher M, Wood G: "Clinical Improvement with Bottom Line Impact - Custom Care Planning for the Acutely, Chronically Ill in a Managed Care Setting," J Managed Care 3(7): 1039-1048, July 1997.

Borron SW, Forman, SA, Lockey JE, Lemasters GK, Yee LM: "An Unpublished 1932 Study of Asbestosis Among Manufacturing Workers: Reconstruction of the Cohort and Original Findings," American Journal of Industrial Medicine 31: 324-334, 1997.

Ducatman AM, Forman SA, Teichman R, Gleason RE: "Occupational Physician Staffing in Large U.S. Corporations," Journal of Occupational Medicine 33(5): 613-618, 1991.

Samuel A. Forman, MD                                                    Curriculum vitae

Forman SA:  "A Review of Propylene Glycol Dinitrate Toxicology and Epidemiology," Toxicology Letters  43: 51-65,  1988.

Ducatman AM, Yang WM, Forman SA:  "B-Readers and Asbestos Medical Surveillance," Journal of Occupational Medicine  30(8): 644-647,  1988.

Forman SA:  "Sublethal Exposure to Microwave Radiation (letter)," Journal of the American Medical Association  259(1): 3129,  1988.

Forman SA:  "U.S. Navy Occupational Medicine Through World War Two," Journal of Occupational Medicine  31(1):  28-32,  1988.

Forman SA, Potter HG, Helmkamp JC:  "Retrieval Methodology for Inpatient Records," Military Medicine  152: 190-193,  1987.

Forman SA, Helmkamp JC, Bone CM:  "Cardiac Morbidity Associated With Occupational Exposure to 1,2 Propylene Glycol Dinitrate," Journal of Occupational Medicine  25(5): 445-450,  1987.

Forman SA:  "Radiation-Induced Breast Cancer (letter)," Archives of Internal Medicine  145: 574-575,  1985.

Helmkamp JC, Forman SA, McNally MS, Bone CM:  "Morbidity and Mortality Associated With Exposure to Otto Fuel II in the U.S. Navy 1966-1979," Naval Health Research Center Report  84-35,  1984.

Forman SA:  "Industrial Hygiene Records - Will They Be Useful and IBM's Experience With ECHOES," American Conference of Governmental Industrial Hygienists Journal  6: 41,75,  1983.

Forman SA, Holmes CK, McManamon TV, Wedding C:  "Psychological Symptoms and Intermittent Hypertension Following Acute Microwave Exposure," Journal of Occupational Medicine  24(11): 932-934,  1982.

Forman SA, Castell DO:  "Food Intolerance and Peptic Ulcer Disease," Gastroenterology  75(1): 162,  1978.

Forman SA: "The Dynamic Interplay Between Photochemistry and Photography," Journal of Chemical Education  52(10): 629-631, Oct 1975

## ACADEMIC AFFILIATIONS

Harvard University, School of Public Health, Visiting Scientist in the Department of Environmental Health, 2007 – current.
Residency Advisory Council 2009 – current.

Yale University School of Management, annual health sector symposia 2005 – current.

University of Cincinnati, chairman of the post-graduate Occupational Medicine Advisory Committee, 1988-1990.

Samuel A. Forman, MD                                                      Curriculum vitae

Eastern Virginia Medical College, adjunct assistant professor of family
practice and community medicine, 1983-1985.

## LICENSES and CERTIFICATIONS

Licensed to practice medicine in Massachusetts, Virginia, California and
Ohio.
Board certified in Occupational Medicine.

## MEMBERSHIPS

Member, American Medical Association and Massachusetts Medical
Society
Fellow, American College of Occupational and Environmental Medicine.
Member, Massachusetts Historical Society, Boston Athenaeum,
Bostonian Society, New England Historical and Genealogical Society

## INTERESTS

General management within health related and other businesses.
Innovations, strategy and leadership in the cost effective delivery of
medical care and the maintenance of high patient functional status.
Enjoy history, writing, sculling, numismatics, antiques. Company surgeon
of the Lexington Minutemen historical reenactors.

# Depositions and Court Appearances – Most Recent Four Years
## Samuel A. Forman, MD

| Court | Case ID | Firm | Status |
|---|---|---|---|
| San Francisco County, CA  Case No. 274060. | Daniel Murphy | Paul, Hanley & Harley | **Deposed September 10, 2007,** by David Amell |
| MA Superior Court Department of the Trial Court, CA No. 06-1599. | Hebert | Coady/SEG | **Deposed October 17, 2007,** by Mr. Ben Braly |
| San Francisco County, CA Case No. 274142. | Emery | Paul, Hanley & Harley | **Deposed October 18, 2007,** by Ms. Rae Lovko |
| District Court of Harris County, TX, 11th Judicial District, No. 2007-12577. | Hall | Waters & Kraus | **Deposed December 28, 2007,** by Marc Willick |
| Los Angeles County Cause No. 360 274. | O'Neil | Waters & Kraus | **Deposed January 7, 2008,** by Mr. George Kim. **Testified at trial Feb 1, 2008.** |
| District Court of Harris County, Texas 11th Judicial Court Cause No. 2004-07960. | Price | Waters & Kraus | **Deposed January 14, 2008,** by Ms. Rhonda Bartlett |
| Superior Court of the State of California, County of San Francisco – Court of Unlimited Jurisdiction, Case No. 274248. | Russel Roberts | Paul, Hanley & Harley | **Deposed January 14, 2008,** by Ms. Carolyn Shining |
| Superior Court of the State of California, County of Los Angeles, Cause No. BC355757. | Brendel | Simon, Eddins & Greenstone | **Deposed January 16, 2008,** by Mr. Chris Panatier |
| Philadelphia Court of Common Pleas, Case No. 001063. | James S. Baccus | Waters & Kraus | **Testified at trial March 5, 2008** |
| Superior Court of the State of California, County of Los Angeles, Cause No. BC361382. | James. M. Baker | Waters & Kraus | **Deposed April 4, 2008,** by Brent Zadorozny |
| Superior Court of the State of California, County of Alameda, Unlimited Jurisdiction, No. RG-07-348526 | Arlen Fuller | Levin, Simes, Kaiser and Gornick | **Deposed April 10, 2008,** by Timothy Pearce |
| Superior Court of the State of California, County of San Francisco, No. CGC 04434604 | Cornell and Susan Janes | Waters & Kraus | **Deposed April 24, 2008,** by Scott Kruka |
| Superior Court of CA, County of San Francisco, No. CGC 04-436144 | Peter Galassi | | |

| | | | |
|---|---|---|---|
| Superior Court of the State of California, County of Los Angeles, Case No. BC 374 988. | Chief Brewer | Waters & Kraus | **Deposed May 1, 2008,** by Marc Willick. **Testified at trial May 5, 2008** |
| Superior Court of CA, County of San Francisco, Case No. 456053 | Charles and Odetta Hudiburgh | Paul and Hanley | **Deposed June 9, 2008,** by Mr. Robert Barrow |
| South Carolina case; formerly CA. | Milton and Mary Ann Duncan | Simon, Eddins & Greenstone | **Deposed June 9, 2008,** by Ms. Dana Simon |
| Richland County SC, C/A No. 2007-CP-40-02580. | Gary Lenz | Simon, Eddins & Greenstone | **Deposed June 30, 2008,** by Mr. Brad Smith |
| Judicial District at Bridgeport, CT – BA 06-5005849 | David Fortier | Simon, Eddins & Greenstone | **Deposed August 22, 2008,** by Chris Misenkothen |
| MA case, Superior Court Dept. of the Trial Court No. 07-1270. | William Taylor | Waters & Kraus | **Deposed September 18, 2008,** by Mary Keyes |
| Superior Court of the State of California, County of San Francisco, Case No. 274561 | Robert Hilt | Brayton Purcell | **Deposed October 24, 2008,** by Mr. David Backenstoe |
| Commonwealth of MA, Department of the Trial Court, Middlesex County Superior Court CA No. 05-4505 | Marinus Walraven | Coady Law Firm (Simon Eddins) | **Deposed October 28, 2008,** by Mr. Ben Braley |
| Circuit Court of Maryland for Baltimore City, Consolidated Case No. 24X07000297; Case No. 24X06000754. | Blackmon | Waters & Kraus | **Deposed November 6, 2008,** by Mr. Demetrios Zacharopoulos |
| MA case, Superior Court Dept. of the Trial Court No. 07-1270. | Arlen Kiper | Baron & Budd | **Deposed January 2, 2009,** by Mr. Jeffrey O'Connell |
| Superior Court of the State of California, County of Los Angeles. Case No. BC 388 972. | Wayne Handley | Waters & Kraus | **Deposed January 22, 2009,** by Mr. Marc Willick |
| Superior Court of the State of California, County of Los Angeles | Dennis Woodard | Waters, Kraus and Paul | **Testified at trial January 26, 2009.** Cross examination by Mr. Paul |
| Superior Court of the State of California, County of Los Angeles. Case No. BC 390398 | Cundiff | Waters, Kraus and Paul | **Deposed February 17, 2009,** by Mr. Brent Zadorozny |
| Commonwealth of Massachusetts for Middlesex County, Depart. of the Trial Court – CA No. 07-2925MA. | Slattery | Belluck & Fox | **Deposed February 24, 2009,** by Mr. Thomas Hart |

| | | | |
|---|---|---|---|
| Superior Court of the State of California, County of Alameda.  Case No. RG 08404667. | Denton Crull | Paul and Hanley | **Deposed March 5, 2009,** by Mr. Robert Barrow |
| Circuit Court of the 7th Judicial Circuit, Volusia County, Florida Case No. 2007-32098 CICI | Willie C. Flynt | Simon Eddins Greenstone | **Deposed March 25, 2009,** by Mr. Clay Carroll |
| Circuit Court for the City of Newport News, Virginia: at Law No. CL0800724 PT. | Gerald P. Gray | Patten, Wornom, Hatten & Diamonstein | **Deposed April 27, 2009,** by Mr. Hatten |
| Superior Court of the State of California, County of Alameda.  Case No. RG 08404667 | Cheek | Waters, Kraus & Paul | **Deposed June 5, 2009,** by Mr. Dmitri Nichols |
| Superior Court of the State of California, County of San Francisco.  Case No. CGC 07-274401. | Van Hoy | Waters, Kraus & Paul | **Deposed June 12, 2009,** by Mr. Ken Lee |
| Superior Court of the State of California, County of Los Angeles.  Case No. BC 401422 | Niebauer | Waters, Kraus and Paul | **Deposed June 16, 2009,** by Mr. Ari Friedman |
| Superior Court of the State of California, County of Los Angeles.  Case No. BC397242 | Lopez | Simon Eddins Greenstone | **Deposed August 21, 2009,** by Mr. Charles Soechting |
| Circuit Court for the City of Richmond, Virginia, Case No. CL08-2360-1. | Brunson | Simon Eddins Greenstone | **Deposed September 9, 2009,** by Ms Dana Simon |
| Superior Court of the State of California, County of San Francisco – Asbestos 274749. | John O. Robertson | Brayton Purcell | **Deposed October 9, 2009,** by Mr. John Goldstein |
| Superior Court of the State of California, County of Los Angeles.  Case No. BC 381 085. | Earl Miller | Waters, Kraus and Paul | **Deposed October 15, 2009,** by Ms. Jillian Rice |
| State of California Superior Court, County of Los Angeles.  Case No. BC 390 954. | Goebel | Waters, Kraus and Paul | **Deposed October 15, 2009,** by Mr. Ari Friedman |
| State of California Superior Court, , County of Los Angeles – Court of Unlimited Jurisdiction, Case No. BC 403754. | Robert Pryor | Paul and Hanley | **Deposed October 23, 2009,** by Mr. Mark Swanson |
| Superior Court of the State of Delaware, New castle County. C.A. No. 08C-09-085 ASB. | George Luper | Simmons Firm | **Deposed November 3, 2009,** by Mr. William Kohlburn |

| Court of the State of New York, Onandaga County – Index No. 7224/2008. | James Avery | Belluck & Fox | **Testified at Trial November 30, 2009.** Cross by Mr. Thomas Hart |
|---|---|---|---|
| Superior Court of the State of California, County of San Francisco – No. 274733. | Bruce Mock | Paul and Hanley | **Deposed January 13, 2010,** by Mr. Rohit Kodical |
| Superior Court of the State of California, County of Los Angeles – Case No. 419624 | Charles Duncan | Waters & Kraus | **Deposed March 9, 2010,** by Mr. Charles Brown |
| Superior Court of the State of California, San Francisco County - Case No. 25284 | John Ayer | Keller, Fishback & Jackson | **Deposed March 18, 2010,** by Mr. Douglas Duklow |
| Commonwealth of Massachusetts, Middlesex Co. Superior Court, Dept. of the Trial Court. Case No. 07-3804 and 08-0152 | Daniel Jacoby | Simon Eddins Greenstone | **Deposed April 20, 2010,** by Ms. Laura Cabutto |
| US District Court for the eastern District of Pennsylvania for trial in Massachusetts, C.A. MDL 875, EDPA File No. 2:09-CV-62577-ER | Eldon C. Keener | Early Ludwig | **Deposed April 29, 2010,** by Mr. Chris Misenkothen |
| Judicial District of Fairfield County, Bridgeport, Connecticut. Bridgeport Asbestos Litigation BA 03-0405399S | Thomas R. Pantalone | | |
| U.S. District Court for the Eastern District of Pennsylvania, MDL Docket No. 875; EDPA Civil Action No. 2:09-cv-67099-ER | Robert Conner | Waters & Kraus | **Deposed May 17, 2010,** by Mr. Brent Zadorozny |
| District Court of Harris County, 11th Judicial District, Dallas County, Texas, before Asbestos MDL Pre-Trial Judge, No. 2009-26210-ASB | James Bludworth | Baron & Budd | **Deposed May 29, 2010,** by Mr. Chris Norris |
| Circuit Court for Richmond, Virginia. Case No. 760-CL07-001771-00 | John Brunson | Simon Eddins Greenstone | **Deposed June 11, 2010,** by Ms. Laura Cabutto |
| Circuit Court for Portsmouth, Virginia. Case No. L-08-1026 | William Bussey | Simon Eddins Greenstone | **Deposed June 11, 2010,** by Ms. Laura Cabutto |

| | | | |
|---|---|---|---|
| Superior Court of the State of California, County of Los Angeles – Case No. BC 421405 | Henry Orozco | Simon Eddins Greenstone | **Deposed July 15, 2010,** by Mr. Ben Braley |
| State of Illinois, County of Grundy, in the Circuit Court of the Thirteenth Judicial Circuit of Illinois, Case No. 08 L 62 | Terry Carkhuff | Simon Eddins Greenstone | **Deposed September 16, 2010,** by Ms. Kathryn Pryor |
| Superior Court of the State of California, County of Los Angeles – Case No. BC 380390 | Robert Austin | Brayton Purcell | **Deposed September 17, 2010,** by Mr. Gary Brayton |
| Superior Court of the State of California, County of San Francisco – Case No. 274439 | James Baragar | Brayton Purcell | **Deposed September 23, 2010,** by Ms. Jennifer Alesio |
| Commonwealth of Massachusetts, Middlesex Co. Superior Court, C.A. No. 07-1659 | Donald A. MacLean | Simon Eddins Greenstone | **Deposed November 22, 2010,** by Ms. Kathryn Pryor |
| Commonwealth of Massachusetts, Middlesex Co. Superior Court, Dept. of the Trial Court. C.A. No. 07-4424 | William A. O'Connell | | |
| Superior Court of New Jersey Law Division Middlesex County, Docket No. L10117-09AS | Lawrence Sparta | Weitz Luxenberg | **Deposed January 25, 2011,** by Mr. Jerry Kristal |
| Superior Court of New Jersey Law Division Middlesex County, Docket No. L10369-09AS | Gennaro Russano | | |
| U.S. District Court for the Eastern District of Pennsylvania, MDL Docket No. 875; EDPA Civil Action No. 2:09-cv-91449-ER | Hiram C. Peavy | Waters & Kraus | **Deposed February 4, 2011,** by Mr. Scott Kruka |
| U.S. District Court for the Eastern District of Pennsylvania, MDL Docket No. 875; EDPA Civil Action No. 2:10-cv-67411 and 67442 ER | William S. Hays | Buck Law Firm | **Deposed February 14, 2011,** by Mr. Robert C. Buck |
| Superior Court of the State of California, County of San Francisco – Case CGC-08-274858 | Robert Morgan | Brayton Purcell | **Deposed February 24, 2011,** by Ms. Kimberly Chu |
| U.S. District Court for the Eastern District of Pennsylvania, MDL 875, Civil Action No. 2:10-cv-67442 | Curry | Simon Eddins Greenstone | **Deposed March 24, 2011, by** Mr. Ben Braley |

| | | | |
|---|---|---|---|
| Superior Court of the State of California, County of Los Angeles – Case No. BC 441029 | Morrison | Lanier | **Deposed April 6, 2011,** by Mr. Ari Friedman. **Testified at trial, May 3-4, 2011**. Cross by Mr. Trey Jones. |
| Superior Court of the State of California, County of San Diego – No. 31-2010-00104112 CU AS CTL | William Mansir | Waters & Kraus | **Deposed May 19, 2011,** by Mr. David Bricker |
| Supreme Court of the State of New York, County of New York, New York City Asbestos Litigation Index No. 190196 / 2010 | Ronald Dummit | Belluck & Fox | **Testified at Trial August 5, 2011.** Cross by Mr. Jordan Fox |

Court Appearances: 2008 (3); 2009 (2); 2010 (0); 2011YTD (2)
Depositions: 58
Depositions in past four years, by year: 2007 (4); 2008 (16), 2009 (17), 2010 (14), 2011YTD (7)

9/02/2011 saf